IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DENNIS DANNER, *et al.*,           *

            Plaintiffs,         *

v.                            *

                               Civil Action No.:      RDB-09-3139

INTERNATIONAL FREIGHT SYSTEMS  *
OF WASHINGTON, LLC, *et al*.,

                               *

           Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiffs Dennis Danner, his son Alex Danner, and his son-in-law Michael Coletta (collectively, "Plaintiffs") bring this action against, *inter alia*, Defendants Cargolux Airlines International S.A. d/b/a Cargolux Airlines International, Inc. ("Cargolux") and its ground handling agent, Cargo Airport Services USA, Inc. ("Cargo Airport") (collectively, "Defendants"), for alleged negligence and breach of duty and contract regarding the temporary loss of two crates containing lion skins and skulls acquired during Plaintiffs' hunting trip in South Africa. Plaintiffs bring suit in this Court based on diversity of citizenship. *See* 28 U.S.C. § 1332. Pending before this Court is Cargolux and Cargo Airport's Motion to Dismiss Plaintiffs' Amended Complaint (Paper No. 14). Defendants' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons stated below, Defendants' Motion to Dismiss (Paper No.14) is DENIED.

## BACKGROUND

In ruling on a motion to dismiss, the factual allegations in the plaintiff's complaint must be accepted as true and all reasonable factual inferences must be drawn in the plaintiff's favor. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). All three plaintiffs, Dennis

1

Danner, his son Alex Danner, and his son-in-law Michael Coletta, reside in Highland, Maryland.

Am. Compl. ¶¶ 1-3. In June, 2007, they traveled to South Africa on a safari hunting trip, where

each killed a "trophy quality" lion. *Id*. ¶ 9. The lions were subsequently skinned, salted, and

packed in two crates in preparation for transport. *Id.* Plaintiffs hired Defendant Cargolux in

November, 2007 to transport the two crates from Port Elizabeth, South Africa to Seattle,

Washington, and hired Defendant International Freight Systems of Washington, LLC

("International Freight"), a freight forwarder and customs broker, to transport the crates from

Seattle to Acheson Taxidermy in Butte, Montana. *Id.* ¶¶ 10, 12.[1]

The two crates arrived in Seattle on November 23, 2007. *Id*. ¶ 11. On November 28, 2007,

the United States Department of Homeland Security and the U.S. Fish and Wildlife Service cleared

the crates through customs. *Id.* ¶ 12. It appears that Defendant Cargo Airport, Cargolux's cargo

handler, transported the crates from the Seattle airport to Cargolux's warehouse that same day. *Id.*

¶ 11; Compl. Ex. 3. On November 30, 2007, International Freight contracted for Even Rock, Inc.

d/b/a Seattle Air Cargo, a cartage company, to deliver the crates from the Cargolux warehouse to

Acheson Taxidermy. *Id.* ¶ 13; Paper No. 19.

Plaintiffs allege that Seattle Air Cargo signed for the crates' release from Cargolux's

warehouse and thereby accepted delivery of the crates via Cargo Airport on November 30, 2007.

Am. Compl. ¶ 13; Compl. Ex. 3. Plaintiffs also allege that none of the Defendants could account

for the location of the two crates after November 11, 2007.[2] *Id*. ¶ 16. The crates were found over

six months later in Vancouver, British Columbia, a point along one of Cargolux's trucking routes.

---

[1] International Freight entered Answers to Plaintiffs' Amended Complaint (Paper Nos. 12, 13) and to Cargolux and Cargo Airport's Crossclaim (Paper No. 16), but it has not joined in the present Motion.

[2] Plaintiffs do not explain the significance of the November 11 date or what prompted Defendants to allegedly lose track of the two crates after that point.

*Id.* ¶ 16.  Plaintiffs allege that Cargolux and Cargo Airport were responsible for the crates'

mistakenly being transported to British Columbia, rather than to Montana.  *Id.* ¶ 16; Pl.'s Opp. at 4.

