IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DENNIS DANNER, *et al.*,

    *Plaintiffs*,

    v.

INTERNATIONAL FREIGHT SYSTEMS
OF WASHINGTON, LLC, *et al.*,

    *Defendants*.

Civil Action No. ELH-09-3139

**MEMORANDUM OPINION**

Dennis Danner; his son, Alexander Danner; and his son-in-law, Michael Coletta, plaintiffs, went on a hunting trip in South Africa in June 2007, during which each plaintiff killed a "trophy quality" lion.[1]   The lion skins and skulls (the "Lion Trophies" or the "Cargo") were shipped to the United States, but at some point were lost in transit.   The Cargo was located many months later, in a warehouse in Vancouver, Canada.   By that time, two of the Lion Trophies allegedly had suffered irreparable damage due to buildup of moisture and bacteria.

As a result, plaintiffs filed suit against International Freight Systems of WA, LLC ("International Freight"), a customs broker and freight forwarder; Cargolux Airlines International S.A. d/b/a Cargolux Airlines International, Inc. ("Cargolux"), an all-cargo air carrier; Cargo Airport Services USA, Inc. ("CAS"), Cargolux's ground handling agent in Seattle (CAS and Cargolux are collectively referred to as the "Cargolux Defendants"); and Even Rock, Inc. d/b/a Seattle Air Cargo ("Even-Rock"),[2] defendants, to recover for damages allegedly sustained as a result of the loss of the Cargo.   International Freight and the Cargolux Defendants

---

[1] To distinguish father and son, I will generally refer to Dennis Danner as Mr. Danner and to Alexander Danner by his nickname, Alex.

[2] Even-Rock is a Seattle-based warehousing company.   The parties usually refer to Even-Rock as "SAC."   In order to avoid confusion with CAS, however, I will refer to the company as Even-Rock.

filed cross-claims against each other and against Even-Rock, seeking indemnity or contribution in the event that liability is established. *See* ECF 13, 16. Even-Rock is no longer a party; in an earlier ruling (ECF 36 & 37), Judge Richard D. Bennett granted Even-Rock's motion to dismiss the claims against it for lack of personal jurisdiction.[3]

The remaining parties have filed cross-motions for summary judgment.[4] In particular, International Freight has filed a motion for summary judgment (ECF 53), the Cargolux Defendants have filed a motion for summary judgment (ECF 54), and plaintiffs have filed combined oppositions and cross-motions for summary judgment (ECF 56 & 56). The motions have been fully briefed,[5] and no hearing is necessary to resolve them. *See* Local Rule 105.6. For

---

[3] The case was reassigned to me on January 14, 2011.

[4] The Cargolux Defendants previously moved to dismiss based on an assertion that the claims against them were barred by the Montreal Convention (also known as the Convention for the Unification of Certain Rules for International Carriage by Air, *see* S. Treaty Doc. No. 106-45 (2000)), which governs international airline liability and is the successor to the earlier Warsaw Convention (also known as the Convention for the Unification of Certain Rules Relating to International Transportation by Air, *see* 49 Stat. 3000, T. S. No. 876 (1934), 49 U.S.C. § 40105). *See* ECF 14. Judge Bennett denied the motion (ECF 42 & 43). The Cargolux Defendants have not reasserted their Montreal Convention defense.

[5] In connection with International Freight's summary judgment motion, I have considered International Freight's supporting memorandum (ECF 53-1) (collectively with the motion, "IF Motion"); plaintiffs' combined memorandum in opposition to International Freight and cross-motion for summary judgment (ECF 56-1) ("Danner-IF Motion"); International Freight's combined reply and opposition to plaintiffs' cross-motion ("IF Opp.") (ECF 58); and plaintiffs' reply ("Danner-IF Reply") (ECF 63).

With respect to the Cargolux Defendants' summary judgment motion, I have considered the Cargolux Defendants' supporting memorandum (ECF 54-1) (collectively with the motion, "Cargolux Motion"); plaintiffs' combined memorandum in opposition to the Cargolux Defendants and cross-motion for summary judgment (ECF 55-1) ("Danner-Cargolux Motion"); the Cargolux Defendants' combined reply and opposition ("Cargolux Opp.") (ECF 60); and plaintiffs' reply ("Danner-Cargolux Reply") (ECF 62). In the Danner-Cargolux Reply, plaintiffs included further argument with respect to the Cargolux Motion, as well as reply argument in support of the Danner-Cargolux Motion—in essence, the submission was both a reply and a surreply. Pursuant to Local Rule 105.2(a), plaintiffs also filed a motion for leave to file their surreply (ECF 61), which the Cargolux Defendants opposed (ECF 65). Plaintiffs' motion for leave to file a surreply will be granted, so as to permit plaintiffs to address the case of *In re*

the reasons that follow, I will grant International Freight's motion for summary judgment and deny plaintiffs' cross-motion.  As to the Cargolux Defendants, I will deny both their motion and plaintiffs' cross-motion.

### Background[6]

In June 2007, plaintiffs participated in a two-week hunting safari at a private game reserve in South Africa, operated by Tam Safaris, a South African business.  *See* Cargolux Motion at 2; IF Motion at 2; Danner-Cargolux Motion at 1.  During the safari, each of the plaintiffs shot and killed a "trophy quality," full-maned, male lion, as well as other game.  *See* Cargolux Motion at 2; IF Motion at 2; Danner-Cargolux Motion at 1.  Mr. Danner paid all of the expenses of the trip, including airfare and accommodations for himself, his son, and his son-in-law; a $35,000 trophy fee for each lion;[7] and other costs related to the hunt.  Danner-Cargolux Motion at 1; IF Motion at 3.  The three lions were skinned and "salted and dipped" in South Africa, in preparation for shipment by air to Seattle, Washington and subsequent transport to a

---

*Korean Air Lines Co.*, 642 F.3d 685 (9th Cir. 2011), which the Cargolux Defendants did not cite until their reply.

In addition, the Cargolux Defendants filed a "Motion to Strike" (ECF 59), seeking to exclude from consideration various statements made by Mr. Danner in an affidavit submitted in support of the Danner-Cargolux Motion, as well as two exhibits to Mr. Danner's affidavit, on the grounds that the evidence is inadmissible hearsay, improper lay opinion testimony, and lacks foundation.  Plaintiffs opposed the motion (ECF 64), and the Cargolux Defendants replied (ECF 66).  I will deny the motion to strike.  However, in my discussion, I will consider the parties' arguments made in connection with the motion to strike as they relate to the adequacy of plaintiffs' evidence to support and/or oppose summary judgment and, of course, will not consider the evidence to the extent that it is inadmissible.  *See* Fed. R. Civ. P. 56(c)(2) (permitting a party at the summary-judgment stage to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence").

[6] The facts set forth in the "Background" section are undisputed, unless otherwise noted.

[7] According to Mr. Danner's deposition testimony, a trophy fee is payable if a hunter "draws blood" from an animal, regardless of whether the hunter kills the animal or whether it is kept as a trophy.  *See* IF Motion at 2 (citing deposition).  It is not clear whether the trophy fees were paid in U.S. dollars ("$" or "USD"), or in South African rand ("R" or "ZAR"); in any event, each fee was approximately $35,000.

taxidermist in Butte, Montana.  *See* Danner-Cargolux Motion at 1; Cargolux Motion at 2.

On or about July 24, 2007, the Lion Trophies were packed into two crates, along with other trophies of plaintiffs' hunt.  One of the crates contained one lion pelt and one skull, along with the skulls, horns, and skins of a wildebeest and a springbuck.  Coletta was listed as the "client" with respect to this crate, and it was marked with his name.  Alex was listed as the "client" as to the second crate, which was marked with his name.  That crate contained the other two lion pelts and skulls, along with the skulls, horns, and skins of two blesbucks, a rhebok, a nyala, a caracal, and a fallow deer.  *See* South African Professional Hunting Registers & Trophy Export Applications ##29156 & 29157, Ex.A to Aff. of Joseph Moine at 12-13, Ex.G to IF Motion (ECF 53-9); Danner-Cargolux Motion at 2.[8]

Plaintiffs hired Rex Freight Forwarders ("Rex"), a South African business entity that is not a party to this case, to arrange for shipment of the Lion Trophies to the United States.  *See* Danner-Cargolux Motion at 2; IF Motion at 3; Cargolux Motion at 2.  The process of clearing the Cargo for export from South Africa with various South African agencies apparently took several months.  *See generally* Ex.A to Aff. of Joseph Moine at 9-19, Ex.G to IF Motion (ECF 53-9).[9] At his deposition, Mr. Danner recounted that he instructed Rex to insure the shipment for "at least the cost of the trip."  Dep. of Dennis Danner at 142, Ex.C to Cargolux Motion (ECF 54-4). Rex obtained a "Marine Certificate of Insurance" for each crate from an insurer, Santam Limited, by which the crates were insured against "risk" during a "voyage," defined as "Port Elizabeth via Johannesburg / Luxembourg via Seattle to final destination in the United States of America."

---

[8] Although the first crate was labeled with Coletta's name, Dennis Danner's lion skin was the one that was packed in that crate.  Coletta's lion skin and Alex's lion skin were both packed in the crate marked with Alex's name.  Affidavit of Dennis Danner ¶ 13, Ex.1 to Danner-Cargolux Motion (ECF 55-3).

[9] It is not entirely clear from the record during what part of this process Tam Safaris was responsible for the Cargo, and at what point Rex assumed responsibility.

Certificates of Insurance, Ex.A to Aff. of Joseph Moine at 21-22.  Coletta's crate was insured for ZAR 120,000, and Alex's crate was insured for ZAR 240,000.[10]  *Id.*

Rex hired Cargolux to transport the Cargo to the United States.  *See* Cargolux Air Waybill, Ex.1 to Decl. of Joseph M. Joyce, Ex.D to Cargolux Motion (ECF 54-5).  The Air Waybill for the flight listed Rex as the "shipper."  International Freight, which was hired by plaintiffs as their United States customs agent and freight forwarder, was listed as the "consignee."  *Id.*  The Cargo was described as two crates containing "consolidated cargo of dip & pack trophies," with a "gross weight" of 114 kilograms.  *Id.*  The following text appears in the front, upper right corner of the Air Waybill, *id.*:

> It is agreed that the goods described herein are accepted in apparent good order and condition (except as noted) for carriage SUBJECT TO THE CONDITIONS OF CONTRACT ON THE REVERSE HEREOF. . . .  THE SHIPPER'S ATTENTION IS DRAWN TO THE NOTICE CONCERNING CARRIER'S LIMITATION OF LIABILITY.  Shipper may increase such limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required.

The reverse side of the Air Waybill contained a "Notice Concerning Carriers' [sic] Limitation of Liability," which stated that the "Warsaw Convention may be applicable" and that the Warsaw Convention "in most cases limits the liability of the carrier in respect of loss, damage or delay to cargo" to certain amounts.  *Id.* (capitalization altered).  The reverse side of the Air Waybill also contained several "Conditions of Contract," including provisions purporting to limit the carrier's liability for lost or damaged cargo both in circumstances in which the Warsaw Convention applied, as well as those in which the convention was inapplicable.  *Id.*[11]

---

[10] As we shall see, those amounts were significantly less than the cost of plaintiffs' trip.

[11] In their motion for summary judgment, the Cargolux Defendants do not rely on the Air Waybill's liability-limiting provisions.  Accordingly, I have not considered them.

On the front of the Air Waybill, Rex listed the "Declared Value for Carriage" as "NDV," (*i.e.*, no declared value). *Id.* The Air Waybill also contained a blank for the shipper to indicate the "Amount of Insurance," accompanied by the following instruction: "INSURANCE – If carrier offers insurance, and such insurance is requested in accordance with the conditions thereof, indicate amount to be insured in figures in box marked 'Amount of Insurance'." *Id.* Rex listed the amount of insurance as "NIL." *Id.*

In November 2007, Cargolux transported the Cargo by air from Johannesburg, South Africa to Seattle, Washington. It arrived at Seattle-Tacoma International Airport ("SEA") on or about November 23, 2007. While the Cargo was awaiting clearance by United States Customs and other federal agencies for formal entry into the United States, it was placed in a bonded warehouse operated by CAS,[12] the handling company and ground handling agent for Cargolux in Seattle.[13] *See* IF Motion at 3; Danner-Cargolux Motion at 2; Cargolux Motion at 2; Decl. of Roxana Alvarado ¶ 4, Ex.B to Cargolux Motion (ECF 54-3).

The parties agree that International Freight was hired by plaintiffs, upon referral from Atcheson Taxidermy (their taxidermist in Butte, Montana), to act as plaintiffs' customs broker

---

[12] A bonded warehouse is used "for the storage of imported merchandise," pending payment of customs duties. 19 U.S.C. § 1555(a). "While the goods are in bonded warehouses they are in the joint custody of the United States Customs Service and the warehouse proprietor and under the continuous control and supervision of the local customs officers. Detailed [federal] regulations control every aspect of the manner in which the warehouses are to be operated." *Xerox Corp. v. Harris County*, 459 U.S. 145, 150 (1982) (internal citations omitted).

[13] In ¶ 5 of her "Declaration," Ex.B to Cargolux Motion (ECF 54-3), Roxana Alvarado, CAS's "Office Supervisor," described CAS's role as a cargo handling company and ground handling agent:

> For incoming cargo, a ramp handling company removes cargo from arriving aircraft and delivers the cargo, which is on pallets, to CAS at its warehouse at SEA. CAS separates and checks the cargo against lists provided by the airline, stores the cargo in its warehouse and, after the cargo has been cleared by government agencies, releases it to consignees and their designated trucking companies, who accept delivery of the cargo at the warehouse's loading dock. CAS also handles outgoing cargo at SEA.

and freight forwarder.  *See* Danner-IF Motion at 2; IF Reply at 2.  The roles of a customs broker and a freight forwarder are distinct, although International Freight performed both functions on behalf of plaintiffs.

A "'[c]ustoms broker' means a person who is licensed . . . to transact customs business on behalf of others."  19 C.F.R. § 111.1.  In turn, "customs business" includes "activities involving transactions with [U.S. Customs] concerning the entry and admissibility of merchandise, its classification and valuation, [and] the payment of duties, taxes, or other charges assessed or collected by [U.S. Customs] on merchandise by reason of its importation."  *Id.*

The parties do not dispute that International Freight's duties as a customs broker consisted, in the words of Joseph Moine, International Freight's Chief Financial Officer and corporate designee, of "clear[ing] the cargo through US Fish and Wildlife and US Customs," as well as the "USDA."  Deposition of Joseph Moine ("Moine Dep.") at 12.[14]  This task involves only the submission of documents to the appropriate federal agencies, *see id.* at 5, and does not involve physical handling of cargo.  *Id.* at 32.  According to Mr. Moine, in order to enable International Freight to act as its customs broker, an importer must execute a customs power of attorney, which grants International Freight authority to sign documents on the importer's behalf. *See id.* at 25-26, 29.  On November 28, 2007, Alex and Coletta each executed a customs power of attorney appointing International Freight as their customs broker.  *See* Ex.N to IF Motion (ECF 53-16).  Mr. Danner did not execute a power of attorney.[15]

---

[14]  Excerpts of Moine's deposition testimony were submitted as exhibits to several of the parties's submissions.  *See* ECF 53-11, 55-7, 56-7, 58-1.  I have cited to the pagination of the deposition transcript, without reference to which exhibit(s) included the particular excerpt.

[15]  In addition to the two powers of attorney executed by Coletta and Alex on November 28, 2007, Exhibit N to International Freight's motion contains a third power of attorney executed by Alex on May 30, 2007 (over a month before the hunting trip at issue occurred).  No party has explained the relevance, if any, of the May 30, 2007, power of attorney.  Accordingly, I have not

As noted, International Freight also served as a freight forwarder.  A "freight forwarder is one who hires independent common or contract carriers" to transport goods for a shipper. *Shippers' Co-op., Inc. v. I.C.C.*, 308 F.2d 888, 891 (9th Cir. 1962).  In other words, a freight forwarder "facilitates the movement of cargo" by, in essence, acting as a "'travel agent'" for cargo.  *Prima U.S. Inc. v. Panalpina, Inc.*, 223 F.3d 126, 129 (2d Cir. 2000).  According to Mr. Moine, International Freight's responsibility was to arrange for transportation of the Cargo to the taxidermist in Montana.  Moine Dep. at 12; *see also* IF Reply at 3.  However, International Freight does not physically handle or transport cargo.  Moine Dep. at 27, 32, 55, 57.  Rather, it hires other companies to do so.  *Id.* at 27.[16]  The parties have not submitted a written contract governing International Freight's responsibilities to plaintiffs as a freight forwarder and, at his deposition, Mr. Moine testified that "[t]here was no contract." *Id.* at 28.