In September, 2008, Canadian Customs returned the crates to Cargolux's warehouse in

Washington, at which point Plaintiffs were notified of the crates' whereabouts.  *Id.* ¶ 17.  Plaintiffs

allege that Cargolux refused to release the crates to Plaintiffs for a period of time because of

"pending notices of claim[s]" against Cargolux and Cargo Airport.  *Id.* ¶¶ 17-18.  On or about

September 10, 2008, Conway Trucking delivered the crates to their original destination, Acheson

Taxidermy, in Montana.[3]  *Id.*  After the lion skins arrived there, a tanning company determined that

the skins had a buildup of moisture and bacteria, which had caused the skin hair to "slip," damaging

the lion skins nearly beyond repair.  *Id.* ¶ 19.

Plaintiffs filed their original Complaint on November 23, 2009, and filed their Amended

Complaint on December 18, 2009.  Plaintiffs bring claims for breach of contract and negligence

against Defendants International Freight and Cargolux and breach of duty and negligence against

Defendants Seattle Air Cargo and Cargo Airport.[4]  Plaintiffs demand a total judgment in the amount

of $111,820.00.  On February 12, 2010, Defendants Cargolux and Cargo Airport filed the instant

Motion to Dismiss.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain

statement of the claim showing that the pleader is entitled to relief."  Rule 12(b)(6) of the Federal

Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon

---

[3] There is no indication whether Cargolux hired Conway Trucking at the Plaintiffs' request or on its own initiative.

[4] Defendant Seattle Air Cargo was dismissed from this case for lack of personal jurisdiction on June 15, 2010.  *See* Paper No. 37.

which relief can be granted, and a Rule 12(b)(6) motion therefore tests the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action" in order to survive a motion to dismiss. *Id.* at 555. Thus, a court considering a motion to dismiss "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Well-pleaded factual allegations contained in the complaint are assumed to be true "even if [they are] doubtful in fact," but legal conclusions are not entitled to judicial deference. *See Twombly*, 550 U.S. at 570 (stating that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'" (citations omitted)). Thus, even though Rule 8(a)(2) "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950.

To survive a Rule 12(b)(6) motion, the legal framework of the complaint must be supported by factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Supreme Court has explained recently that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal*, 129 S. Ct. at 1949. The plausibility standard requires that the pleader show more than a sheer possibility of success, although it does not impose a "probability requirement." *Twombly*, 550 U.S. at 556. Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

4

alleged." *Iqbal*, 129 S. Ct. at 1937; *see also Arista Records LLC v. Doe*, 604 F.3d 110, 120-21 (2d Cir. 2010) (noting that while *Twombly* and *Iqbal* "require factual amplification [where] needed to render a claim plausible" the cases do not "require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible") (internal quotations omitted). Thus, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Id.*

## DISCUSSION

## I.      Applicability of the Montreal Convention

Defendants argue that the Montreal Convention, which governs international airline liability, applies in this case and completely preempts Plaintiffs' state law breach of contract and negligence claims. Plaintiffs argue that the Montreal Convention does not apply because Defendants' alleged misconduct did not happen during "international carriage" or "carriage by air" as the terms are defined in the Convention.

### A.      Montreal Convention Background

The Convention for the Unification of Certain Rules for International Carriage by Air was signed on May 28, 1999 and is known as the Montreal Convention. *See* S. Treaty Doc. No. 106-45 (2000). The Montreal Convention supersedes the Convention for the Unification of Certain Rules Relating to International Transportation by Air, which was signed on October 12, 1929 and is known as the Warsaw Convention. *See* 49 Stat. 3000, T. S. No. 876 (1934), 49 U.S.C. § 40105 (2008). Although there is relatively little case law interpreting the Montreal Convention's, there are a substantial number of cases interpreting similar provisions in the Warsaw Convention. *See, e.g.*, *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 175 (1999); *Karfunkel v. Compagnie Nationale Air France*, 427 F. Supp. 971, 977 (S.D.N.Y. 1977). In the past, this Court has looked to cases

5

analyzing the Warsaw Convention to supplement the existing case law on the Montreal Convention. *Knowlton v. Am. Airlines, Inc.*, No. 06-854, 2007 WL 273794, at *4 (D. Md. Jan. 31, 2007) (citation omitted).