The Cargo was cleared by U.S. Fish & Wildlife as well as U.S. Customs on or about November 28, 2007.[17]  *See* Danner-IF Motion at 2; IF Motion at 3.  Upon notification that the

_____

considered it.

[16] In their briefing, the parties dispute the nature of International Freight's role as freight forwarder, but it appears that their disputes relate to how the facts are characterized and the legal implications of the facts, rather than the underlying facts themselves.  Plaintiffs assert: "Once the Cargo cleared customs, the Cargo was supposed to be picked up by . . . International Freight." Danner-IF Motion at 2.  They add that International Freight "was the last person who had possession and control of the Cargo before it disappeared." *Id.* at 7.  In contrast, International Freight insists that it never "picked up" or took actual "possession and control" of the Cargo; rather, it hired other companies, including Even-Rock, to do so.  *See* IF Reply at 2-3.  In its initial briefing, International Freight argued that it was hired solely as a customs broker, and "was not hired to supervise the transport of the cargo."  IF Motion at 9.  In its reply, International Freight concedes that it was hired as a freight forwarder, as well as a customs broker, and that its duties included "arranging transportation."  IF Reply at 2.  But, it continues to underscore that it "was not hired to pick up or physically transport the cargo" itself.  *Id.*  As I shall explain, there are some freight forwarders that do physically handle and transport cargo.  However, it appears undisputed that, although International Freight was hired as a freight forwarder, it was not the variety of forwarder that actually handles cargo.

[17] Plaintiffs and International Freight dispute whether both crates had also been cleared by the U.S. Department of Agriculture ("USDA") by November 28, 2007, or whether one of the

Cargo had been cleared, International Freight instructed Even-Rock, a Seattle-based warehousing company with which International Freight worked regularly, *see* Moine Dep. at 8, to pick up the Cargo from CAS's bonded warehouse, and to "hold" the crates at Even-Rock's "facility until further notice."  Ex.B to Affidavit of Joseph Moine, Ex.G to IF Motion at 23-24 (ECF 53-9); *see* IF Motion at 4; Danner-IF Motion at 2.  International Freight also instructed CAS to release the Cargo to Even-Rock.  *See* IF Motion at 4; Danner-IF Motion at 3; Moine Dep. at 36.

At 7:24 p.m. on November 30, 2007, a driver, Kim Keep, signed a CAS warehouse delivery order for the Cargo, accepting receipt of the two crates.  *See* Ex.1 to Decl. of Roxana Alvarado, Ex.B to Cargolux Motion (ECF 54-3).  In his deposition, Mr. Moine stated that he could "only assume" that Keep was a driver employed by Even-Rock.  Moine Dep. at 36.

On or about December 5, 2007, Midwest Motor Express, the trucking company hired by International Freight to transport the Cargo to Atcheson Taxidermy, arrived at Even-Rock's warehouse to pick up the Cargo, but the crates could not be located.  *See* IF Motion at 4; Moine Dep. at 41.  An International Freight employee, Mary Terry, contacted other entities that had been involved with the transmission of the Cargo, including Cargolux and Rex, in an attempt to locate the Cargo, and filed a "Preliminary Notice of Claim" with CAS.  *See* Danner-IF Motion at 3; Ex.11 to Danner-IF Motion (ECF 55-13); Ex.17 to Danner-IF Motion (ECF 55-19).  According to Mr. Moine, however, no one from International Freight attempted to contact the

---

crates was not actually cleared by the USDA until December 26, 2007.  *Compare* Danner-IF Motion at 2 *with* IF Reply at 3; *see also* Moine Dep. at 14-15, 25; Ex.8 to Danner-IF Motion (ECF 55-10).  However, no party has indicated that this dispute is material to resolution of the motions.  Indeed, plaintiffs admit that the dispute is, at most, "only collaterally relevant." Danner-IF Motion at 6 n.1.  In my view, the dispute is not pertinent to the issues presently before the Court.

driver, Kim Keep, who purportedly had picked up the Cargo from CAS's warehouse.  Moine Dep. at 44-45.[18]

Over six months later, in July 2008, the Cargo was discovered during a Canadian Customs walkthrough in a bonded warehouse in Vancouver operated by Menzies, a company that performed warehousing operations for Cargolux in Vancouver, with responsibilities similar to those of CAS.[19]  *See* IF Motion at 4; Danner-Cargolux Motion at 3; Chinn Dep. at 30-31, 70; Ex.12 to Danner-IF Motion (ECF 55-14).  No party has any record of how the Cargo was transported to Vancouver.  *See* Danner-Cargolux Motion at 3; IF Motion at 4.

Gordon Chinn, Cargolux's corporate designee, testified that Cargolux and its ground handling agents use a computer system called "E-Champ" for tracking of cargo.  *See* Chinn Dep. at 50, 52, 54, 70.  If a Cargolux package is received at the wrong destination, Cargolux or its ground handling agent at the incorrect destination can generate an "alert" in the E-Champ system associated with the package's air waybill, such that a "teletype message" would be sent to the

---

[18] In an email apparently sent to a representative of Rex in January 2008, Ex.17 to Danner-IF Motion (ECF 55-19), Ms. Terry acknowledged that CAS possessed the signed warehouse delivery order indicating that Keep had picked up the Cargo, but stated:

> I personally had to run a check over to Cargo Airport Services (CAS) at 5pm [on the date the Cargo was released] for CAS to release freight as the trucker was there trying to pick them up.  If Cargloux would ask CAS to show them the pickup paper, they will see that "supposedly" the crates were picked up at 7:24 pm—almost 2 and 1 half hours after I dropped off the check AND the trucker who "supposedly" picked up the freight at 7:24pm does not start work till 6pm.  What happened with the trucker who was there at 5pm?  What freight did he get?  What freight was given to the trucker at 7:24pm?  No trucker waits that long for freight.  Which again, has me asking……where's the freight?

Notably, no deposition testimony or affidavit of Ms. Terry is contained in the record. Nor have the parties discussed Ms. Terry's observations regarding the timing of the pickup.

[19] At the relevant time, Cargolux did not fly into Vancouver.  But, it shipped cargo by truck from Seattle to the Menzies warehouse in Vancouver on a daily basis.  *See* Deposition of Gordon Chinn ("Chinn Dep.") at 58-59.  The parties have submitted various excerpts from the transcript of Mr. Chinn's deposition.  *See* ECF 53-7, 55-6, 57-6.  I will cite to the deposition by transcript page.

Cargolux facility at the correct destination, and the alert would be "in the system . . . every time you pull the air waybill up." *Id.* at 50. However, the Menzies warehouse did not generate an E-Champ alert regarding the Cargo. *Id.* at 96. Cargolux's first indication that Menzies had possession of the Cargo came by way of a phone call in July 2008 from Menzies, in Vancover, to Cargolux's Seattle office.

After the Cargo was located in Vancouver, International Freight coordinated its return to the United States, including its clearance through Canadian Customs. IF Motion at 4. Atcheson Taxidermy then hired a trucking company to transport the Cargo to Atcheson in Butte, Montana. Deposition of Dennis Danner at 87, Ex.A to IF Motion (ECF 53-3). The Cargo arrived at Atcheson Taxidermy in September 2008. Affidavit of Dennis Danner ¶ 13, Ex.1 to Danner-Cargolux Motion (ECF 55-3). According to Mr. Danner, Atcheson discovered during the tanning process that two of the Lion Trophies (specifically, those of Alex and Coletta) were irreparably damaged,[20] as a result of "severe slippage on the faces and paw due to bacteria buildup."[21] *Id.*

---

[20] Mr. Danner testified at his deposition that his undamaged lion trophy is "mounted and looks beautiful" in his "trophy room." Deposition of Dennis Danner at 78, Ex.C to Cargolux Motion (ECF 54-4).

[21] Mr. Danner's testimony in this regard is one of the subjects of the Cargolux Defendants' Motion to Strike (ECF 59). *See* note 5, *supra*. The Cargolux Defendants argue that Mr. Danner's assertions are inadmissible because they are hearsay (in that they are based on what Atcheson told Danner) and because they are lay opinion testimony (*i.e.*, the expert opinion testimony of a taxidermist would be required to demonstrate that the Lion Trophies were irreparably damaged). *See* ECF 59-1 at 2-3. In response, plaintiffs state that they "seek partial summary judgment as to liability only, not damages"; that they "have designated experts to testify regarding the cause of the damage to the lion skins and the irreparable nature of the damage"; and that Mr. Danner's statements in his affidavit were intended only "to present the circumstances that have lead [sic] the parties to this litigation." ECF 64 at 1. Given plaintiffs' concession that they do not seek summary judgment as to damages, and the fact that defendants' summary judgment motions are not predicated on claims that plaintiffs have failed to prove that the Lion Trophies were damaged, I view this dispute as immaterial to resolution of the motions.

Plaintiffs filed claims against the Santam Limited insurance policy that Rex had procured and obtained payment of the sum of ZAR 360,000, the full amount for which the Cargo had been insured.  However, at then-current exchange rates, this only amounted to $47,140.71.  *See* Ex.M to IF Motion (ECF 53-15).

This suit followed.  Plaintiffs filed their original Complaint (ECF 1) on November 23, 2009.  The currently operative pleading is plaintiffs' Amended Complaint (ECF 6), filed on December 18, 2009, which contains six counts: breach of contract against International Freight (Count I); negligence against International Freight (Count II); negligence against Even-Rock (Count III);[22] breach of contract against Cargolux (Count IV); negligence against Cargolux (Count V); and negligence against CAS (Count VI).  Plaintiffs seek damages of $111,820, plus interest, costs, and attorney's fees.

Additional facts will be included in the discussion.

## Discussion

### A.  Subject Matter Jurisdiction

Before addressing the merits, I must consider whether the Court possesses subject matter jurisdiction.  Plaintiffs asserted subject matter jurisdiction on the basis of diversity of citizenship.  *See* Amended Complaint at 2 (ECF 6); 28 U.S.C. § 1332.

All of the plaintiffs apparently are Maryland citizens.  *See* Amended Complaint ¶¶ 1-3.  If any defendant is also a Maryland citizen, complete diversity is not present.  *See Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011) ("With the exception of certain class actions, Section 1332 requires complete diversity among parties, meaning that the citizenship of every plaintiff must be different from the citizenship of every defendant.") (footnote omitted).  Upon review of plaintiffs' Amended Complaint, however, it is

---

[22] As noted, Even-Rock was dismissed from the case for lack of personal jurisdiction.

impossible to discern the citizenship of the defendants, so as to determine whether diversity jurisdiction is satisfied.

To illustrate, as to CAS and Even-Rock, which are corporations, plaintiffs asserted only their principal places of business (the states of New York and Washington, respectively), *see* Amended Complaint ¶¶ 5, 7, and did not allege the states in which the defendants are incorporated. *But see* 28 U.S.C. § 1332(c)(1) (providing that, for purposes of diversity jurisdiction, "a corporation shall be deemed to be a citizen of *any State by which it has been incorporated and* of the State where it has its principal place of business") (emphasis added). As to International Freight, which is a limited liability company, plaintiffs alleged only that defendant's principal place of business is in Washington state. *See* Amended Complaint ¶ 4. However, "[f]or purposes of diversity jurisdiction, the citizenship of a limited liability company . . . is determined by the citizenship of all of its members." *Mountain State*, *supra*, 636 F.3d at 103; *see also Gen. Tech Applications, Inc. v. Exro Ltda.*, 388 F.3d 114, 120 (4th Cir. 2004).

With regard to Cargolux, the record does not make clear whether it is incorporated in a United States jurisdiction (as suggested by its alleged "d/b/a" name, which contains the suffix of "Inc."), or whether it is solely a foreign corporation, as suggested by the suffix "S.A." in its name. That suffix designates a "*société anonyme*" or "*sociedad anónima*" (literally, "anonymous society"), a "business form roughly equivalent to a U.S. corporation" in several countries. *Pittway Corp. v. United States*, 88 F.3d 501, 502 (7th Cir. 1996); *see, e.g.*, *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 152 n.2 (3d Cir. 2010). In addition, an exhibit to the Cargolux Motion identifies Cargolux as a "Foreign Air Carrier of Luxembourg." Ex.A to Cargolux Motion, at 4 (ECF 54-2).

The citizenship of foreign corporations under 28 U.S.C. § 1332 has long been the subject

of "unfortunate doubt" in the federal courts.   13F WRIGHT, MILLER & COOPER, FEDERAL

PRACTICE & PROCEDURE § 3624, at 69 (2009, 2011 Supp.); *see generally id.* § 3628.   A recent

amendment to § 1332(c)(1) aims to resolve this doubt by providing that a corporation (whether

foreign or domestic) is deemed "a citizen of every State and foreign state by which it has been

incorporated and of the State or foreign state where it has its principal place of business."   28

U.S.C. § 1332(c)(1), *as amended by* the Federal Courts Jurisdiction and Venue Clarification Act

of 2011, Pub. L. No. 112-63, 125 Stat. 758, § 102 (Dec. 7, 2011).   However, the amendment

applies only to cases (unlike this one) that are "commenced on or after" January 6, 2012.   *See id.*

§ 105(a).   In any event, plaintiffs failed sufficiently to specify Cargolux's citizenship under any

standard, because they alleged only that Cargolux has its principal place of business in the state

of Washington.   *See* Amended Complaint ¶ 6.[23]

In sum, this Court might possess diversity jurisdiction, but it is not possible to determine

whether it does from plaintiffs' Amended Complaint.   Nor is the uncertainty resolved by the

balance of the record.   To be sure, there is no affirmative suggestion in the record that any of the

defendants is a Maryland citizen.   Nor has any party or the Court previously raised this

jurisdictional issue.   Nevertheless, federal courts "have an independent obligation to determine

whether subject-matter jurisdiction exists, even when no party challenges it."   *Hertz Corp. v.*

*Friend*, ___ U.S. ___, 130 S. Ct. 1181, 1193 (2010).   "No court can ignore" a jurisdictional

defect, once it is discovered; "rather a court, noticing the defect, must raise the matter on its

own."   *Wis. Dept. of Corrections v. Schacht*, 524 U.S. 381, 389 (1998).

---

[23] Despite this allegation in their Amended Complaint, plaintiffs assert in the Danner-Cargolux Motion at 5 that Cargolux's "headquarter[s] and principal place of business is in Luxembourg."   The record suggests that Cargolux's principal place of business is, indeed, in Luxembourg, in contrast to the allegations of plaintiffs' Amended Complaint.

However, plaintiffs' inadequate pleading of diversity jurisdiction does not create an insurmountable hurdle.  This is because, as discussed, *infra*, some of plaintiffs' claims against Cargolux arise under federal law.  Thus, the Court possesses original jurisdiction over those claims pursuant to federal question jurisdiction, *see* 28 U.S.C. § 1331, and, even in the absence of complete diversity, it may exercise supplemental jurisdiction over the other claims against Cargolux and the claims involving the other parties that "form part of the same case or controversy."  28 U.S.C. § 1367(a).

## B.  Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which provides, in part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue.  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment.  *Id.* at 248.

When, as here, more than one party has filed a motion for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether [any] of the parties deserves judgment as a matter of law.'"  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 822 (2003).  All of the "motions must be denied if the court finds that there is a genuine issue of material fact.  But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment."  10A Wright, Miller & Kane, Federal Practice & Procedure § 2720, at 336-37 (3d ed. 1998, 2010 Supp.).

In this case, the Cargolux Defendants and International Freight have filed separate motions for summary judgment.  Defendants seek determinations that they are not liable to plaintiffs or, in the alternative, a ruling that the amount of damages recoverable by plaintiffs is reduced as a matter of law, effectively to zero.  Defendants make no arguments with respect to their cross-claims against each other.

For their part, plaintiffs only seek partial summary judgment against defendants; at this juncture, they seek judgment as to liability, but not damages.  *See* ECF 64 at 1.  Plaintiffs contend that the Court should find defendants jointly liable as a matter of law and that, "[a]s joint tortfeasors, Defendants should have the burden of sorting out their respective level of fault." Danner-IF Motion at 11.