The Warsaw Convention was drafted during the airline industry's early years to give a measure of uniformity to claims resulting from international air travel. *See O'Gray Import & Export v. British Airways PLC*, No. 06-1020, 2007 WL 1378391, at *3 (D. Md. May 4, 2007). The Montreal Convention contains many of the same clauses as its predecessor and was created primarily to unify the disjointed "hodgepodge" of provisions in the Warsaw Convention. *Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 371 n.4 (2d Cir. 2004). In contrast to the Warsaw Convention, however, the Montreal Convention shows "increased concern for the rights of passengers and shippers" and is less favorable to airlines in general. *Knowlton*, No. 06-854, 2007 WL 273794, at *4.

### B.    "International Carriage"

The Montreal Convention applies to all international carriage of cargo, baggage, and passengers done for hire. Montreal Convention, art. 1(2). Plaintiffs argue as a threshold issue that Defendants' alleged misconduct did not occur during "international carriage" and therefore the Convention is inapplicable. The Montreal Convention defines international carriage as carriage originating and terminating in countries that are a party to the treaty. Montreal Convention, art. 1(2). Whether a particular flight constitutes international carriage is determined solely by reference to the "agreement between the parties." Montreal Convention, Art. 1(2); *see e.g. Karfunkel v. Compagnie Nationale Air France*, 427 F. Supp. 971, 977 (S.D.N.Y. 1977) (interpreting similar language in the Warsaw Convention). In this case, this Court may take judicial notice that the crates' departure and destination points listed on the Air Waybill are cities located in South Africa

and the United States, both of which are parties to the Montreal Convention. *See* U.S. Department of State, Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2010, *available at*: http://www.state.gov/documents/organization/143863.pdf (last visited July 23, 2010). Although the cargo was ultimately found in Vancouver, British Columbia, the Montreal Convention explains that international carriage includes all segments of an international journey contained in the agreement or contract between the parties, "whether or not there be a break in the carriage or a transshipment." *Id.* Thus, it appears that the alleged misconduct meets the definition of "international carriage."

Plaintiffs nonetheless argue that because the destination city listed on Cargolux's Air Waybill is Seattle, Washington, and not Vancouver, British Columbia, where the cargo was eventually located, Defendants' alleged misconduct did not happen during international carriage. Though Plaintiffs' argument on this point is not entirely clear, Plaintiffs emphasize the following language from the Montreal Convention in support of their claim: "Carriage between two points within the territory of a single State Party without an agreed stopping place within the territory of another State is not international carriage for the purposes of this Convention." Montreal Convention art. 1(2). Plaintiffs appear to misinterpret this language. To phrase the Convention's language another way, "transportation between two points in the same state without the 'agreed stopping place in the territory of another State' is not international carriage." *Gustafson v. Am. Airlines, Inc.*, 658 F. Supp. 2d 276, 284 (D. Mass. 2009) (quoting the Montreal Convention, art. 1(2)). Since Plaintiffs do not allege that the damage to the crates containing the lion skins happened during transportation within one country, but instead happened at some point after the crates left Seattle and before they arrived in Vancouver, this language is not at all applicable to the situation at bar. Thus, the fact that the Waybill does not list Vancouver as the destination city has no effect on

whether the Montreal Convention applies in this case.  Accordingly, since Defendants' purported

misconduct appears to have happened during "international carriage," this Court must next

determine whether it also happened during "carriage by air."

## C. "Carriage By Air"

The Montreal Convention applies to "damage sustained in the event of the destruction or

loss of, or damage to, cargo upon condition only that the event which caused the damage so

sustained took place during the carriage by air." Montreal Convention, art. 18.  Plaintiffs claim that

the Montreal Convention does not apply because the damage to the lion skins did not occur during