## C.  Choice of Law

Preliminarily, I note that no party has mentioned the issue of choice of law.  Rather, the

parties have briefed the issues as if substantive Maryland law governs all of plaintiffs' claims. Although they have cited persuasive authority from other states and various federal courts, and although the Cargolux Defendants contend that plaintiffs' negligence claims against them are preempted by federal law, the parties rely primarily upon Maryland law as to the substantive common law principles at issue.  Setting aside the issues of federal law with regard to the negligence claims against the Cargolux Defendants, it is by no means clear that substantive Maryland law should control plaintiffs' other common law claims.

"When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero Museum Workshop v. Wilson*, ___ F. Supp. 2d ___, 2011 WL 3758582, at *11 (D. Md. Aug. 24, 2011) (citing, *inter alia*, *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 49 n.11 (4th Cir. 1983), *cert. denied*, 469 U.S. 1215 (1985)).  Maryland is, of course, the forum state of this Court.  Under Maryland's choice-of-law principles, tort claims are governed by the law of the state where the alleged harm occurred ("*lex loci delicto*").  *See, e.g.*, *Proctor v. Washington Metropolitan Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010). And contract claims are ordinarily governed by the law of the state where the contract was made ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another jurisdiction.  *See, e.g.*, *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995).  The record before me strongly suggests that the harm inflicted by the defendants' alleged negligence occurred in Seattle (or, perhaps, in Vancouver).  The contract between Cargolux and plaintiffs' agent, Rex, was apparently made in South Africa.  The record does not make clear where plaintiffs' contractual arrangements with International Freight were

made, but Washington appears at least as plausible a location as Maryland.  In sum, it is quite

doubtful that Maryland substantive law ought to control any of the claims in this case.

Nevertheless, Maryland choice-of-law principles also contain guidance for courts when

the parties fail to address a choice-of-law issue.  In *Chambco, Div. of Chamberlin Waterproofing*

*& Roofing, Inc. v. Urban Masonry Co.*, 338 Md. 417, 421, 659 A.2d 297, 299 (1995), the

Maryland Court of Appeals said:

> Where the parties to an action fail to give . . . notice of an intent to rely on
> foreign law, and where it is clear that one or more issues in the case are controlled
> by another jurisdiction's law, a court in its discretion may exercise one of two
> choices with respect to ascertaining the foreign law.  First, the court may presume
> that the law of the other jurisdiction is the same as Maryland law.  Alternatively,
> the court may take judicial notice of the other state's law.  This discretion may be
> exercised by either the trial court, or by an appellate court . . . .

*Accord Felland Ltd. P'ship v. Digi-Tel Commc'ns, LLC*, 384 Md. 520, 530 n.1, 864 A.2d 1027,

1033 n.1 (2004).

Here, the parties rely upon Maryland law and have not identified any relevant legal

principles that might differ in other jurisdictions.  In the absence of any analysis presented by the

parties, I decline to undertake a choice-of-law analysis.  *See Ohio Sav. Bank v. Progressive Cas.*

*Ins. Co.*, 521 F.3d 960, 962 (8th Cir. 2008) ("Like the district court, we will ignore what might

be a complex choice of law analysis because the parties have not identified a relevant state law

conflict."); *Cleaning Authority, Inc. v. Nubert*, 739 F. Supp. 2d 807, 820 (D. Md. 2010)

("'Choice-of-law analysis becomes necessary . . . only if the relevant laws of the different states

lead to different outcomes.'") (citation omitted).  Accordingly, except with respect to the issues

of federal law that control plaintiffs' negligence claims against the Cargolux Defendants, I will

resolve the parties' disputes by applying Maryland law, in accordance with the *Chambco*

presumption that, to the extent that the law of any other jurisdiction ought to govern, it is the same as the law of Maryland.

### D.  International Freight

In arguing that International Freight is liable as a matter of law, plaintiffs describe their contract and negligence claims as arising from the bailment of the Cargo.  *See* Danner-IF Motion at 5.  International Freight argues principally that it cannot be liable to plaintiffs for loss of the Cargo because it never took physical possession of the Cargo, nor was it obligated to do so.  Therefore, it maintains that it did "not enter into a bailment relationship" with plaintiffs.  IF Opp. at 6.[24]  In response, plaintiffs argue that International Freight had "constructive" possession of the Cargo, by virtue of the (purported) possession of the Cargo by Even-Rock.   Danner-IF Motion at 6.   Plaintiffs cite a criminal case regarding possession of controlled dangerous substances, *United States v. Rusher*, 966 F.2d 868 (4th Cir. 1992), for the proposition that constructive possession is established where "the defendant exercised, or had the power to exercise, dominion and control over the item."  *Id.* at 878.

According to plaintiffs, International Freight was a bailee of the Cargo, and Even-Rock was International Freight's "agent."  Danner-IF Motion at 6.  Plaintiffs reason that International Freight used Even-Rock "on a daily basis for [International Freight's] business of transporting and warehousing cargo," and International Freight directed Even-Rock "to pick up the Cargo and

---

[24] International Freight also argues strenuously that plaintiffs improperly rely on legal principles related to bailment, because plaintiffs (by their own admission) had "not termed the parties' relationship in this case as one of bailment" until the filing of their cross-motions. Danner-IF Motion at 5.  According to International Freight, permitting plaintiffs to assert a bailment claim at this juncture would constitute "unfair surprise."  IF Opp. at 6.  Plaintiffs respond that the "facts pled and established in this litigation show a bailment relationship" between plaintiffs and International Freight.  Danner-IF Reply at 1.  Although plaintiffs did not previously label any claim as a "bailment" action, a bailment for hire is a contract.  *See* page 22, *infra*.  In any event, I need not resolve International Freight's claim of unfair surprise because, as I shall explain, plaintiffs' claims fail even when considered under the principles of bailment law.

take it to their warehouse at which point [International Freight] (the named consignee) had the exclusive power to control the movement of the Cargo, either by itself or through an agent trucker [International Freight] hired."   Danner-IF Motion at 5-6.   Rejecting this assertion, International Freight contends that Even-Rock was not its agent because, *inter alia*, it had no authority over the hiring or management of Even-Rock's employees; it exerted no control over Even-Rock with respect to its transportation or storage of cargo; it did not supervise Even-Rock's daily activities; and Even-Rock did not act primarily for International Freight's benefit.

### 1. Bailment

Before addressing the parties' arguments, I pause to elucidate the concept of bailment.

"A bailment is 'the relation created through the transfer of the possession of goods or chattels, by a person called the bailor to a person called the bailee, without a transfer of ownership, for the accomplishment of a certain purpose, whereupon the goods or chattels are to be dealt with according to the instructions of the bailor.'"   *Broadview Apts. Co. v. Baughman*, 30 Md. App. 149, 151, 350 A.2d 707, 709 (1976) (citation omitted).   Put more simply, a "bailment may be defined as the rightful possession of goods by one who is not the owner."   RICHARD A. LORD, 19 WILLISTON ON CONTRACTS § 53:1, at 5 (4th ed. 2001, 2011 Supp.) ("WILLISTON").[25]

Under Maryland law, a bailment consists of the following elements: (1) "'an existing subject-matter'" consisting of personal property; (2) "'a contract with reference to [the property] which involves possession of it by the bailee'"; (3) "'delivery, actual or constructive,'" of the

---

[25] The common law of bailment is truly ancient in origin.   In *John T. Handy Co. v. Carman*, 102 Md. App. 188, 199-200, 648 A.2d 1115, 1121 (1994), *cert. denied*, 337 Md. 438 (1995), the court described the various classifications of bailments under Roman law, and in *Charles J. Miller, Inc. v. McClung-Logan Equipment Co.*, 40 Md. App. 585, 588 & n.2, 392 A.2d 1153, 1155 & n.2 (1978), the court traced the law of bailment to "Biblical times and before," describing Maimonides' discussion of bailments, which was derived from the Book of Exodus, and remarking: "It is amazing how little change has occurred in the law of bailments over the intervening centuries since the time of Moses."

property to the bailee; and (4) "'acceptance, actual or constructive,'" of the property by the bailee. *John T. Handy Co. v. Carman*, 102 Md. App. 188, 201-02, 648 A.2d 1115, 1122 (1994) (quoting *Gen. Refining Co. v. Int'l Harvester Co.*, 173 Md. 404, 414-15, 196 A.2d 131 (1938)) (emphasis omitted); *see also* PAUL MARK SANDLER & JAMES K. ARCHIBALD, PLEADING CAUSES OF ACTION IN MARYLAND § 2.20, at 73-74 (4th ed. 2008, 2010 Supp.).

A bailment relationship can arise in a variety of ways.  In modern usage, there are three general categories of bailments: "'(1) for the sole benefit of the bailor; (2) for the sole benefit of the bailee; and (3) for the mutual benefit of both.'"  *John T. Handy*, 102 Md. App. at 199-200, 648 A.2d at 1121 (quoting 8 Am. Jur. 2d *Bailments* § 17 (1980)).  Assuming, *arguendo*, that bailment principles apply here, plaintiffs contend, and I agree, that the alleged bailments created in this case would be bailments for mutual benefit, also known as bailments for hire.  *Compare, e.g.*, *Fox Chevrolet Sales, Inc. v. Middleton*, 203 Md. 158, 160-61, 99 A.2d 731, 732 (1953) ("when an automobile is delivered to one who, for a consideration, undertakes to repair it, the contract is one of bailment for hire, or for mutual benefit"); *Schleisner Co. v. Birchett*, 202 Md. 360, 363-64, 96 A.2d 494, 496 (1953) (holding that where employee was required as a condition of employment to keep her coat in an "executive closet" and "denied use of a locker," the relationship between the employer and employee, as to the coat, was one of "'bailment for profit, for the mutual benefit of the parties'") (citation omitted), *with Mickey v. Sears, Roebuck & Co.*, 196 Md. 326, 330, 76 A.2d 350, 352 (1950) (holding that, where customer inadvertently left his briefcase at a store, the store "became a gratuitous bailee of the brief case").[26]

---

[26] The WILLISTON treatise describes several types of bailment for mutual benefit:

1.  Where the bailee hires the use of the property.

2.  Where the bailor employs the bailee to do some work upon the property.

3.  *Where the bailor hires the bailee to store the property.*

It is "quite clear," under Maryland law, "that a mutual benefit bailment is a contract." *Fisher v. Tyler*, 284 Md. 100, 108, 394 A.2d 1199, 1203-04 (1978).[27]  Nevertheless, in "the case of a bailee for hire, liability is *usually, though not always*, asserted in a contract action."  *Mickey*, *supra*, 196 Md. at 331, 76 A.2d at 352 (emphasis added).  This flexibility is likely attributable to the nature of the bailee's duty of care existing by reason of the bailment relationship, because "the standards more nearly approximate the law of torts than that of contracts."  19 WILLISTON § 53:5, at 23.

Of import here, "when the subject matter of a mutual bailment for hire is delivered by the bailor to the bailee, it must be returned by the bailee in substantially the same condition ordinary wear and tear excepted."  *Charles J. Miller, Inc. v. McClung-Logan Equip. Co.*, 40 Md. App. 585, 588, 392 A.2d 1153, 1155 (1978).  Put another way, the "bailee in accepting possession of the bailed property assumes the duty of exercising reasonable care in protecting it."  *Broadview Apts.*, *supra*, 30 Md. App. at 151, 350 A.2d at 709.[28]

---

4. Where the property is bailed as a pledge or security for a debt or other obligation.

5. *Where the bailor employs the bailee to carry the property.*

6. Where the bailee is to act as factor or agent for the bailor in the sale of the property.

7. Where the custody or use of the property is incidental to some other business transaction between the parties.

19 WILLISTON, § 53:11, at 50-51 (internal footnotes omitted) (emphasis added).

[27] With regard to a gratuitous bailment, the "contract" forming the second element of a bailment is often said to be an implied contract, but there is "considerable uncertainty among the authorities as to whether a gratuitous bailment, being unsupported by consideration, is truly a contract."  *Fisher*, 284 Md. at 108, 394 A.2d at 1203; *see* 19 WILLISTON §§ 53:8 - 53:10, at 37-49.

[28] The same or similar standards of care are imposed by statute in some types of bailment relationships.  *See, e.g.*, Md. Code (2002 Repl. Vol., 2011 Supp.), § 7-204(1) of the Commercial Law Article ("C.L.") (Maryland codification of Uniform Commercial Code provision establishing duty of care for warehousemen); *see also Commodities Reserve Corp. v. Belt's*

When bailed property is lost or damaged, Maryland courts apply a burden-shifting procedure with respect to the burden of production in a suit against a bailee, as described by the Maryland Court of Special Appeals in *McClung-Logan*, 40 Md. App. at 588, 391 A.2d at 1155:

> When the bailed chattel is either not returned or returned in a damaged condition without legal excuse, a prima facie case of lack of due care or negligence is made out. It is then the duty of the bailee to go forward with proof that the loss or injury was occasioned by a cause which excuses the bailee, thereby providing a complete defense as the bailee is not an insurer. The bailor is then, by reason of his burden of proof, required to overcome this defense by establishing by a preponderance of the evidence that the bailee failed to use ordinary care and diligence to safeguard the bailor's property, and that failure to perform his duty caused the loss to the bailor.

*See also Stehle Equip. Co. v. Alpha Constr. & Dev. Co.*, 247 Md. 210, 213, 230 A.2d 654, 655 (1967) ("Once appellant proved the delivery, the bailment for hire, and the unexplained failure to return . . . a prima facie case of negligence was made out."); *Trans-System Serv., Inc. v. Keener*, 249 Md. 369, 372, 239 A.2d 897, 898 (1968) ("the burden of proof remains upon the [bailor] to show negligence on the part of the [bailee] and . . . the prima facie case established by the failure to return the bailed property simply shifts to the [bailee] the burden of going forward with the evidence showing that it was not negligent").

A bailee may be liable for negligence, but is not strictly liable for loss of bailed property. This is because a bailee for hire "is not an insurer of the safety of the property entrusted to its care, but . . . owes only such care as persons of common prudence in their own situation and business usually use in the custody and keeping of similar property belonging to themselves." *Trans-System*, 249 Md. at 372, 239 A.2d at 898 (internal citation omitted); *see also Broadview Apts.*, 30 Md. App. at 151, 350 A.2d at 709; 19 WILLISTON § 53:11, at 52-54 ("The bailee is not

---

*Wharf Warehouses, Inc.*, 310 Md. 365, 370-72, 529 A.2d 822, 824-25 (1987) (discussing bailment principles in context of C.L. § 7-204). However, because no party relies upon any statutes with respect to the applicable duty of care, I shall analyze the issues solely with respect to the duty of care under the common law.

an insurer, and the standard of care with respect to bailed property remains the exercise of ordinary care.").

## 2. *Liability of International Freight as a Freight Forwarder*

In arguing that International Freight is liable for the loss of the Cargo, plaintiffs suggest that a freight forwarder is a bailee, subject to a bailee's duty of reasonable care in the safekeeping of bailed property.   Although plaintiffs recognize that International Freight did not take actual physical possession of the Cargo, they contend that International Freight is vicariously liable for the alleged negligence of Even-Rock because, according to plaintiffs, Even-Rock was International Freight's "agent."[29]   As I shall explain, I disagree in both respects.

At the outset, it is important to observe that the term "freight forwarder" has more than one meaning.   As the Supreme Court observed in *Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. Acme Fast Freight, Inc.*, 336 U.S. 465 (1949), one must "distinguish between two very different kinds of 'forwarders.'"  *Id.* at 484.   The Supreme Court stated, *id.*:

> The term ["freight forwarder"] was originally applied to persons who arrange for the transportation by common carrier of the shipper's goods.   The forwarder['s] . . . duties, as agent of the shipper, went no farther than procuring transportation by carrier and handling the details of shipment. . . .
>
> Later, a different type of forwarding service was offered.   This forwarder picked up the less than carload shipment at the shipper's place of business and engaged to deliver it safely at its ultimate destination.   The freight forwarder charged a rate covering the entire transportation and made its profit by consolidating the shipment with others in carload quantities to take advantage of the spread between carload and [less-than-carload] rates.   It held itself out not merely to arrange with common carriers for the transportation of the goods, but

---

[29] "'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act.'"  *Green v. H & R Block, Inc.*, 355 Md. 488, 503, 735 A.2d 1039, 1047 (1999) (quoting RESTATEMENT (SECOND) OF AGENCY § 1 (1958)).   Whether an agency relationship exists "ultimately turns on the parties' intentions as manifested by their agreements or actions," and may be determined from the express agreement of the agent and principal or by inference from their acts.  *Green*, 355 Md. at 503, 735 A.2d at 1047-48.

rather to deliver them safely to the consignee.  The shipper seldom if ever knew which carrier would be utilized in the carriage of his shipment.