"carriage by air."  The Montreal Convention defines carriage by air as the "period during which the

cargo is in the charge of the carrier."  Montreal Convention, art. 18(3).  Typically, the carriage by

air period does not extend to ground transportation of cargo that occurs off the airport premises.  If

ground transportation of cargo occurs pursuant to a contract for carriage by air, however, "damage

is presumed, subject to proof to the contrary, to have been the result of an event which took place

during the carriage by air." *Id.* art. 18(4).  Thus, an air waybill functions as an agreement or

contract between parties, and the length of the period of presumptive "carriage by air" typically

depends on the language in the air waybill. When an air waybill provides for door-to-door delivery

from a foreign country to a recipient's premises in the United States, the period of carriage by air

generally lasts until the recipient receives the goods.  In those instances, the waybill contains

provisions for the *entire* contract of carriage, which generally includes both air and land

transportation. *See Jaycees Patou, Inc. v. Pier Air Int'l, Ltd.*, 714 F. Supp. 81, 84 (S.D.N.Y. 1989)

(quoting *Magnus Electronics, Inc. v. Royal Bank of Canada*, 611 F. Supp. 436, 440 (N.D. Ill.

1985)).  Accordingly, "[s]o long as the goods remain in the air carrier's actual or constructive

possession pursuant to the terms of the carriage contract, the period of 'transportation by air' does not end." *Jaycees Patou*, 714 F. Supp. at 84.

Sometimes, though, an air waybill only provides for transportation from one airport to another and contains no provisions regarding land transportation. The period of carriage by air in such cases generally ends *before* delivery to the recipient is effectuated. More specifically, proof that the carrier "has entrusted the delivery of goods to a trucker or other independent agency may be sufficient" to end the period of carriage by air, especially if that agency was not party to the original carriage contract. *Victoria Sales Corp. v. Emery Air Freight, Inc.*, 917 F.2d 705, 710 (2d Cir. 1990); *see also R.R. Salvage of Conn. V. Japan Freight Consolidators*, 556 F. Supp. 124 (E.D.N.Y. 1983), *aff'd* 779 F.2d 38 (2d Cir. 1985) (holding that the loss of cargo, which occurred *after* the goods were released from a freight forwarder to a trucking company, did not occur during "transportation by air"). In summary, whether the period of carriage by air lasts until the goods in question are delivered to the recipient or terminates at an earlier point depends upon the cities of departure and destination listed in the waybill and any other provisions for transportation noted in the waybill itself.

In this case, the Waybill lists the airport of departure as Port Elizabeth, and the destination airport as Seattle. Am. Compl. Ex. 3. The record is unclear, however, regarding the whereabouts of the skins and who possessed them after they were cleared through Customs on November 28, 2007. Thus, in order to determine whether the damage to the crates happened during "carriage by air," this Court must make factual findings regarding the many facts that are in dispute. For example, both Seattle Air Cargo and International Freight deny taking possession of the skins after they cleared customs on November 30, 2007. Cargolux and Cargo Airport also deny any misconduct on their parts but do not offer an explanation regarding how the crates were transported

from Seattle to Vancouver.  Because of these factual disputes, it is impossible to determine at this point whether the damage to the lion skins occurred while the skins were in the charge of Defendants Cargolux and Cargo Airport and thus during the presumptive period of "carriage by air." Accordingly, this Court cannot make a finding at this time regarding whether the alleged misconduct happened during "carriage by air," and must await discovery to determine whether the Montreal Convention applies and preempts Plaintiffs' claims against Defendants.

**II:     Terms of Cargolux's Air Waybill and Notice Requirements**

Defendants allege that even if the Montreal Convention does not apply to this case, Plaintiffs' claims are nonetheless barred by the notice provisions in Cargolux's Air Waybill ("Waybill").  Although the Montreal Convention draws distinctions between air and ground transport and limits the period of "carriage by air," the Waybill states that a carrier is liable for goods "during the period they are in its charge or the charge of its agent." Paper No. 14, Exhibit 1 ¶ 9 ("Waybill"). Thus, this contention, however, depends upon the same factual dispute referenced above.  Accordingly, a factual issue remains with respect to whether the crates were damaged while they were "in the charge of" Cargolux or Cargo Airport.

**CONCLUSION**

For the reasons explained above, Defendants Cargolux and Cargo Airport's Motion to Dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (Paper No. 14) is DENIED.

Dated: August 20, 2010                                    /s/_____

                                                                              Richard D. Bennett
                                                                              United States District Judge