As the Supreme Court explained, Congress regulated the second type of freight forwarder, which takes actual physical possession of cargo in order to consolidate small shipments into larger lots.  *See id.* at 485 ("The Freight Forwarder Act encompasses only the second type of forwarder described above."); 49 U.S.C. § 13102(8) (definition of "freight forwarder" in the Freight Forwarder Act, a component of the Interstate Commerce Act).  However, there is no indication in the record that International Freight operated as the kind of freight forwarder that takes actual possession of cargo.  Rather, the record reflects that International Freight was hired merely to arrange transportation of plaintiffs' Cargo.  In the words of the Supreme Court, International Freight's "duties . . . went no farther than procuring transportation by carrier and handling the details of shipment."  *Acme Fast Freight*, 336 U.S. at 484.

In my view, a freight forwarder of the first variety described by the Supreme Court, which does not take physical possession of cargo, is not a bailee.  Thus, no bailment relationship was established if International Freight did not take or agree to take physical possession of plaintiffs' Cargo.  In this regard, I am guided by the Supreme Court and by an instructive Florida appellate decision, *Monroe Systems for Business, Inc. v. Intertrans Corp.*, 650 So.2d 72 (Fla. App. 1994), which involved circumstances analogous to this case (although no party has cited it).

In *Acme Fast Freight*, the Supreme Court observed that an "agent-forwarder," *i.e.*, the "original[]" type of freight forwarder whose "duties, as agent of the shipper, went no farther than procuring transportation by carrier and handling the details of shipment," was "liable to the shipper only for its own negligence, including negligence in selecting a carrier," and was not

"liable for loss or damage [regardless of] whether it or an underlying carrier had been at fault." *Acme*, 336 U.S. at 484-85.

*Monroe* exemplifies the distinction made in *Acme Fast Freight*.  In *Monroe*, the plaintiff was an importer of calculators manufactured in Asia.  The calculators were shipped to the Port of Miami, and "Monroe hired Intertrans, a freight forwarder, to serve as its Miami agent."  650 So.2d at 73.  Monroe's calculators were to be stored in warehouses in Miami, until Intertrans arranged for shipment of them in accordance with Monroe's instructions.  *Id.*  The calculators fell into two groups: (1) products imported for domestic sale in the United States; and (2) so-called "in-bond" products that were not intended to be imported into the United States, but rather would be held in bonded warehouses for later shipment to Latin America (and thus would never incur United States customs duties).  *Id.* at 74.  With respect to the calculators imported for domestic sale, Intertrans stored the calculators in its own warehouse until shipment, and "[w]hile the goods were in the warehouse, Intertrans was clearly the bailee."  *Id.*  However, Intertrans did not operate a bonded warehouse, and so "it was agreed that Intertrans would select a customs-bonded warehouse for storage of Monroe's in-bond goods. . . .  Thus, under the agreement and operative statutes, Intertrans would never obtain physical custody of the in-bond goods because Intertrans could not legally do so."  *Id.*  To store the in-bond calculators, Intertrans selected a bonded warehouse operated by another party, IWDC, which "took its instructions from Intertrans and submitted its bills to Intertrans," who in turn billed Monroe.  *Id.*  Subsequently, Monroe's in-bond calculators were destroyed as a result of a toxic chemical fire at IWDC's warehouse.  *Id.*

In the suit that followed, Monroe asserted two claims against Intertrans.  First, Monroe alleged that Intertrans was negligent in selecting IWDC to store the goods, because Intertrans should have inspected IWDC's warehouse and discovered various alleged fire code violations at

the facility.  This count "went to the jury and Intertrans was exonerated."  *Id.* at 75.  Second, Monroe alleged that "Intertrans and IWDC were both bailees of the in-bond goods," and that "Intertrans was vicariously liable for the negligence of IWDC, even if Intertrans itself was entirely without fault."  *Id.*  The trial court held that Intertrans was not vicariously liable as a matter of law, and dismissed the count, prompting Monroe's appeal.  *Id.*

As a preliminary matter, the Florida appellate court held that Intertrans was not a bailee of the in-bond calculators (as opposed to the calculators imported for domestic sale and held in Intertrans's own warehouse, as to which Intertrans "was plainly a bailee").  *Id.* at 76 & n.11.  The *Monroe* Court reasoned, *id.* at 76:

> It is facially clear that with regard to the products held for export, Intertrans undertook only to act as Monroe's agent to procure a suitable bonded warehouse.  Intertrans could not itself act as bailee.  Its responsibility was to locate a bailee—a bonded warehouse which could store Monroe's in-bond goods.
>
> Monroe says, however, that the result should be otherwise because Intertrans selected the IWDC warehouse, and Monroe was dependent on Intertrans' judgment in that regard.  That argument does not change the analysis.  Intertrans acted within the scope of the agency relationship.  Intertrans was obliged to use due care and would incur liability if negligent.  Here, of course, Intertrans was exonerated on the negligence claim.
>
> In sum, when Intertrans obtained bonded warehouse space for Monroe, Intertrans was acting as agent and did not thereby become the bailee of the goods.

In *Monroe*, Monroe hired Intertrans as Monroe's agent to secure IWDC's services as a bailee.  Here, plaintiffs argue that they hired International Freight as a bailee, and International Freight in turn secured Even-Rock's services as International Freight's agent.  In my view, however, the situation is the same as in *Monroe*: plaintiffs hired International Freight as their agent to secure the services of a bailee, which happened to be Even-Rock.  In other words, International Freight was not the bailee of the Cargo; it was plaintiffs' agent in selecting a bailee.

And, Even-Rock was not International Freight's agent; it was the bailee of the Cargo (hired by plaintiffs' agent, International Freight).

However, the *Monroe* Court did not rest its conclusion solely on the determination that Intertrans was not a bailee.  The court "[a]ssum[ed] for purposes of discussion that Intertrans was the bailee of the in-bond goods," and went on to determine whether Intertrans could be held vicariously liable for IWDC's negligence.  *Id.* at 76-77.  Applying Florida bailment law (which is consistent with the Maryland bailment law I have discussed), the *Monroe* Court explained that a "'bailee is not an insurer of the property delivered into its keeping and is not liable for the loss of the thing bailed, except where there is a breach of the duty of the requisite degree of care.'"  *Id.* at 77 (citation omitted).  The appellate court adopted the trial court's reasoning that, "since the negligence count and the bailment count would both be governed by a negligence standard, the case should go to the jury solely under the negligence count."  *Id.* at 75.  It held, *id.* at 77:

> Here, the selection of IWDC as the in-bond warehouse was consistent with, and not in violation of, Intertrans' contract with Monroe.  Intertrans had not agreed to act as an insurer for these goods and is therefore governed only by the standard of ordinary care.  Consistent with well settled principles, Intertrans would be liable only if negligent in selecting IWDC to serve as the in-bond warehouse.  The question of negligence was submitted to the jury, and Intertrans was found not negligent.

In my view, the *Monroe* Court's analysis is equally applicable here.  To be sure, there was no allegation in *Monroe* that Intertrans was liable on a theory that IWDC acted as Intertrans's "agent."  However, applying well settled Maryland principles of agency, vicarious liability, and bailment law, I am convinced that the result here is precisely the same as in *Monroe*.

Under Maryland agency law, three characteristics have "particular relevance to the determination of the existence of a principal-agent relationship: (1) the agent's power to alter the

legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent." *Id.* at 503, 735 A.2d at 1048.  As to the third factor, the Maryland Court of Appeals has explained, *id.* at 507-08, 735 A.2d at 1050:

> The control a principal must exercise over an agent in order to evidence an agency relationship is not . . . comprehensive.  A principal need not exercise physical control over the actions of its agent in order for an agency relationship to exist; rather, the agent must be subject to the principal's control over the result or ultimate objectives of the agency relationship.
>
> Often an agent is left free from direct supervisory control as he or she furthers the interest of the principal. . . .  Indeed, there are circumstances under which very little control is exercised by the principal.

In Maryland, a principal may, in some circumstances, be "'liable to third persons in a civil suit, for the . . . torts, negligences, and other malfeasances, or misfeasances, and omissions of duty of his agent . . . .'" *Sanders v. Rowan*, 61 Md. App. 40, 54, 484 A.2d 1023, 1030 (1984) (citations and some internal quotation marks omitted).  This doctrine of vicarious liability is commonly referred to as *respondeat superior*, and typically arises in the employment context. *See Southern Mgmt. Corp. v. Taha*, 378 Md. 461, 481, 836 A.2d 627, 638 (2003) ("On a successful claim under the doctrine of respondeat superior, an employer will be held jointly and severally liable for the tortious acts committed by its employee."); *Barclay v. Ports Am. Balt., Inc.*, 198 Md. App. 569, 577-78, 18 A.3d 932, 937 (2011) ("[T]he doctrine of *respondeat superior* . . . holds an employer vicariously—and jointly and severally—liable for the tortious conduct of an employee, where it has been shown that the employee was acting within the scope of the employment relationship at that time.").

 "Generally, a principal is vicariously liable for the negligence of its agent when the two share a master-servant relationship but not when the agent is merely an independent contractor of the principal." *Hunt v. Mercy Med. Ctr.*, 121 Md. App. 516, 545, 710 A.2d 362, 376 (1998).  In

the taxonomy of agents, employee/servants, and independent contractors, a "'master is a species of principal and a servant is a species of agent,'" *Green*, 355 Md. at 509, 735 A.2d at 1051 (quoting RESTATEMENT (SECOND) OF AGENCY § 2 cmt. a), and there are different "species" of independent contractor: those who are agents and those "from an entirely separate genus of 'non-agents.'" *Brooks v. Euclid Sys. Corp.*, 151 Md. App. 487, 517, 827 A.2d 887, 904, *cert. denied*, 377 Md. 276, 833 A.2d 31 (2003). Put another way, "all masters are principals and all servants are agents, but only when the level of control is sufficiently high does a principal become a master and an agent a servant." *Green*, 355 Md. at 509, 735 A.2d at 1051. "'Agents who are not servants are regarded as independent contractors.'" *Brooks*, 151 Md. App. at 517, 827 A.2d at 904 (quoting *Sanders*, *supra*, 61 Md. App. at 50, 484 A.2d at 1028). But, "'[n]ot all independent contractors are agents. 'A person who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other, is a non-agent independent contractor.'" *Brady v. Ralph Parsons Co.*, 308 Md. 486, 510 n.26, 520 A.2d 717, 730 n.26 (1987) (citing RESTATEMENT (SECOND) OF AGENCY §§ 2 cmt. b, 14N cmt. b) (internal citations omitted); *accord Brooks*, 151 Md. App. at 517, 827 A.2d at 904.

Thus, the dispute between plaintiffs and International Freight as to whether Even-Rock was an "agent" of International Freight is beside the point. The question of International Freight's vicarious liability for Even-Rock's alleged negligence hinges not on agency, but on whether Even-Rock was International Freight's "servant" or, instead, an independent contractor. The distinction between a servant and an independent contractor lies in the degree of control exerted by the employer.

In *Kersten v. Van Grack, Axelson & Williamowsky, P.C.*, 92 Md. App. 466, 608 A.2d 1270 (1992), the Maryland Court of Special Appeals explained that "'the decisive test in

determining whether the relation of master and servant exists is whether the employer has the *right to control and direct the servant in the performance of his work and in the manner in which the work is to be done*.'" *Id.* at 469-70, 608 A.2d at 1272 (citation omitted) (emphasis in original). *See also Balt. Harbor Charters, Ltd. v. Ayd*, 365 Md. 366, 387, 780 A.3d 303, 315-16 (2001) ("'[T]he test in determining whether a person is a servant or an independent contractor is whether the employer has the right of control over the employee in respect to the work to be performed.'") (citation omitted); *Hunt, supra*, 121 Md. App. at 545, 710 A.2d at 376 ("The ultimate test for whether an agent is also a servant is control . . . .").

In other words, a "servant is a person who is employed to perform . . . services for another . . . and who, in respect to his physical movements in the performance of the service, is subject to the other's control or right of control." *Globe Indem. Co. v. Victill Corp.*, 208 Md. 573, 581-82, 119 A.2d 423, 427 (1956); *accord Green*, 355 Md. at 508-09, 735 A.2d at 1050-51. Conversely, an independent contractor is generally "'free to exercise his own judgment and discretion as to the means and assistants that he may think proper to employ about the work, exclusive of the control and direction, in this respect, of the party for whom the work is being done.'" *Baltimore Harbor Charters*, 365 Md. at 387 n.15, 780 A.2d at 316 n.15. Notably, "'[t]he reservation of some control over the manner in which work is done does not destroy the independent contractor relationship where the contractor is not deprived of his judgment in the execution of his duties.'" *Brooks*, 151 Md. App. at 510, 827 A.2d at 900 (quoting *Schweitzer v. Keating*, 150 F. Supp. 2d 830, 840 (D. Md. 2001)).

On the undisputed facts in the record before me, there is no indication that Even-Rock was a servant of International Freight, rather than an independent contractor. In this regard, it is salient that the two companies appear to be independent businesses. Moreover, International

Freight did not exercise control over Even-Rock's selection of drivers.   Indeed, International Freight's corporate designee, Joseph Moine, did not know whether Kim Keep was a driver for Even-Rock, but "assumed" so.  It is undisputed that International Freight instructed Even-Rock to pick up the Cargo and hold it at Even-Rock's warehouse, but plaintiff has advanced no evidence that International Freight directed the details of how Even-Rock was to accomplish that task.  The fact that International Freight frequently used Even-Rock's services did not transform Even-Rock into a servant of International Freight.

The distinction between a servant and an independent contractor is critical here, because "[g]enerally, an 'employer of an independent contractor is not liable for the negligence of the contractor or his employees.'"  *Appiah v. Hall*, 416 Md. 533, 558, 7 A.3d 536, 551 (2010) (quoting *Rowley v. Baltimore*, 305 Md. 456, 461, 505 A.2d 494, 496 (1986)).  This rule is subject to some exceptions, but none are applicable here.[30]  To be sure, I have not found a Maryland case applying the foregoing principles in a bailment case.  But, there is no indication that Maryland would depart from these principles in the context of bailment.

Of course, an employer is liable for its own negligence "'in selecting, instructing, or supervising the contractor.'"  *Appiah*, 416 Md. at 559, 7 A.3d at 551 (citation omitted).  As the Florida court in *Monroe* observed, a bailee can be liable for negligence in selecting a sub-bailee. *See Monroe*, 650 So.2d at 77.  One Maryland bailment case seems to illustrate this principle.  In

---

[30] Some tort duties are considered "non-delegable," and "liability for breach of a non-delegable duty is [one] exception to the general rule that one who employs an independent contractor is not liable for the independent contractor's negligence."  *Norris v. Ross Stores, Inc.*, 159 Md. App. 323, 335, 859 A.2d 266, 273 (2004); *see also Appiah*, 416 Md. at 559, 7 A.3d at 551; *Norris*, 159 Md. App. at 334-35, 859 A.2d at 273 ("Non-delegable duty is something of a misnomer, as the owner is free to delegate the duty of performance to another, but the owner cannot thereby avoid or delay its liability for the non-performance of the delegated duties."). Another exception is "'[w]ork which is specially, peculiarly, or 'inherently' dangerous.'" *Appiah*, 416 Md. at 559, 7 A.3d at 551 (citation omitted).  However, I have found no case law indicating that a bailee's duty to use reasonable care to safeguard bailed property is non-delegable, nor is there any suggestion that a bailee's duties are inherently dangerous.

*Goldberg v. Kunz*, 185 Md. 492, 45 A.2d 279 (1946), the Court of Appeals upheld a judgment against a bailee for damage to the bailor's automobile, which had been "practically demolished" in an accident while being driven, without authorization, by the bailee's employee. *Id.* at 494, 45 A.2d at 280. The employee's unauthorized use of the vehicle placed the case outside the scope of *respondeat superior* liability, because the use was outside the scope of employment. *See id.* at 497, 45 A.2d at 281. Nevertheless, the Court of Appeals held the bailee liable, stating that "'[i]t was the duty of the defendant to use ordinary care to employ a trustworthy servant in charge of the garage,'" and that the bailee placed the employee "in complete charge of the garage on a Sunday," despite knowing "nothing whatever about" the employee, "who had worked for [the bailee] for only three weeks." *Id.* at 495-97, 45 A.2d at 280-81 (citation omitted).[31]

Corpus Juris Secundum also supports the foregoing analysis. It states that a bailee is not liable for the negligence of independent contractors to whom the bailed property is entrusted, "in the absence of a showing of negligence in the selection of the contractor." 8 C.J.S. *Bailments* § 70 (2011).

Here, plaintiffs do not allege, and the record does not reflect, that International Freight was negligent in selecting Even-Rock to retrieve and store the Cargo. Therefore, even if, *arguendo*, International Freight was a bailee of the Cargo under plaintiffs' theory of constructive possession, it is nevertheless clear that International Freight discharged its duty of ordinary care and its obligation to arrange for transportation of the Cargo by hiring Even-Rock, an independent contractor, to take actual possession of the Cargo. Assuming that the loss of the Cargo was the result, in whole or in part, of Even-Rock's negligence, International Freight is not vicariously

---

[31] *Goldberg*, which is a product of the time in which it was written, also remarks gratuitously that the employee was "colored," seeming to suggest that the color of the employee's skin was a factor in his untrustworthiness. 185 Md. at 494-97, 45 A.2d at 280-81. Despite this offensive aspect of *Goldberg*, the decision remains good law for the proposition that a bailee may be liable for negligence in the selection of its employees or contractors.

liable for the negligence of its independent contractor, Even-Rock.  Accordingly, because there is

no material dispute of fact as to either motion, I will grant International Freight's motion for

summary judgment, and deny plaintiffs' cross-motion for summary judgment against

International Freight.[32]

### D.  Cargolux Defendants

#### 1.  Airline Deregulation Act Preemption

The Cargolux Defendants' principal argument is that plaintiffs' negligence claims against

them (*i.e.*, Counts V and VI) are precluded by 49 U.S.C. § 41713(b)(1), which is the preemption

provision of the Airline Deregulation Act of 1978 ("ADA"), Pub. L. No. 95-504, 92 Stat. 1705

(codified as amended in various sections of 49 U.S.C.).[33]  Section 41713(b)(1) provides, with

exceptions not relevant here, that "a State . . . may not enact or enforce a law, regulation, or other

provision having the force and effect of law related to a price, route, or service of an air carrier

that may provide air transportation under this subpart."

The Cargolux Defendants contend that § 41713(b)(1) preempts plaintiffs' negligence

claims against both Cargolux and CAS, because the claims are "related to a . . . service" that

---

[32] Because of the conclusion I reach on other grounds, I need not resolve International Freight's other arguments: (1) that it was not in contractual privity with Mr. Danner;  (2) that plaintiffs' negligence claim is barred by the economic loss rule; and (3) that the damages claimed by plaintiffs are not recoverable.  I also make no determination as to whether Even-Rock's negligence has been established, or whether Even-Rock would be liable to plaintiffs.  Because this Court lacks personal jurisdiction over Even-Rock, those issues are not before me.  Moreover, to the extent that the contractual arrangements between Even-Rock and International Freight may have contained provisions purporting to limit Even-Rock's liability (the record does not reveal whether such provisions existed), I express no view as to whether such provisions would be enforceable against plaintiffs or, if so, whether plaintiffs could have stated a cause of action against International Freight for agreeing to Even-Rock's limitation of liability.

[33] In recognition of the Supreme Court's decision in *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 228-29 (1995) (discussed in more detail, *infra*), the Cargolux Defendants concede that § 41713(b)(1) does not preempt plaintiffs' claim against Cargolux for breach of contract (*i.e.*, Count IV).  *See* Cargolux Motion at 8 n.4.

Cargolux provides, namely storing and accounting for cargo in connection with transporting it. Cargolux Motion at 9.  The Cargolux Defendants rely, *inter alia*, upon an unreported decision of the Fourth Circuit, *Wagman v. Federal Express Corp.*, 47 F.3d 1166, 1995 WL 81686 (4th Cir. Feb. 17, 1995), which they contend stands for the proposition that the ADA preempts common law tort claims against air carriers for cargo loss and damage.  Although CAS, Cargolux's ground handling agent, is not an "air carrier" itself, the Cargolux Defendants argue that plaintiffs' claim against CAS is also preempted.  In support, they cite two lower court decisions holding that the ADA's preemption provision applies to claims against "agents, servants and employees of an airline as well as the airline itself."  *Vail v. Pan Am Corp.*, 616 A.2d 523, 528 (N.J. Super. Ct. App. Div. 1992); *see also Huntleigh Corp. v. La. State Bd. of Private Sec. Examiners*, 906 F. Supp. 357, 362 (M.D. La. 1995).

In response, plaintiffs dispute that Cargolux is an "air carrier" within the meaning of § 41713(b)(1).  As noted, § 41713(b)(1) preempts claims "related to a price, route, or service of an *air carrier* that may provide air transportation."  (Emphasis added.)  The term "air carrier," defined in 49 U.S.C. § 40102(a)(2), means "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation."[34]  In turn, § 40102(a)(15) provides the following definition of "citizen of the United States":

> (A) an individual who is a citizen of the United States;
>
> (B) a partnership each of whose partners is an individual who is a citizen of the United States; or
>
> (C) a corporation or association organized under the laws of the United States or a State, the District of Columbia, or a territory or possession of the United States, of which the president and at least two-thirds of the board of directors and other managing officers are citizens of the United States, which is under the actual

---

[34] "Air transportation" is also a defined term, which includes the "transportation of passengers *or property* by aircraft as a common carrier for compensation," either by interstate or foreign transportation, "when any part of the transportation is by aircraft."  49 U.S.C. § 40102(a)(5), (23), (25) (emphasis added).

control of citizens of the United States, and in which at least 75 percent of the voting interest is owned or controlled by persons that are citizens of the United States.

Notably, the term "foreign air carrier" is separately defined.  It means "a person, not a citizen of the United States, undertaking by any means, directly or indirectly, to provide foreign air transportation."  49 U.S.C. § 40102(a)(21).

Plaintiffs argue that Cargolux does not satisfy the definition of "air carrier" because it is not a "citizen of the United States" within the meaning of § 40102.  Rather, plaintiffs contend that Cargolux is majority-owned by entities controlled by the Grand Duchy of Luxembourg.  *See* Danner-Cargolux Motion at 5.  Even if Cargolux is an "air carrier," plaintiffs contend that their claims against CAS are not precluded because "the storing of Plaintiffs' Cargo by CAS at CAS' warehouse was not 'related to the . . . service of an air carrier.'"  Danner-Cargolux Motion at 5. In this connection, plaintiffs point out that, separate from the bill for air transportation of the Cargo that was paid by Rex to Cargolux, CAS invoiced International Freight (who in turn invoiced plaintiffs) for the storage of the Cargo at CAS's warehouse.  *See* Danner-Cargolux Motion at 5-6.  *See also* Moine Dep. at 38-39 (describing billing arrangements);[35] Ex.9 to Danner-Cargolux Motion (ECF 55-11) (checks from International Freight to CAS for storage); Ex.10 to Danner-Cargolux Motion (ECF 55-12) (bill from International Freight to Coletta, including charge for "storage").

The Cargolux Defendants concede that Cargolux is a foreign air carrier, but maintain that foreign air carriers are covered by the ADA's preemption provision, despite the fact that they do not satisfy the definition of "air carrier" in 49 U.S.C. § 40102(a)(2).  The Cargolux Defendants rely upon a recent decision of the Ninth Circuit, *In re Korean Airlines Co.*, 642 F.3d 685 (9th

---

[35] At his deposition, Mr. Moine testified that International Freight was "allowed two days free in [CAS's] warehouse and then they start charging storage."  In turn, International Freight then invoices its customer for those charges.  Moine Dep. at 38-39.

Cir. 2011), in which the court reached that conclusion as a matter of first impression.   In addition, they insist that CAS is covered by the preemption provision, notwithstanding its billing of International Freight for storage fees, because "the Air Waybill expressly provides that Cargolux's contracted 'service' included not just transportation of the cargo from South Africa to [Seattle] but also delivery of the cargo to . . . International Freight . . . , the consignee, or [International Freight's] designee," and because "it is undisputed that CAS took custody of the cargo as Cargolux's ground handling agent."  Cargolux Motion at 6.[36]

Plaintiffs suggest that *In re Korean Airlines* is not persuasive because, in their view, that decision disregards the "plain definitions expressly provided by Congress" in the ADA.  Danner-Cargolux Reply at 1.  But, they maintain that, even if Cargolux qualifies as an "air carrier," the ADA does not preempt "all tort claims relating to cargo," *id.* at 2, and the Cargolux Defendants' "conduct in wrongfully transporting Plaintiffs' cargo . . . [to a] warehouse in a foreign country without the knowledge or consent of Plaintiffs is not an airline service" within the meaning of the ADA's preemption provision.  *Id.* at 4.

In determining whether an airline's activity is a "service" for purposes of preemption, plaintiffs urge application of a three-part test articulated by then-District Judge Sonia Sotomayor in *Rombom v. United Air Lines, Inc.*, 867 F. Supp. 214, 221-22 (S.D.N.Y. 1994): (1) "whether the activity at issue in the claim is an airline service"; (2) "if the activity in question implicates a

---

[36] The Cargolux Defendants also suggest that plaintiffs' allegation in their Amended Complaint that they hired Cargolux to transport the Cargo "and store same in its warehouse" constitutes a binding judicial admission that storage of the Cargo was part of the "service" provided by Cargolux.  *See* Cargolux Motion at 5.  However, "even a judicial admission does not always foreclose different position," *Coral v. Gonse*, 330 F.2d 997, 999 n.1 (4th Cir. 1964), and whether to construe a party's statement as a judicial admission is discretionary with the court. *Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 264 (4th Cir. 2004).  Indeed, "the court is not bound by a party's conception of the legal effect of certain facts."  *Id.* at 265 n.2 (emphasis omitted).  I do not construe the allegations in plaintiffs' Amended Complaint to foreclose their argument that their claims against CAS withstand preemption.  In any event, this dispute is immaterial because, as I shall explain, plaintiffs' claims are not preempted for a different reason.

service, . . . whether the claim affects the airline service directly or tenuously, remotely, or peripherally"; and (3) "whether the underlying tortious conduct was reasonably necessary to the provision of the service."  The *Rombom* Court concluded: "If the tortious act did not occur during the service in question or the tortious act did not further the provision of a service in a reasonable manner, then the state tort claim should continue."  *Id.* at 222.

I have considered the case law cited by the parties, as well as other case law uncovered in researching the matter.  The Ninth Circuit's analysis in *In re Korean Airlines* concerning whether the ADA's preemption provision applies to foreign air carriers is compelling, but it is ultimately unnecessary for me to resolve whether foreign air carriers are entitled to ADA preemption.  This is because I conclude that, even assuming that Cargolux is an "air carrier" for preemption purposes, plaintiffs' negligence causes of action with respect to the misplacement of the Cargo are not foreclosed by the ADA's preemption provision.  Rather, the case law dictates that such a claim arises under federal common law.  I shall explain.

The Supreme Court has construed the ADA's preemption provision in two cases: *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), and *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995).

*Morales* arose from a declaratory judgment action initiated by certain airlines in response to an effort by several state attorneys general, coordinated through the National Association of Attorneys General ("NAAG"), to promulgate "Air Travel Industry Enforcement Guidelines" containing "detailed standards governing the content and format of airline advertising, the awarding of premiums to regular customers (so-called 'frequent flyers'), and the payment of compensation to passengers who voluntarily yield their seats on overbooked flights," and to enforce those guidelines by means of existing state consumer protection laws.  *Id.* at 379.  The

Supreme Court affirmed a grant of declaratory and injunctive relief in favor of the airlines, barring enforcement of the "fare advertising provisions" of the NAAG guidelines. *See id.* at 380, 391. It reasoned that the ADA's preemption provision, then codified in 49 U.S.C. App'x § 1305(a)(1),[37] "pre-empts the States from prohibiting allegedly deceptive airline fare advertisements through enforcement of their general consumer protection statutes." *Morales*, 504 U.S. at 378.

Although the state consumer protection provisions with respect to price advertising that were at issue in *Morales* are dissimilar to the common law negligence claims at issue here, *Morales* established several important principles. First, the Court discussed the legal landscape that existed before and after enactment of the ADA. It recounted, *id.* at 378-79:

> Prior to 1978, the Federal Aviation Act of 1958 (FAA) gave the Civil Aeronautics Board (CAB) authority to regulate interstate airfares and to take administrative action against certain deceptive trade practices. It did not, however, expressly pre-empt state regulation, and contained a "saving clause" providing that "[n]othing . . . in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." As a result, the States were able to regulate intrastate airfares (including those offered by interstate air carriers), and to enforce their own laws against deceptive trade practices.

> In 1978, however, Congress, determining that "maximum reliance on competitive market forces" would best further "efficiency, innovation, and low prices" as well as "variety [and] quality . . . of air transportation services," enacted the Airline Deregulation Act (ADA). To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision, prohibiting the States from enforcing any law "relating to rates, routes, or services" of any air carrier. (Internal citations omitted.)

The ADA preserved federal enforcement authority over deceptive airline trade practices (initially vested in the CAB, and later in the Department of Transportation). *Id.* at 379. Notably, however, as the *Morales* Court observed, the ADA "did not repeal or alter the saving clause in

---

[37] The preemption provision was recodified as 49 U.S.C. § 41713(b)(1) in 1994, without substantive change. *See* Pub. L. No. 103-272, 108 Stat. 745 (1994). *See also Wolens*, 513 U.S. at 223 n.1.

the prior law." *Id.*   The saving clause, formerly codified in 49 U.S.C. App'x § 1506, is now codified in 49 U.S.C. § 40120(c).  It states: "A remedy under this part is in addition to any other remedies provided by law."[38]

Next, the Court considered the scope of the preemption provision.  It observed that the ADA "pre-empts the States from actually prescribing rates, routes, or services," but also goes further.  *Id.* at 385.  Construing the phrase "relating to" in the ADA's preemption clause, the *Morales* Court opined that it expressed "a broad pre-emptive purpose," similar to the scope of the preemption provision of the Employee Retirement Income Security Act ("ERISA"). *Morales*, 504 U.S. at 383.  Therefore, the Court reasoned: "State enforcement actions having a connection with or reference to airline 'rates, routes, or services' are pre-empted" by the ADA. *Id.* at 384.  The Court also commented that the case before it was "much like" prior ERISA case law, in which it "held that a common-law tort and contract action seeking damages for the failure of an employee benefit plan to pay benefits 'related to' employee benefit plans and was pre-empted by ERISA." *Id.* at 388.  And, in the context of the fare advertising guidelines at issue, the Court found that the FAA saving clause did not "supersede the specific substantive pre-emption provision." *Id.* at 385.  In conclusion, the *Morales* Court stated: "'Some state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect.'"   *Id.* at 390 (citation omitted; alteration in *Morales*).   But, the Court did not decide "'where it would be appropriate to draw the line,'" because "'[t]he present litigation plainly does not present a borderline question.'" *Id.* (citation omitted).

---

[38] The statutory language was changed in the recodification from 49 U.S.C. App'x to 49 U.S.C.  *See* Pub. L. No. 103-272, 108 Stat. 745 (1994).  It has not subsequently been amended. As noted, the recodification was not intended to effect substantive change.  *See Wolens*, 513 U.S. at 223 n.1.   The revision notes to § 40120(c) state that the revision was intended "to eliminate unnecessary words and for clarity and consistency."

In *Wolens*, *supra*, 513 U.S. 219, the Supreme Court again considered the scope of the ADA's preemption provision.  In that case, participants in an airline's frequent flyer program filed class action suits against the airline, challenging the airline's retroactive changes to terms and conditions of the program.  *Id.* at 222, 224.  The participants asserted state common law claims for breach of contract, and also claimed that the changes to the program violated Illinois's Consumer Fraud Act.  *Id.* at 225.  In a straightforward application of *Morales*, the Court concluded that the plaintiffs' statutory claims were preempted by the ADA.  *See id.* at 227-28. The Court commented: "This Illinois law, in fact, is paradigmatic of the consumer protection legislation underpinning the NAAG guidelines" that were at issue in *Morales*.  *Id.* at 227.

In contrast, the *Wolens* Court held that the plaintiffs' common law breach of contract claims were not preempted.  It reasoned: "We do not read the ADA's preemption clause . . . to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings."  *Id.* at 228.  The Court also remarked that the "conclusion that the ADA permits state-law-based court adjudication of routine breach-of-contract claims . . . makes sense of Congress' retention of the FAA's saving clause."  *Id.* at 232.  In conclusion, the Court opined, *id.* at 232-33 (internal citation omitted):

> The ADA's preemption clause, read together with the FAA's saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated.  This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement.

Thus, the Supreme Court has clearly held that the ADA's preemption provision bars the states from directly regulating fares, routes, and services of air carriers, and also bars

enforcement of state statutes of general application to the extent that they "relate to" fares, routes, and services.   In contrast, the Court has indicated that state statutes that affect fares, routes, and services in only a "'tenuous, remote, or peripheral . . . manner'" may not be preempted.   *Morales*, 504 U.S. at 390 (citation omitted).   And, it has held that the ADA's preemption provision does not apply to state breach of contract suits, so long as the contract claim does not depend upon "enlargement or enhancement based on state laws or policies external to the agreement" between the plaintiff and the defendant airline.   *Wolens*, 513 U.S. at 233.   However, the Supreme Court has not commented on whether or in what degree common law tort claims, in general—or negligence claims regarding cargo loss or damage, in particular— are preempted by the ADA.

To my knowledge, the Fourth Circuit has addressed the ADA's preemption provision in a single reported opinion, which neither side has cited: *Smith v. Comair, Inc.*, 134 F.3d 254 (4th Cir. 1998).   *Smith* involved claims under state tort law, but not claims concerning damaged or lost cargo.

In *Smith*, a passenger sued an airline for breach of contract, false imprisonment, and intentional infliction of emotional distress, after the airline refused to permit him to board a connecting flight (effectively detaining him at a layover airport for several hours) because its personnel at the passenger's originating airport had failed to check his identification.   *Id.* at 256. The Fourth Circuit held that the passenger's contract claim was preempted by the ADA, because the airline "invoke[d] defenses provided by federal law"—specifically, federal regulations and directives that required inspection of passenger identification and granted airlines discretion over passenger boarding for safety reasons.   *Id.* at 258.   Addressing *Wolens*, the Court explained: "*Wolens* recognized that state contract claims escape preemption only when courts would be

confined to the terms of the parties' agreement. . . .   Because a court adjudicating [the passenger's] contract claim could not confine itself to the terms of the parties' bargain, *Wolens* is not controlling." *Id.*

Turning to the intentional tort claims, the Court stated: "To determine whether a claim has a connection with, or reference to an airline's prices, routes, or services, we must look at the facts underlying the specific claim." *Id.* at 259.   It concluded that the passenger's tort claims were "based in part upon Comair's refusal of permission to board," and reasoned that "boarding procedures" are "[u]ndoubtedly . . . a service rendered by an airline." *Id.*   Accordingly, the Court held that, "to the extent Smith's claims are based upon Comair's boarding practices, they clearly relate to an airline service and are preempted under the ADA." *Id.*   But, it determined that the passenger's tort claims were not preempted to the extent that they were based on alleged actions other than denial of permission to board, stating, *id.*:

> Suits stemming from outrageous conduct on the part of an airline toward a passenger will not be preempted under the ADA if the conduct too tenuously relates or is unnecessary to an airline's services.  If, for example, an airline held a passenger without a safety or security justification, a claim based on such actions would not relate to any legitimate service and would not be preempted.[39]

*Wainwright's Vacations, LLC v. Pan American Airways Corp.*, 130 F. Supp. 2d 712 (D. Md. 2001), is also instructive.   There, the district court held that a defamation claim based on derogatory remarks made by an airplane captain over the airplane's public address system was not preempted by the ADA.   It reasoned that the purpose of the preemption provision was "'[t]o ensure that the states would not *re*-regulate what Congress had decided to *de* regulate,'" *id.* at 724 (quoting *Taj Mahal Travel, Inc. v. Delta Airlines Inc.*, 164 F.3d 186, 191 (3rd Cir. 1998)) (emphasis in original), and that the remarks at issue "were not related in more than a tenuous

---

[39] The *Smith* Court held, however, that Smith's unpreempted tort claims failed to state a claim for relief under the applicable substantive state law.  *Smith*, 134 F.3d at 259-60.

fashion to rates, routes, or services, and, indeed, were not necessary to carry out any regulated duty." *Wainwright's*, 130 F. Supp. 2d at 724.

Although the foregoing cases provide guidance with respect to the scope of the ADA's preemption provision, none of them concerns tort liability for loss of or damage to cargo.  As noted, the Cargolux Defendants rely on the Fourth Circuit's unreported decision in *Wagman v. Federal Express Corp.*, *supra*, 47 F.3d 1166, 1995 WL 81686 (4th Cir. Feb. 17, 1995), for the proposition that such tort claims are preempted by the ADA.

In *Wagman*, the plaintiffs sued Federal Express, asserting claims of deceptive advertising under state consumer protection law, as well as negligence and breach of contract claims, arising out of Federal Express's failure timely to deliver to plaintiffs' attorney a package containing a signed complaint, which their attorney was to file in another case.  "The complaint had to be filed the next delivery day to avoid the statute of limitations, but Federal Express delivered the package one day too late."  *Wagman*, 1995 WL 81686, at *1.  The district court granted summary judgment in favor of Federal Express as to all claims.  *See Wagman v. Federal Express Corp.*, 844 F. Supp. 247 (D. Md. 1994).[40]

On appeal, however, the plaintiffs did not press their tort or contract claims.  *See Wagman*, 1995 WL 81686, at *1 ("On appeal, the Wagmans *concede their negligence and breach of contract claims cannot survive summary judgment*, but challenge the district court's entry of summary judgment on the claims based on Federal Express's allegedly deceptive advertising.") (emphasis added).  Thus, the Fourth Circuit considered *only* whether the ADA preempted the plaintiffs' claim under state statutory consumer protection law.  In light of *Morales* and *Wolens*, it held that the claim was preempted, stating: "[T]he ADA's preemption

---

[40]  The district court's ruling in *Wagman* as to the tort and contract claims was substantially based on federal common law principles that are also applicable here, as I will discuss, *infra*.

provision prohibits state regulation of airline advertising pertaining to services—such as Federal Express's overnight delivery guarantee—as well as to airline fares." *Id.* at *2.  In so holding, and contrary to the Cargolux Defendants' suggestion, the Court did not discuss whether the ADA preempted the plaintiffs' contract and tort claims arising from the untimely package delivery. Indeed, the district court had based its summary judgment ruling as to those claims on other grounds. *See Wagman*, 844 F. Supp. at 249-51.

In addition to *Wagman*, the Cargolux Defendants cite several district court decisions (none from this circuit) to buttress their claim that plaintiffs' negligence claims are preempted. *See Aretakis v. Fed. Express Corp.*, Civ. No. 10-1696, 2011 WL 1226278 (S.D.N.Y. Feb. 28, 2011) (report & recommendation of magistrate judge), *adopted*, 2011 WL 1197596 (S.D.N.Y. Mar. 25, 2011); *Cathedral of Hope v. FedEx Corp. Servs., Inc.*, Civ. No. 3:07-CV-1555-D, 2008 WL 2242546 (N.D. Tex. May 30, 2008); *Cash America Pawn, L.P. v. Fed. Express Corp.*, 109 F. Supp. 2d 513 (N.D. Tex. 2000); *Breitling U.S.A., Inc. v. Fed. Express Corp.*, 45 F. Supp. 2d 179 (D. Conn. 1999); *Rockwell v. United Parcel Serv., Inc.*, No. 2:99 CV 57, 1999 WL 33100089 (D. Vt. July 7, 1999); *Trujillo v. American Airlines, Inc.*, 938 F. Supp. 392 (N.D. Tex. 1995), *aff'd*, 98 F.3d 1338 (5th Cir. Sep. 6, 1996) (unreported) (per curiam).  These cases largely support the proposition that negligence claims under state law against an air carrier for misplacement or late delivery of cargo may be preempted under the ADA.[41]

---

[41] Not all of the cases are squarely on point.  In *Breitling*, 45 F. Supp. 2d at 181, similar to *Wagman*, the plaintiffs did not contest the defendants' motion for summary judgment as to their tort claims.  Thus, the sole claim as to which the Court considered preemption was the plaintiffs' breach of contract claim.  *Rockwell* was a decision under the Federal Aviation Authorization Administration Act ("FAAAA"), not the ADA.  *See Rockwell*, 1999 WL 33100089, at *1-2.  However, *Rockwell* relied on ADA case law and, to be sure, the FAAAA's preemption provision is codified in the same section of the United States Code as the ADA's preemption provision.  *See* 49 U.S.C. § 41713(b)(4).

*Trujillo* is a fair representative of the reasoning of these cases.[42]  In *Trujillo*, the plaintiff

sued an airline after it lost a package containing jewelry valued at $23,490, alleging violation of

a state consumer protection statute, negligence, and gross negligence.  *Trujillo*, 938 F. Supp. at

393.  The *Trujillo* Court held that all of the plaintiff's claims were preempted by the ADA.  The

court reasoned that it was "clear that the acts Trujillo complains of—preparation of the Waybill

by telephone and delivery of the package—are services within the meaning of § 41713(b)(1),"

because they were "activities that 'generally represent a bargained-for or anticipated provision of

labor from one party to another.'"  938 F. Supp. at 394 (citation omitted).  Citing *Wolens*, the

court stated, *id.* (internal citations omitted):

> State causes of action are available to enforce bargains for services into
> which an airline voluntarily entered, but may not be used to impose external
> requirements upon airlines in the provision of services to the consumer.
> Plaintiff's breach of contract claim was the means by which he could enforce the
> agreement for services he made with American.[43]  He may not cast his claims as
> ones for negligence or deceptive trade practices to extend his recovery beyond the
> terms of the contract.  To do so would frustrate Congress' intent to deregulate the
> airline industry.

I have considered *Trujillo* and the other district court cases cited by the Cargolux

Defendants, but I do not find them persuasive.  Rather, I am persuaded by a substantial body of

precedent at the federal appellate level, including the seminal case of *Sam L. Majors Jewelers v.*

*ABX, Inc.*, 117 F.3d 922 (5th Cir. 1997), which was decided after *Trujillo*.

Like *Trujillo*, *Sam L. Majors* arose from an airline's loss of shipments of jewelry.  In *Sam*

*L. Majors*, a jeweler sued an airline regarding three lost shipments of jewelry, with declared

values between $3,000 and $6,000.  *See id.* at 924.  The jeweler sued the airline in state court,

---

[42] Indeed, several of the other cases rely upon *Trujillo*.  *See Cathedral of Hope*, 2008 WL 2242546, at *4; *Cash America*, 109 F. Supp. 2d at 524; *Rockwell*, 1999 WL 33100089, at *2.

[43] It is not clear whether Mr. Trujillo in fact alleged a contract claim, or whether the *Trujillo* Court was suggesting that he ought to have done so.  If Mr. Trujillo did allege a contract claim, it was no longer at issue by the time the opinion in *Trujillo* was rendered.

alleging breach of contract, negligence, and violation of state deceptive trade practices law, and the airline removed the case to federal court. *Id.* "The important and difficult question" in the case was "whether there is a basis for federal jurisdiction, the monetary amount at issue being insufficient to raise diversity jurisdiction." *Id.* at 923. The Fifth Circuit observed that the jeweler's claims did not arise under an express or implied federal statutory cause of action. *Id.* at 925. Moreover, although the airline asserted a preemption defense under the ADA, the court reasoned that the ADA's preemption clause "does not give rise to federal jurisdiction," applying the general principle that "'a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption.'" *Id.* (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987)). However, the *Sam L. Majors* Court found federal question jurisdiction satisfied because "a cause of action against air carriers for lost or damaged goods arises under federal common law." *Sam L. Majors*, 117 F.3d at 926.[44]

The *Sam L. Majors* Court painstakingly traced the history of the federal common law cause of action against common air carriers for lost or damaged cargo, beginning before federal regulation, and continuing during the period of regulation and after deregulation by the ADA, explaining that "a federal common law did develop and was saved by subsequent acts of Congress." *Id.* at 926; *see id.* at 926-29. The court cited several cases from the pre-ADA period in which, "applying federal common law, federal courts found that civil actions against air

---

[44] The *Sam L. Majors* Court recognized that federal question jurisdiction applies in "exceptional" situations of so-called "complete preemption," in which "Congress intended any related cause of action to be governed under federal law." *Sam L. Majors*, 117 F.3d at 925. But, the court concluded that the ADA's preemption clause did not evince an intent by Congress to "completely preempt state law" in all respects or to "'channel actions into federal court'" whenever any dispute between an airline and its customer arose. *Id.* (quoting *Wolens*, 513 U.S. at 230) (some internal citations and quotation marks omitted).

carriers for lost or damaged goods arose under federal law." *Id.* at 927-28.[45]  And, the Fifth

Circuit stated: "When deregulating the airlines under the ADA, not only did Congress [choose]

not to repeal federal common law in 'clear' and 'explicit' language, it chose the opposite course:

the ADA includes an express provision preserving common law remedies." *Id.* at 928.  Citing

the ADA's savings provision, originally codified in 49 U.S.C. App'x § 1506 and now codified

without substantive change at 49 U.S.C. § 40120(c), the court said: "This savings clause had the

effect of preserving the clearly established federal common law cause of action against air

carriers for lost shipments." *Sam L. Majors*, 117 F.3d at 928.  Thus, the court concluded that it

had "jurisdiction over this action," because the jeweler's "negligence action against [the airline]

arises under federal common law." *Id.* at 929.  Although the court concluded that the jeweler's

state statutory consumer protection claim was preempted by the ADA, *see id.* at 931, it

proceeded to the merits of the negligence claim. *See id.* at 929-31.

   The *Sam L. Majors* Court cited two other post-deregulation federal appellate decisions

that had previously concluded that federal common law continues to govern claims for lost or

damaged air cargo. *See First Pa. Bank v. Eastern Airlines*, 731 F.2d 1113, 1115-22 (3d Cir.

1984) (stating that airline's liability for lost cargo is "a purely judicial question for determination

by application of the federal common law"); *Deiro v. American Airlines, Inc.*, 816 F.2d 1360,

1365 (9th Cir. 1987) (stating that "deregulation of air carriers in 1978 did not change the

applicability or substantive content of the relevant federal common law").  Moreover, every

federal circuit that has considered the issue since *Sam L. Majors* has likewise held that "federal

common law continues to control the issue of liability of air carriers for lost or damaged

---

[45] The *Sam L. Majors* Court cited, as examples, *North American Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d 229 (2d Cir. 1978); *Klicker v. Northwest Airlines, Inc.*, 563 F.2d 1310, 1312-16 & n.10 (9th Cir. 1977); *Tishman & Lipp, Inc. v. Delta Air Lines*, 413 F.2d 1401, 1403 (2d Cir. 1969); and *Lichten v. Eastern Airlines*, 189 F.2d 939, 941 (2d Cir. 1951).  *See Sam L. Majors*, 117 F.3d at 928 n.11.

shipments even after deregulation." *Nippon Fire & Marine Ins. Co. v. Skyway Freight Sys., Inc.*, 235 F.3d 53, 59 (2d Cir. 2000); *see Treiber & Straub, Inc. v. UPS, Inc.*, 474 F.3d 379, 383-84 (7th Cir. 2007) ("We . . . join our colleagues in holding that a claim for lost or damaged goods transported by a common air carrier arises under federal common law."); *Read-Rite Corp. v. Burlington Air Express, Ltd.*, 186 F.3d 1190, 1195-98 (9th Cir. 1999) ("[F]ederal common law applies to loss of or damage to goods by interstate common carriers by air."); *see also Tran Enters., LLC v. DHL Express (USA), Inc.*, 627 F.3d 1004, 1012 n.2 (5th Cir. 2010); *King Jewelry, Inc. v. Fed. Express Corp.*, 316 F.3d 961, 964-65 (9th Cir. 2003).

It is also noteworthy that another judge of this court, in *Wagman*, *supra*, 844 F. Supp. 247, relied upon federal common law to resolve a negligence claim against an air carrier for loss of cargo, stating: "Federal law determines the liability of interstate common carriers for loss, damage, or delay of goods in transit." *Id.* at 249.  Although *Wagman* predated *Sam L. Majors*, it relied on several cases upon which the *Sam L. Majors* Court also relied in reaching a similar conclusion.  *See id.* at 249-51 (citing, *inter alia*, *Deiro*, *supra*, 816 F.2d 1360; *First Pa. Bank*, *supra*, 731 F.2d 1113; and *N. Am. Phillips*, *supra*, 579 F.2d 229).

Although the Fourth Circuit has not addressed these matters, I am amply persuaded by the cogent analysis presented in *Sam L. Majors*, the district court decision in *Wagman*, and the other federal appellate decisions I have cited, which hold that federal common law governs claims against air carriers for loss, damage, or delay of cargo.  Therefore, the parties' contentions regarding the extent to which tort claims under state law are preempted by the ADA, and the question of whether plaintiffs' claims are "related to a . . . service" of Cargolux, are not dispositive.

To be sure, in plaintiffs' negligence claims against the Cargolux Defendants (Counts V

and VI), as in all of the counts in the Amended Complaint, plaintiffs do not specify whether the claims arise under federal law or the law of any particular state. Rather, they simply assert a claim for "negligence" arising from defendants' loss of the Cargo. In accordance with *Sam L. Majors* and its progeny, I conclude that such negligence claims are governed by, and arise under, federal common law. Therefore, I need not consider whether the ADA would preempt a complaint concerning loss of cargo that expressly and exclusively invoked state tort law. It follows that plaintiffs' negligence claims against the Cargolux Defendants are not preempted by the ADA's provision barring enforcement of "a State . . . law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier," 49 U.S.C. § 41713(b)(1), because plaintiffs' negligence claims arise under federal law, not state law.

A fortuitous result of this determination is that, as noted, the Court possesses federal question jurisdiction over the negligence claim against Cargolux, and supplemental jurisdiction over the other claims in the case. *See Sam L. Majors*, 117 F.3d at 929 ("Because Jewelers' negligence action against Airborne arises under federal common law, we have jurisdiction over this action."). Accordingly, I need not resolve the issue of plaintiffs' inadequate pleading of diversity jurisdiction, discussed earlier.

## 2. *Liability and Damages*

My consideration of the other arguments made by plaintiffs and the Cargolux Defendants is hampered by the fact that much of their discussion is premised on the assumption that plaintiffs' negligence claims against Cargolux and CAS arise under state law. But, as I have explained, plaintiffs' negligence claim, at least against Cargolux, is a creature of federal common law.[46]

---

[46] Although the Cargolux Defendants contend that the same ADA preemption principles apply to plaintiffs' claims against both Cargolux and CAS, it is not clear that the same principles

Plaintiffs contend that the Cargolux Defendants' liability in both tort and contract is established as a matter of law. In this regard, they maintain that the Cargolux Defendants are liable based on principles of Maryland bailment law, discussed previously. And, citing Maryland case law, they also contend that the Cargolux Defendants are liable based on the negligence principle of *res ipsa loquitur*. In so arguing, plaintiffs do not address whether the bailment and *res ipsa* standards on which they rely are applicable in a claim against an air carrier under federal common law for lost or damaged cargo.

The Cargolux Defendants contend that, if plaintiffs' negligence claim against Cargolux is not preempted by the ADA, it is precluded by the existence of a contractual agreement between Cargolux and plaintiffs, in the form of the Air Waybill executed by plaintiffs' agent, Rex. In a similar vein, the Cargolux Defendants suggest, in a footnote, that plaintiffs' negligence claim against CAS is barred by the "economic loss rule." But, even assuming that these arguments would be correct as a matter of state law, the Cargolux Defendants have not addressed whether a state law claim for breach of contract would preclude a tort claim for loss of cargo under federal law. Nor have they discussed the operation of the economic loss rule with respect to such a federal cause of action.

In regard to plaintiffs' breach of contract claim, the Cargolux Defendants do not concede liability. Indeed, they argue strenuously that there are disputes of material fact as to their liability, discussed *infra*, which they argue defeat plaintiffs' motion for summary judgment. However, the Cargolux Defendants' own motion for summary judgment as to the contract claim does not rest on a contention that they are not liable for breach of contract as a matter of law.

---

apply to a claim against an air carrier and the carrier's ground handling agent for cargo loss or damage. Because neither side has presented substantial analysis, beyond the preemption context, as to how CAS's liability might differ from that of Cargolux, I will assume, *arguendo*, that the same principles govern the liability of both of the Cargolux Defendants.

Rather, they assert that most of the damages claimed by plaintiffs were unforeseeable and therefore not recoverable.[47]   And, this assertion is premised on the notion that the "'scope of foreseeability in claims for consequential damages resulting from breach of contract is much narrower than the scope of foreseeability of damages in tort.'"  Cargolux Motion at 13 (quoting *Anyangwe v. Nedlloyd Lines*, 909 F. Supp. 315, 323 n.8 (D. Md. 1995)).  The viability of this argument is unclear, however, given that plaintiffs' tort claims are not preempted.

It is difficult, therefore, to analyze properly the parties' motions.  Nevertheless, I will consider the parties' arguments in the context of Maryland state law.  As I shall explain, both motions will be denied.

### 3.  Plaintiffs' Motion

As noted, plaintiffs claim that the liability of the Cargolux Defendants is established as a matter of law, invoking principles of bailment and *res ipsa loquitur*.  They assert that, "[o]nce the Cargo was delivered to and accepted by Cargolux and CAS, these defendants are deemed to have assumed the duty of reasonable care in protecting the bailed property."  Danner-Cargolux Motion at 8.[48]  Moreover, plaintiffs contend that, "[w]hen the Cargo was found eight months later in Cargolux' warehouse in Vancouver, Canada, there is a direct inference of negligence on [the] part of Cargolux and CAS."  *Id.*  In plaintiffs' view, by showing the unexplained

---

[47] The Cargolux Defendants appear to concede that some of plaintiffs' alleged damages are foreseeable.  Nevertheless, they contend that those damages are not recoverable because they are less than the approximately $47,000 in proceeds that plaintiffs have already received from the Santam Limited insurance policy obtained by Rex.  As I shall explain, *infra*, this argument is without merit, in light of the collateral source rule.

[48] Apparently, plaintiffs and the Cargolux Defendants agree that, when Rex executed the Air Waybill, it did so on plaintiffs' behalf as their agent.  *See* Cargolux Opp. at 17 ("Plaintiffs, through Rex Freight Forwarders, their agent, and Cargolux entered into Cargolux Air Waybill 172-3221 6881, a contract of carriage . . . ."); Danner-Cargolux Motion at 2 ("Plaintiffs' freight forwarder in South Africa was Rex Freight Forwarders, who hired Defendant, Cargolux Airlines International SA ('Cargolux'), to transport the Cargo . . . .").  Because neither party disputes this matter, I need not explore it further.

- 52 -

disappearance of the Cargo, they have established an unrebutted *prima facie* case of liability against the Cargolux Defendants, and therefore are entitled to partial summary judgment.

Even if the case were governed entirely by Maryland common law, there is no merit to plaintiffs' argument that the Cargolux Defendants' liability is established as a matter of law.  As noted, Maryland bailment law contemplates a burden-shifting procedure, whereby a plaintiff may establish a *prima facie* case of breach of bailment by showing that the defendant had an agreement with the plaintiff regarding possession of property, that the property was delivered to the defendant, that the defendant accepted possession of the property, and that the property was "either not returned or returned in a damaged condition."  *McClung-Logan*, *supra*, 40 Md. App. at 588, 391 A.2d at 1155; *see also Stehle Equip.*, *supra*, 247 Md. at 213, 230 A.2d at 655; *John T. Handy*, *supra*, 102 Md. App. at 201-02, 648 A.2d at 1122.[49]

The doctrine of *res ipsa loquitur,* on which plaintiffs rely, operates in a similar manner. The Maryland Court of Appeals elucidated the concept of *res ipsa loquitur* in *Dover Elevator Co. v. Swann*, 334 Md. 231, 236-37, 638 A.2d 762, 765 (1994) (internal citations and some internal quotation marks omitted):

---

[49] Like International Freight, the Cargolux Defendants argue that plaintiffs' invocation of bailment principles subjects defendants to unfair surprise.  As they see it, plaintiffs' reliance on bailment law somehow contradicts the plaintiffs' prior contentions that "the Air Waybill comprised the contract between themselves and Cargolux." Cargolux Opp. at 8 n.5.  Further, the Cargolux Defendants claim that, if they had known that plaintiffs were asserting a bailment cause of action, their "strategy and discovery objectives in this case would have been very different." *id.*  However, the Cargolux Defendants do not explain how an express invocation of bailment principles would have changed their strategy or discovery tactics.  Moreover, plaintiffs' assertion of a bailment theory of liability, belated though it may be, is in no way inconsistent with their assertion that the Air Waybill was a contract between the parties.  Rather, the Air Waybill appears to be a contract with relation to possession of property, satisfying one of the elements of bailment.  *See John T. Handy*, *supra*, 102 Md. App. at 201-02, 648 A.2d at 1122.

In any event, I need not resolve the Cargolux Defendants' objection to plaintiffs' assertion of a bailment theory of liability.  Even assuming that bailment principles apply, plaintiffs are not entitled to summary judgment.

*Res ipsa loquitur* is applied in negligence actions as a permissible inference that literally means "the thing speaks for itself." *Res ipsa loquitur* is "merely a short way of saying that the circumstances attendant upon an accident are themselves of such a character as to justify a [court or] jury in inferring negligence as the cause of that accident." The doctrine allows a plaintiff the opportunity to establish a *prima facie* case "when he could not otherwise satisfy the traditional requirements for proof of negligence." The jury is thereby permitted, but not compelled, to infer a defendant's negligence without the aid of any direct evidence. Even when the doctrine applies, however, the burden of proving the defendant's negligence remains upon the plaintiff. Under Maryland's tort law, successful reliance on *res ipsa loquitur* requires proof of the following three components:

> 1. A casualty of a sort which usually does not occur in the absence of negligence.

> 2. Caused by an instrumentality within the defendant's exclusive control.

> 3. Under circumstances indicating that the casualty did not result from the act or omission of the plaintiff.

Even if state law applied and plaintiffs established all the elements of a *prima facie* case under either bailment or *res ipsa* principles, they still would not be entitled to summary judgment as to liability. Under both *res ipsa loquitur* and bailment law, a plaintiff's proof of an unrebutted *prima facie* case does not entitle the plaintiff to judgment as a matter of law; rather, it entitles the plaintiff to present the case to the fact finder, which is permitted, *but not required*, to infer the defendant's liability. *See, e.g.*, *Dover*, 334 Md. at 236, 638 A.2d at 765 (under *res ipsa loquitur*, the "jury is . . . permitted, but not compelled, to infer a defendant's negligence without the aid of any direct evidence"); *Johnson & Towers Baltimore, Inc. v. Babbington*, 264 Md. 724, 727-28, 288 A.2d 131, 133-34 (1972) (under bailment law, the "burden is always on the bailor to establish affirmatively that [loss of bailed property] was occasioned or was not prevented by reason of some negligence on the part of the bailee," and "the question of the negligence of the bailee is ordinarily for the jury").

Moreover, it is by no means clear that plaintiffs have established a *prima facie* case of liability under bailment or *res ipsa* principles, although I need not definitively resolve that issue. The Cargo was handled by parties other than the Cargolux Defendants both before transportation to Seattle and (at least arguably, taking the facts in the light most favorable to the Cargolux Defendants) after the Cargo was purportedly surrendered to Even-Rock. Notably, clearance of the Cargo through South African agencies apparently took several months and, for all that the record shows, the mold damage to the Lion Trophies could have occurred before they were shipped out of South Africa. It is also noteworthy that the Maryland Court of Appeals has held the doctrine of *res ipsa loquitur* inapplicable to cases involving multiple defendants in situations similar to those here. *See, e.g.*, *Giant Food, Inc. v. Washington Coca-Cola Bottling Co.*, 273 Md. 592, 332 A.2d 1 (declining, in tort case against soda retailer and soda bottler for injuries sustained when soda bottle exploded, "to extend the doctrine of res ipsa loquitur to a case against multiple defendants absent a showing that their liability was joint or that they were in joint or exclusive control of the injury producing factor; or that the wrongdoer, among several possible, has not been identified").

For these reasons, even if the matter were entirely controlled by Maryland common law, plaintiffs' motion for summary judgment could not succeed.[50]

---

[50] In their opposition to plaintiffs' motion for summary judgment, the Cargolux Defendants assert that there are several other disputes of material fact and/or undisputed material facts that favor the Cargolux Defendants and compel denial of plaintiffs' motion. *See* Cargolux Opp. at 15-18. The Cargolux Defendants insist that plaintiffs "admitted" that CAS released the Cargo to Even-Rock. *Id.* at 15-16. Moreover, the Cargolux Defendants challenge plaintiffs' characterizations of their Vancouver business, arguing that plaintiffs' assertion that the Cargolux Defendants "have daily truck deliveries" to the Menzies warehouse is disputed because neither Cargolux nor CAS operates trucks; and that plaintiffs' assertion that the Cargo was located at "Cargolux' (Menzies) warehouse" is disputed because the Vancouver warehouse is operated by Cargolux's ground handling agent, Menzies, rather than Cargolux itself. *Id.* at 17-18.

#### 4. Cargolux Defendants' Motion

The Cargolux Defendants maintain that the amount of their liability for damages is effectively zero. Primarily, the Cargolux Defendants contend that the vast majority of the damages that plaintiffs seek are "special" or "consequential" damages, which they insist are not recoverable unless the damages were foreseeable to the Cargolux Defendants.[51] *See* Cargolux Motion at 13-14. In the Cargolux Defendants' view, the damages were not foreseeable, in large part because plaintiffs' agent, Rex, expressly stated in the Air Waybill that the Cargo had no declared value and did not purchase supplemental insurance from Cargolux. *See id.* at 14-17. Furthermore, to the extent that plaintiffs claim "direct damages," for which the Cargolux Defendants concede they could otherwise be liable,[52] the Cargolux Defendants argue that

---

In my view, these assertions are specious. "[D]isputes over semantics do not create a genuine issue of material fact." *Jones v. Shinseki*, 804 F. Supp. 2d 665, 677 (M.D. Tenn. 2011). The record is clear that Cargolux regularly ships cargo by truck to the Menzies warehouse (regardless of whether Cargolux actually operates the trucks itself), and that Menzies operates the warehouse in Vancouver at least in part as a ground handling agent for Cargolux (although Cargolux itself does not operate the warehouse). Plaintiffs have consistently alleged, and the record is undisputed, that although the Cargo was *purportedly* picked up from CAS by Even-Rock, the Cargo somehow appeared in a different country, in a warehouse operated by a ground handling agent of Cargolux, to which Cargolux regularly ships cargo by truck. The record contains no inconsistency or dispute as to these facts. In my view, a fact finder could infer (but would not be required to infer) from the undisputed facts that the Cargo's disappearance and subsequent reappearance in Vancouver was due to the negligence of either or both of the Cargolux Defendants. But, there is no evidence presently in the record from which a fact finder could resolve the issue of whether the Lion Trophies were damaged and, if so, causation of such damage.

[51] Initially, the Cargolux Defendants also challenged damages purportedly sought by plaintiffs for emotional distress. *See* Cargolux Motion at 17-20. But, plaintiffs have clarified that they do "not pursue a cause of action for emotional distress." Danner-Cargolux Motion at 12. Accordingly, I need not consider the contentions of the Cargolux Defendants as to damages for emotional distress.

[52] The Cargolux Defendants define "direct damages" as "'those which arise naturally from a breach of contract and which . . . can be expected to result from the breach.'" Cargolux Motion at 17 n.13 (quoting *Petroleum Traders Corp. v. Balt. County*, Civ. No. L-06-444, 2009 WL 2982942, at *8 (D. Md. Sep. 14, 2009), *aff'd*, 413 F. App'x 588 (4th Cir. 2011), in turn quoting *Transdulles Ctr., Inc. v. USX Copr.*, 976 F.2d 219, 226 (4th Cir. 1992)).

plaintiffs cannot recover those damages from the Cargolux Defendants, because they have already collected approximately $47,000 in insurance proceeds from the Santam Limited policy purchased by Rex, and assessment of further damages against the Cargolux Defendants would result in a double recovery for plaintiffs.  *See id.* at 20-21.

Plaintiffs respond that the Cargolux Defendants should have been aware of the nature of the Cargo (and the damages that would follow from its loss) because the Air Waybill "clearly describes the Cargo as '*Consolidated Cargo of Dip & Pack Hunting Trophies as per attached manifest.*'"  Danner-Cargolux Motion at 10 (quoting Air Waybill) (emphasis in original).  Given that the Cargolux Defendants are in the business of shipping and handling cargo, plaintiffs reason, they "knew or should have known that . . . items such as hunting trophies must be handled properly."  Danner-Cargolux Motion at 10.

More important, plaintiffs contend that the "proper measure of damages in this case is replacement cost," and cite *Davis v. Jackson*, 264 Md. 668, 671, 287 A.2d 768, 770 (1972), for the proposition that

> replacement cost, although not determinative of value, would have a bearing on value in precisely the same manner that the original cost of an automobile would be some evidence of its later value.  In fact, 5 CORBIN ON CONTRACTS § 1020 (1964) states:
>
> > "If a specific subject-matter has no directly ascertainable market value, taken as a whole and in its present form, other methods that accord with the practices of men in business may be used and may be quite sufficient standing alone.  Value may be determined * * * by proving reproduction costs with allowance for depreciation." [sic]

According to plaintiffs, the replacement costs for the Lion Trophies include the following sums, Danner-Cargolux Motion at 11:

1. Lion trophy fees (2) = $70,000.00 (current cost for one is $60,000.00)[53]

2. Airfare for Safari trip (2 hunters) = $4,600.00

3. Hunt support through Air 2000 (2 hunters) = $320.00

4. Guides and staff for 10 days (2 hunters) = $8,000.00

5. Tips to guide, cook, maid, tracker (2 hunters) = $6,600.00

6. Dipping and packing (2 lions) = $400.00

7. Atcheson Taxidermy = $1,176.00

8. Conway Freight = $330.18

9. Betts, Patterson & Miles, (Attorneys) One Convenient Place, Suite 1400, Seattle, Washington 98101 = $3,988.45

10. Buzz Cook Taxidermy = $240.00

These amounts (including trophy fees of $60,000 per lion, rather than $35,000 per lion) total

$145,654.60. Plaintiffs have not submitted admissible evidence, beyond the affidavit of Mr.

Danner, which is challenged by the Cargolux Defendants,[54] to prove these damages. But, as

---

[53] Plaintiffs assert that the trophy fee for a lion is presently $60,000 per lion, although it was approximately $35,000 each at the time of their safari. Danner-Cargolux Motion at 11 n.3. However, as the Cargolux Defendants point out, plaintiffs' sole evidence for this increased figure is a "pullquote" (without citation) from an article in a popular magazine (*American Hunter* (Feb. 2009)), which is not competent or admissible evidence of the fact.

Plaintiffs' reliance on Rule 803(17) of the Federal Rules of Evidence (an exception from the rule against hearsay for "[m]arket reports, commercial publications, market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations") is unavailing. It is obvious from perusal of the exhibit that the magazine article in question was written for a casual readership, and was not "prepared with the view that [it] would be in general use by an industry or members of the public having a general need to rely on information" contained in it; nor did its publisher or author "stake their business or public reputations on the accuracy" of the information. *Conoco Inc. v. Dept. of Energy*, 99 F.3d 387 (Fed. Cir. 1996). Therefore, the article is unlike publications of compiled information that have been admitted under Rule 803(17), such as Bloomberg market quotes, *see United States v. Masferrer*, 514 F.3d 1158, 1162 (11th Cir. 2008), a real estate industry publication providing monthly lists of properties sold by date and sale price, *see United States v. Cassiere*, 4 F.3d 1006, 1018-19 (1st Cir. 1993), or a directory of banks by routing number, *see United States v. Goody*, 792 F.2d 664, 675 (7th Cir. 1986).

[54] To be sure, under Maryland law, "an owner of property may ordinarily testify as to its value." *Bastian v. Laffin*, 54 Md. App. 703, 713, 460 A.2d 623, 629 (1983). But, "the rule regarding the admissibility of an owner's testimony of property values is not without limitations. The owner's competence to testify derives not from title 'but rather [from] the fact that ordinarily

noted, they have clarified that they do not seek summary judgment as to damages at this juncture. *See* ECF 64 at 1.

Rather than the alleged replacement-cost damages sought by plaintiffs, which the Cargolux Defendants contend are unforeseeable, the Cargolux Defendants urge that, in a cargo damage action between a shipper and a carrier, "the measure of damages is the fair market value at the port of destination of the goods in a sound condition less the fair market value of the goods in their damaged condition." *Amstar Corp. v. M/V Alexandros T.*, 472 F. Supp. 1289, 1294 (D. Md. 1979), *aff'd*, 664 F.2d 904 (4th Cir. 1981).[55]  But notably, unlike this case, *Amstar* involved damage to a cargo of a commodity intended for resale—specifically, 4,000 long tons of raw sugar.  The cargo in *Amstar* is not analogous to the Lion Trophies, which were prized souvenirs of plaintiffs' hunt.

The Cargolux Defendants also cite *Anyangwe v. Nedlloyd Lines*, *supra*, 909 F. Supp. 315 (D. Md. 1995), and *Mojica v. Autoridad de las Navieras de Puerto Rico*, Civ. No. 92-2026, 1993 WL 724807 (D.P.R. May 28, 1993), but the losses for which the plaintiffs sought to recover in those cases also are not analogous to this case.   In *Anyangwe*, the plaintiff shipped "certain personal belongings and food" from Maryland to Cameroon.   909 F. Supp. at 318.   The defendant shipping companies allegedly promised plaintiff that the cargo would arrive in Cameroon in time for her wedding.  *Id.* at 323.  The cargo arrived undamaged but too late, and plaintiff sought "consequential damages . . . [for] the emotional distress and pain inflicted upon her by defendants when they did not deliver her goods in time for her wedding."  *Id.*  The

---

an owner knows the property intimately and is familiar with its value,'" and "'if it is demonstrated that the owner possesses no knowledge whatever of the market price and condition of the article in question, his testimony may be inadmissible.'"  *Id.* at 713-14, 460 A.2d at 629 (quoting *Cofflin v. State*, 230 Md. 139, 143, 186 A.2d 216, 219 (1962)).

[55] As noted, the Cargolux Defendants do not rely on the liability-limiting provisions contained in the Air Waybill.

emotional distress damages at issue in *Anyangwe* are unlike the alleged costs to replace the damaged Lion Trophies.

In *Mojica*, the plaintiff sought to recover damages for "loss of income, suffering, [and] mental and moral anguish" due to a carrier's failure timely to transport his pickup truck from New Jersey to Puerto Rico. *Mojica*, 1993 WL 724807, at *2. The court disallowed the damages, stating: "It is settled law that damages which do not related directly to the cargo itself are special or consequential damages." *Id.* However, the *Mojica* Court quoted at length the treatise S. SORKIN, GOODS IN TRANSIT, for a definition of special or consequential damages, which illuminates the distinction between such damages and many of the items of replacement-cost damages sought by plaintiffs here:

> In cargo loss or damage cases, it may be said that special damages is *damage other than physical damage to the cargo* which can be measured by the value of the cargo in the market place *or otherwise*. Special damages include economic damage such as loss of market by delay, loss of profit, loss of income, goodwill, business reputation, future business, loss of continued business of a customer, loss of rental income, labor cost in fabricating material containing unobservable defect resulting from carrier's attempt to remove visible manifestations of rust or cost of alternate transportation. It may include damages sometimes called consequential damages such as mental anguish and physical inconvenience.

*Id.* (quoting GOODS IN TRANSIT) (emphasis added and omitted). Notably absent from the list of special damages is replacement cost for lost cargo, which clearly is "related directly to the cargo itself."

In a recent admiralty decision, *F.C. Wheat Maritime Corp. v. United States*, 663 F.3d 714 (4th Cir. 2011), the Fourth Circuit described market value and replacement cost as alternative measures of direct damages. The Court stated that, ordinarily, a plaintiff is "entitled to be made whole, but only in the least expensive way: market value or replacement cost, whichever is less."

*Id.* at 721-22.[56]  But, the Court also recognized precedent for the proposition that replacement cost may be a correct measure of damages, "even when it is greater than . . . market value, where the person who suffered the loss proved a unique use for the [lost property] that would not be recognized in [the] market price."  *Id.* at 722.

Therefore, although I do not necessarily agree with plaintiffs that all of the items of damages they seek are proper items of replacement cost, it is clear that a court may consider replacement costs as a measure of direct damages.  Replacement costs do not necessarily constitute special or consequential damages.  *See, e.g.*, *21st Century Props. Co. v. Carpenter Insulation & Coatings Co.*, 694 F. Supp. 148, 152 n.2 (D. Md. 1988) (stating, in breach of warranty case under Maryland law against building contractor for installation of faulty roofs, "the cost of replacing the allegedly defective roofs which plaintiffs seek to recover constitutes the direct damage, not incidental or consequential damages, caused by the wrongs alleged").

A simple "market value" measurement may be inadequate here, because of the idiosyncratic nature of the Cargo.  After all, the plaintiffs did not travel to South Africa to hunt the lions in order to sell the Lion Trophies to someone else, and so the Cargo's "market value" (to the extent that there is a market in the trophies of other people's hunts) means little to plaintiffs, and is likely far less than the value, in money and effort, that plaintiffs actually expended to acquire the Lion Trophies.  On the other hand, the "replacement cost" of the Lion Trophies that plaintiffs urge does not simply represent the cost of obtaining new lion trophies.  Rather, the alleged "replacement cost" is, in large measure, the cost of another South African safari—in essence, the cost not only of acquiring new lion trophies, but of personally doing so,

---

[56] Here, no party has established the market value of the Lion Trophies, if any, and so I cannot compare it to plaintiffs' alleged replacement costs.

by means of another vacation experience, of which a lion trophy is the ultimate tangible memento.

In his treatise on the LAW OF REMEDIES, Professor Dan B. Dobbs articulates the problems that inhere in valuing items of idiosyncratic value, akin to the Lion Trophies at issue here:

> Some property held for personal use . . . is held primarily for associational and affect value. . . .  When any such property is destroyed, the suspicion arises that an award of market value is likely to be less than compensatory.  As a result courts seem to have struggled to find some adjustment in the usual formula for damages to permit a something-more than market recovery.
>
> *        *        *
>
> Many items of this kind have no market value at all; the faded photograph of the owner's mother, for example.  Other items, like great grandfather's watch, may have a market value, but if so it is one that does not represent the special significance to the owner.
>
> In these cases, . . . the courts have said, somewhat contradictorily, that recovery is to be measured by value to the owner, but that it may not include anything for sentimental value.  Since the value to the owner *is* sentimental value, this formula should not be understood too literally.  Rather it is a means of warning the jury away from enormous awards for affect value and a way of permitting the courts to limit awards if they do go too far.  Thus courts have had to explain that they do not exclude all claims based on the owner's special attachment but only those based on a "mawkish and unreasonable attachment," and have allowed limited recoveries for sentimental value or something that seems indistinguishable from sentimental value in cases of pets, family photographs, heirlooms and personal trophies.

DAN B. DOBBS, 1 LAW OF REMEDIES, § 5.16(3), at 906-08 (2d ed. 1993) ("DOBBS ON REMEDIES") (footnotes omitted).

In sum, I find both sides' measures of damages unconvincing; neither side has persuaded me that its position is legally correct.  Given the current posture of the case, in which the Cargolux Defendants seek a ruling at summary judgment that plaintiffs are not entitled to any damages, and plaintiffs seek summary judgment only as to liability, but not as to damages, it is the Cargolux Defendants' burden, as the moving parties, to persuade the Court that they are "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When, on a motion for

summary judgment, a question of law is at issue, "summary judgment may be awarded if the defendant has demonstrated a clear entitlement to judgment in its favor as a matter of law." *King v. Government Employees Ins. Co.*, 843 F. Supp. 56, 56 (D. Md. 1994). Because the Cargolux Defendants have not done so, their motion will be denied as to this issue. However, it bears noting that at trial it will be plaintiffs' burden to present a legally sound measure of damages.

### 5. Collateral Source Rule

One final matter remains. As noted, the Cargolux Defendants argue that, even if they might otherwise be liable for damages, they should not be required to compensate plaintiffs to the extent that the damages are less than the approximately $47,000 in proceeds that plaintiffs have received from the Santam Limited insurance policy.[57]

In response, plaintiffs maintain that their recovery of the insurance proceeds is irrelevant, pursuant to the collateral source rule. Under Maryland law, the collateral source rule is both a substantive and evidentiary doctrine: it "permits an injured person to recover the full amount of his or her provable damages, 'regardless of the amount of compensation which the person has received for his [or her] injuries from sources unrelated to the tortfeasor'"; and, it also "generally prohibits presentation to a jury of evidence of the amount of . . . expenses that have been or will be paid by . . . insurance" or other sources. *Lockshin v. Semsker*, 412 Md. 257, 285, 987 A.2d 18, 34 (2010). The doctrine "rests on public policy considerations—principally that the wrongdoer should not receive a windfall because the plaintiff received a benefit from an independent source, but also that, to the extent the collateral benefit arises from insurance

---

[57] The Cargolux Defendants do not expressly characterize their argument as a request for a credit or offset of damages.

maintained by the plaintiff, the rule encourages the maintenance of insurance." *Haischer v. CSX Transp., Inc.*, 381 Md. 119, 132, 848 A.2d 620, 627 (2004).[58]

The Cargolux Defendants counter that the collateral source rule does not apply to contract claims.  In support of this contention, they rely on *Dennison v. Head Const. Co.*, 54 Md. App. 310, 321-22, 458 A.2d 868, 874-75, *cert. denied*, 296 Md. 653 (1983).  In that case, as plaintiffs point out, the Court of Special Appeals did not hold that the collateral source rule was inapplicable to claims for breach of contract; rather, the *Dennison* Court held that the rule "is not applicable in workmen's compensation cases." *Id.* at 322, 458 A.2d at 875.  Nevertheless, in so holding, the court relied on two cases from other states in which the collateral source rule was rejected in contract cases generally, on the rationale that the "'collateral source rule is punitive; contractual damages are compensatory.  The collateral source rule, if applied to an action based on breach of contract, would violate the contractual damage rule that no one shall profit more from the breach of an obligation than from its full performance.'" *Id.* (quoting *Patent Scaffolding Co. v. William Simpson Constr. Co.*, 64 Cal. Rptr. 187, 191 (Cal. App. 1967), and citing *Hubbard Broadcasting, Inc. v. Loescher*, 291 N.W.2d 216 (Minn. 1980)).  And, more recently, the Court of Special Appeals has cited *Dennison*, in *dictum*, for the proposition that "the collateral source rule does not apply to contract cases." *Weichert Co. v. Faust*, 191 Md. App. 1, 10 n.6, 989 A.2d 1227, 1232 n.6 (2010).

As I see it, it is irrelevant whether the collateral source rule applies to contract claims under Maryland law, because plaintiffs' negligence claim under federal common law remains vital, and the collateral source rule applies to tort claims governed by federal law. *See, e.g.*, *Sloas v. CSX Transp., Inc.*, 616 F.3d 380, 389-90 & n.8 (4th Cir. 2010) (applying collateral

---

[58] As Professor Dobbs observes, another justification for the collateral source rule is that it "preserves subrogation rights of any insurer who paid benefits to the plaintiff."  1 DOBBS ON REMEDIES § 3.8(1), at 374.

source rule to Federal Employers' Liability Act negligence claim) (citing *Eichel v. N.Y. Cent. Ry. Co.*, 375 U.S. 253 (1963)); *Gill v. Maciejewski*, 546 F.3d 557, 564-65 (8th Cir. 2008) (applying collateral source rule as part of "federal common law of damages" in § 1983 case); *Perry v. Larson*, 794 F.2d 279, 285-86 (7th Cir. 1986) (same); *Hartnett v. Reiss S.S. Co.*, 421 F.2d 1011, 1016 n.3 (2d Cir. 1970) (stating, in admiralty tort case: "[t]he general rule in the federal courts is that the collateral source rule is applied"); *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 535 (9th Cir. 1962) (stating, in Jones Act case, that federal courts apply the collateral source rule "as a rule of federal law").   Accordingly, plaintiffs' recovery of insurance proceeds from a collateral source has no effect on the Cargolux Defendants' liability for damages.

### Conclusion

For the foregoing reasons, I will grant International Freight's motion for summary judgment and will deny plaintiffs' cross-motion for summary judgment against International Freight.  Additionally, I will deny both the Cargolux Defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment against the Cargolux Defendants.  Finally, I will grant plaintiffs' motion for leave to file a surreply, *nunc pro tunc*, and will deny the Cargolux Defendants' motion to strike.  An Order implementing my rulings follows.

Date:   February 23, 2012

_____/s/_____
Ellen Lipton Hollander
United States District Judge