IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DENNIS DANNER, *et al.*,

    *Plaintiffs*,

v.

INTERNATIONAL FREIGHT
SYSTEMS OF WASHINGTON, LLC,
*et al.*,

    *Defendants*.

Civil Action No. ELH-09-3139

## MEMORANDUM OF DECISION

This case is rooted in a hunting trip in South Africa, during which Dennis Danner, Alexander Danner, and Michael Coletta, plaintiffs, each killed a "trophy quality" male lion. The lion skins and skulls (the "Lion Trophy" or "Lion Trophies," or "Cargo") were shipped to the United States for tanning and taxidermy, but at some point were lost in transit. The Cargo was found several months later at a warehouse in Vancouver, Canada. By that time, two of the Lion Trophies had suffered irreparable damage, allegedly due to exposure to moisture and bacteria.

As a result, plaintiffs filed suit to recover for damages allegedly sustained as a result of the loss of the Cargo. In particular, they sued several defendants: Cargolux Airlines International S.A. d/b/a Cargolux Airlines International, Inc. ("Cargolux"), an all-cargo air carrier; Cargo Airport Services USA, Inc. ("CAS"), a cargo handling company that is Cargolux's ground handling agent in Seattle, Washington (CAS and Cargolux are collectively referred to as the "Cargolux Defendants"); International Freight Systems of Washington, LLC ("International Freight"), a customs broker and freight forwarder; and Even Rock, Inc. d/b/a Seattle Air Cargo ("Even-Rock"), a Seattle-based warehousing company.[1] International Freight and the Cargolux

_____

[1] The parties usually refer to Even-Rock as "SAC." In order to avoid confusion with

Defendants filed cross-claims against each other and against Even-Rock, seeking indemnity or contribution in the event liability was established.  *See* ECF 13, 16.

Earlier in the litigation, Judge Richard D. Bennett granted Even-Rock's motion to dismiss for lack of personal jurisdiction, *see* ECF 36 & 37, but denied a motion to dismiss for failure to state a claim filed by the Cargolux Defendants.  *See* ECF 42 & 43.[2]  Thereafter, in a Memorandum Opinion and Order issued February 23, 2012 (ECF 69 & 70), I granted summary judgment in favor of International Freight as to all of plaintiffs' claims against it, but denied summary judgment with respect to plaintiffs' claims against the Cargolux Defendants.  *See Danner v. Int'l Freight Systems of Wa., LLC*, 855 F. Supp. 2d 433 (D. Md. 2012).[3]  The Cargolux Defendants and International Freight subsequently stipulated to the dismissal of their cross-claims.  *See* ECF 77, 78.  The Cargolux Defendants are now the only remaining defendants.

Plaintiffs' claims against the Cargolux Defendants were tried to the Court, without a jury, on October 2 and 3, 2012.  Thereafter, the parties filed post-trial memoranda.  *See* ECF 108, 111, 112.  The Court now issues this Memorandum of Decision, which includes findings of fact and conclusions of law, in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.[4]

## Findings of Fact

At trial, plaintiffs presented the testimony of Gordon Chinn, Cargolux's corporate designee and Operations Manager; plaintiff Dennis Danner; David Peters, the Customer Service Manager for Wildlife Gallery, Inc., a wholesale, "hair-on" tannery located in Mount Pleasant,

CAS, however, I will refer to the company as Even-Rock.

[2] The case was reassigned from Judge Bennett to me on January 14, 2011.

[3] As I explained in *Danner*, 855 F. Supp. 2d at 444-45, this Court has subject matter jurisdiction on the basis of federal question jurisdiction, *see* 28 U.S.C. § 1331, and has supplemental jurisdiction over plaintiffs' state law claims.  *See*  28 U.S.C. § 1367(a).

[4] The Memorandum of Decision was prepared without the benefit of a trial transcript.

Michigan; and the testimony of Thomas J. Hardesty, the proprietor of Atcheson Taxidermy, Inc. in Butte, Montana, presented via a *de bene esse* video deposition conducted on September 18, 2012.  Mr. Peters and Mr. Hardesty testified as hybrid fact and expert witnesses.  The Cargolux Defendants presented additional testimony of Mr. Chinn as well as the testimony of Roxana Alvarado, CAS's corporate designee and the Office Supervisor for CAS.  The parties stipulated to several facts, which were read into the record at the beginning of trial.  They also introduced numerous exhibits into evidence.[5]

## A.  The Hunting Trip

Dennis Danner took his then-fourteen-year-old son, Alex, and his son-in-law, Michael Coletta, on a safari hunting trip to South Africa at the end of June and the beginning of July 2007.[6]   Mr. Danner paid all of the expenses of the trip.   During the safari, each plaintiff accomplished his goal of shooting and killing a full-maned, trophy-quality male lion, among other game.

The hunting trip was conducted on a large wilderness "ranch," several thousand acres in size, owned and operated by Tam Safaris ("Tam").  In Mr. Danner's estimation, Tam is one of the best South African hunting outfitters.  Tam provided all facilities and supplies for the hunt and was responsible for plaintiffs' physical accommodations and safety during the trip.  In addition, Tam personnel were responsible for the skinning and salting of the various trophies of plaintiffs' hunt, including the Lion Trophies.  Mr. Danner testified in detail about the circumstances of the hunt and the subsequent care for the Lion Trophies during plaintiffs' stay in South Africa.  Although plaintiffs did not seek to qualify Mr. Danner as an expert, he is an

---

[5] Although I do not expressly mention each item of evidence presented during trial, I have considered all of the stipulations, exhibits, and testimony.

[6] To distinguish father and son, I will generally refer to Dennis Danner as Mr. Danner and to Alexander Danner by his nickname, Alex.

experienced hunter who has hunted game since the age of twelve.  In addition, Mr. Danner operates his own hunting outfitting business in Pennsylvania,[7] and has participated in six or seven prior hunting safaris in Africa.

Mr. Danner closely supervised the skinning and salting of the Lion Trophies, observing "every facet" of the process.  After an animal is skinned, it must be salted to draw all moisture out of the skin.[8]  Mr. Danner testified that he instructed Tam personnel to make sure that there was salt in "every nook and cranny" of the Lion Trophies, and made sure that the salt was changed every day.  By the third day after the trophies were skinned, there was no flesh or blood visible on the skins.  Nevertheless, Mr. Danner insisted that the salt continue to be changed on a daily basis.  The trophies were also dipped in a chemical agent, which Mr. Danner testified was required if the skins were to be shipped out of South Africa.  The skinning, salting, and dipping process was performed to Mr. Danner's satisfaction.[9]

During the trip to South Africa, Mr. Danner inspected the condition of the skins daily. He also viewed them immediately before plaintiffs' departure.  The skins were packed in two large containers for transport.[10]  One of the containers contained two of the Lion Trophies. According to Mr. Danner, these were the ones shot by Alex and Mr. Coletta.  The other container

---

[7] Mr. Danner's outfitting business is not his primary occupation.  He is a land developer and builder by profession.

[8] Both of plaintiffs' expert witnesses also testified that the purpose of salting is to draw all moisture out of an animal skin.  In addition, Mr. Peters stated that salting helps to ward off bacteria.

[9] Because Mr. Danner did not testify as an expert, I did not permit him to offer an opinion as to whether the skinning and salting were performed in an objectively correct manner. Nevertheless, as a lay witness with experience in skinning and salting, Mr. Danner was permitted to testify that his own standards were satisfied.

[10] The parties have often referred to the containers as "crates," but Mr. Hardesty testified that the containers were constructed of cardboard.

contained the third Lion Trophy, shot by Mr. Danner.  Each container also held several other trophies of the hunt.

## B.  Shipment to the United States

The Cargo was shipped to Seattle, Washington in November 2007, *i.e.*, several months after plaintiffs left South Africa.  Rex Freight Forwarders ("Rex"), a South African freight forwarding company,[11] made the arrangements for shipment to Seattle.  According to Mr. Danner, Rex was hired by Tam, on plaintiffs' behalf.  The parties stipulated that Rex acted as plaintiffs' agent and that Rex hired Cargolux in that capacity.

On November 11, 2007, an employee of Rex, as the "Shipper," signed Cargolux Air Waybill No. 172-3221 6881 (the "Air Waybill"), Defendants' Exhibit 2, a contract of carriage by which Rex hired Cargolux to transport the Cargo from Johannesburg, South Africa to Seattle, Washington.  International Freight, which was plaintiffs' freight forwarder and customs broker in the United States, was listed as the "consignee" of the Cargo.  On the Air Waybill, the Cargo is described as a "consolidated cargo of dip & pack hunting trophies" in two containers, with a total gross weight of 114 kilograms.  The parties stipulated that Cargolux was not involved in the packing or crating of the Cargo.

The following text appears in the front, upper right corner of the Air Waybill:

It is agreed that the goods described herein are accepted in apparent good order and condition (except as noted) for carriage SUBJECT TO THE CONDITIONS OF CONTRACT ON THE REVERSE HEREOF.  ALL GOODS MAY BE CARRIED BY ANY OTHER MEANS INCLUDING ROAD OR ANY OTHER CARRIER UNLESS SPECIFIC CONTRARY INSTRUCTIONS ARE GIVEN HEREON BY THE SHIPPER, AND SHIPPER AGREES THAT THE SHIPMENT MAY BE CARRIED VIA INTERMEDIATE STOPPING PLACES WHICH THE CARRIER DEEMS APPROPRIATE.  THE SHIPPER'S ATTENTION IS DRAWN TO THE NOTICE CONCERNING CARRIER'S

_____

[11] A freight forwarder is an entity that hires carriers to transport cargo, "by, in essence, acting as a 'travel agent' for cargo."  *Danner*, 855 F. Supp. 2d at 441 (citation and some internal quotation marks omitted).

LIMITATION OF LIABILITY.  Shipper may increase such limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required.

The reverse of the original of the Air Waybill, retained in Cargolux's records, contains the following text, pertinent here:[12]

### NOTICE CONCERNING CARRIER'S LIMITATION OF LIABILITY
IF THE CARRIAGE INVOLVES AN ULTIMATE DESTINATION OR STOP IN A COUNTRY OTHER THAN THE COUNTRY OF DEPARTURE, THE WARSAW CONVENTION MAY BE APPLICABLE AND THE CONVENTION GOVERNS AND IN MOST CASES LIMITS THE LIABILITY OF THE CARRIER IN RESPECT OF LOSS, DAMAGE, OR DELAY TO CARGO TO 250 FRENCH GOLD FRANCS PER KILOGRAM, UNLESS A HIGHER VALUE IS DECLARED IN ADVANCE BY THE SHIPPER AND A SUPPLEMENTARY CHARGE PAID IF REQUIRED.
THE LIABILITY LIMIT OF 250 FRENCH GOLD FRANCS PER KILOGRAM IS APPROXIMATELY USD 20.00 PER KILOGRAM ON THE BASIS OF USD 42.22 PER OUNCE OF GOLD.

### CONDITIONS OF CONTRACT
\* \* \*
4.  Except as otherwise provided in carrier's tariffs or conditions of carriage, in carriage to which the Warsaw Convention does not apply carrier's liability shall not exceed USD 20.00 or the equivalent per kilogram of goods lost, damaged or delayed, unless a higher value is declared by the shipper and a supplementary charge paid.

5.  If the sum entered on the face of the air waybill as 'Declared Value for Carriage' represents an amount in excess of the applicable limits of liability referred to in the above Notice and in these Conditions and if the shipper has paid any supplementary charge that may be required by the carrier's tariffs, conditions of carriage or regulations, this shall constitute a special declaration of value and in this case carrier's limit of liability shall be the sum so declared.  Payment of claims shall be subject to proof of actual damages suffered.
\* \* \*
7.  Any exclusion or limitation of liability applicable to carrier shall apply to and be for the benefit of carrier's agents, servants and representatives . . . .  For purpose of this provision carrier acts herein as agent for all such persons.
\* \* \*
9.  Subject to the conditions herein, the carrier shall be liable for the goods during the period they are in its charge or the charge of its agent. . . .

---

[12] The text on the reverse was not included on the copy of the Air Waybill that was transmitted to plaintiffs via International Freight.

The Air Waybill reflects that Cargolux was paid a total of ZAR 8,529.50 for transportation of the Cargo. "ZAR" is the abbreviation for the South African rand, which is South Africa's unit of currency. The parties stipulated that, as of November 11, 2007, the date the Air Waybill was executed, ZAR 8,529.50 was equivalent to $1,277.51 in U.S. dollars, and that, as of September 24, 2012, ZAR 8,529.50 was equivalent to $1,035.38.

On the Air Waybill, the "Declared Value for Carriage" of the Cargo was listed as "NDV," the "Declared Value for Customs" was listed as "NCV," and the "Amount of Insurance" was listed as "NIL."[13] Although Rex did not elect to declare value or purchase insurance through Cargolux for the Cargo, Rex purchased a separate insurance policy for the Cargo from an insurer, at Mr. Danner's instruction. Mr. Danner testified that he directed Rex to insure the Cargo "for the cost of the hunt," approximately $250,000. Rex procured an insurance policy worth ZAR 360,000, for which Mr. Danner paid the premium.[14]

Cargolux transported the Cargo from Johannesburg to Seattle (by way of Luxembourg), arriving at Seattle-Tacoma International Airport ("SEA") on November 23, 2007.

### C.  Ground Handling in Seattle

As noted, CAS is Cargolux's ground handling agent at SEA. When the Cargo arrived, CAS moved the Cargo into Cargolux's bonded warehouse, where the Cargo was to remain until

---

[13] In addition to the option to declare value, the Conditions of Contract on the reverse of the Air Waybill also contain provisions regarding purchase of insurance through the carrier. It is not clear what distinctions there are between declaration of value and purchase of insurance in the context of the waybill. However, any distinction between the two options is not material here, because Rex, as plaintiffs' agent, did not choose either option.

[14] Although the nature of the miscommunication is not relevant to the issues at trial, the Court suspects that Mr. Danner told Rex a number that he intended as a dollar figure, but which Rex interpreted as an amount in rand. However, after the Cargo was lost, plaintiffs made a claim against the insurance policy, and discovered the harsh reality of the rand-to-dollar exchange rate: the full ZAR 360,000 policy-limits payout of the insurance policy, which plaintiffs received in April 2009, was worth $47,140.71.

the Cargo was cleared, first by the United States Department of Agriculture, then the United States Department of Fish and Wildlife, and finally by United States Customs. Neither CAS nor Cargolux noted any damage to the containers holding the Cargo upon arrival at SEA. The Cargo was cleared by Fish & Wildlife and U.S. Customs on November 28, 2007, at which point CAS notified International Freight that the Cargo was ready to be picked up.[15]

International Freight assigned Even-Rock, a Seattle-based warehousing company, to pick up the Cargo from CAS. According to the Cargolux Defendants' records, the Cargo was picked up from Cargolux's bonded warehouse on the evening of November 30, 2007. Neither Mr. Chinn, Cargolux's Operations Manager, nor Ms. Alvarado, CAS's Office Manager, was present at the warehouse when the Cargo was purportedly picked up. However, both of them testified with regard to the companies' usual procedures.

According to Mr. Chinn, Cargolux has only one warehouse at SEA. CAS leases the warehouse from Cargolux. However, both the warehouse and the offices of Cargolux and CAS are in the same building. In November 2007, when the Cargo arrived at SEA, CAS was the ground handling agent at SEA for Cargolux and for one other airline. It was part of the responsibilities of CAS personnel to note any damage to cargo that arrived at the warehouse.

Ms. Alvarado testified that once CAS receives notice from the applicable federal agencies that holds on cargo have been released, CAS notifies the applicable consignee (ordinarily, a freight forwarder). The freight forwarder then tells CAS what company will pick up the cargo. When the driver for the company authorized to pick up the cargo arrives at the

---

[15] Apparently, the Department of Agriculture had not yet released a hold on the Cargo. According to Ms. Alvarado, CAS's policy was that cargo should not be released to a consignee until all agency holds have been released. Thus, CAS apparently should not have notified International Freight that the Cargo was ready for pickup when it did, because the Department of Agriculture's hold had not yet been released. However, this apparent mistake by CAS is not material to the Cargolux Defendants' liability in this case.

Cargolux Defendants' facility, the driver presents personnel in CAS's office with a "carrier certificate" or an air waybill number to confirm that the driver is authorized by the freight forwarder to retrieve the cargo.  An employee in the CAS office verifies that all holds have been released and all fees paid, and then directs the driver to the warehouse.

Both Mr. Chinn and Ms. Alvarado testified that, when a driver arrives at the warehouse, the driver does not enter the warehouse or handle the cargo.  Because the warehouse is a bonded customs warehouse, only authorized personnel may enter the warehouse.  Indeed, there is a "security line" painted on the floor near the entrance to the warehouse, beyond which unauthorized personnel, including drivers, may not pass.  A CAS employee at the warehouse will locate the cargo within the warehouse, and bring it out to the driver's truck (using a forklift, if needed).  The CAS employee is responsible for loading the cargo onto the truck.  The driver verifies the number of pieces of cargo and inspects the cargo for outwardly visible damage.  The CAS employee presents the driver with a warehouse receipt, also known as a "warehouse delivery order," which the driver signs; if the driver observes any visible damage to the cargo, the driver indicates it on the warehouse receipt.  CAS retains the original warehouse receipt in its records and gives a copy to the driver.  CAS also updates the entry for the cargo in Cargolux's "E-Champ" software system, which is a comprehensive system for tracking cargo.  If any damage was noted by the driver, that information should be entered into the E-Champ system by CAS.  Missing cargo is also supposed to be noted via E-Champ.

In its records, CAS had the warehouse receipt applicable to the Lion Trophies, which was received in evidence as Defendants' Exhibit 6.  The warehouse receipt was signed by CAS's office employee, "Pamela," and by a CAS warehouse employee whose signature is illegible.  It was also signed by the driver, "Kim Keep."  The warehouse receipt does not contain any

indication of the company that employed Mr. Keep, however.  All of the signatures were dated November 30, 2007.  Mr. Keep indicated that two pieces of cargo were received at 7:24 p.m. on that date.  No damage to the items was noted on the warehouse receipt.  Ms. Alvarado testified that she had no recollection of ever meeting Mr. Keep in person, but was aware from previous dealings that he was a driver for Even-Rock.

International Freight had made arrangements for the Cargo to be stored briefly at Even-Rock's warehouse in Seattle until it could be transported by another trucking company to Atcheson Taxidermy in Butte, Montana.  When that trucking company arrived at Even-Rock's warehouse to pick up the Cargo, however, the Cargo could not be found.

Ms. Alvarado testified that she learned the Cargo was missing when Mary Terry of International Freight called to inform her that the Cargo could not be located.  Ms. Alvarado searched CAS's files and found the warehouse receipt indicating that Mr. Keep had picked up the Cargo.  She faxed the warehouse receipt to Ms. Terry.  Ms. Alvarado also physically checked CAS's warehouse for the Cargo on three occasions, but could not locate the Cargo in the warehouse.  Neither CAS nor Cargolux made an entry in the E-Champ System that the Cargo was missing.

Mr. Danner testified that he spoke with a Cargolux or CAS employee by phone regarding the missing Cargo, but was told that the loss of the Cargo was not the responsibility of the Cargolux Defendants because they had a signed warehouse receipt from Even-Rock's driver, Mr. Keep.  On or about January 8, 2008, Mr. Danner sent written notice to Even-Rock, Cargolux, and CAS that the Cargo was missing and that plaintiffs intended to claim damages, subject to amendment, in the amount of $240,000.  *See* Plaintiffs' Exhibit 11.

### D.  Recovery of the Cargo in Vancouver, Canada

In July 2008, the Cargo was discovered, covered with dust and cobwebs, in a warehouse in Vancouver, Canada, operated by Menzies, Cargolux's ground handling agent in Vancouver. James Chu, of Menzies, telephoned Cargolux's Gordon Chinn that month, advising that the Cargo had been located.  Although Menzies has access to the E-Champ system, Menzies apparently did not place a notation in the E-Champ system upon the arrival of the Cargo in Vancouver.  Notably, the Menzies warehouse is a customs-bonded warehouse, but it is not climate controlled.

None of the parties or witnesses knows who transported the Cargo to the Menzies warehouse in Vancouver, or how or when it was transported.  To be sure, CAS's records reflect that the Cargo was picked up from CAS's warehouse by Kim Keep, who the Cargolux Defendants believe was an employee of Even-Rock.  As noted, Even-Rock originally was a defendant in this litigation, but the claims against Even-Rock were dismissed for lack of personal jurisdiction.  In so ruling, Judge Bennett relied upon affidavit evidence that Even-Rock "conducts its business exclusively in Washington state and Oregon."  ECF 36 at 4.  At trial, the parties agreed that I could rely on Judge Bennett's determination for the factual proposition that Even-Rock does not transport cargo to Vancouver.

Cargolux does not fly into Vancouver, but it ships cargo by truck from the CAS warehouse in Seattle to Menzies' warehouse in Vancouver on an as-needed basis, sometimes as often as daily.  Cargolux employs a trucking company, Freight Link, to transport cargo between Seattle and Vancouver.  Ms. Alvarado testified that she does not believe that Kim Keep worked for Freight Link or that Freight Link could have picked up the Cargo and taken it to Vancouver.

According to Ms. Alvarado, Freight Link drivers typically arrive at CAS's warehouse much later in the evening than when Mr. Keep purportedly picked up the Cargo.

After the Cargo was discovered in the Menzies warehouse, Cargolux arranged for Freight Link to transport the Cargo from Vancouver back to Seattle.  Upon arrival in Seattle, the Cargo was inspected by Buzz Cook Taxidermy, a Seattle-based taxidermist hired by Atcheson Taxidermy.[16]   Another trucking company, Conway Freight, then transported the Cargo to Atcheson Taxidermy in Montana.

### E.  Tanning and Taxidermy

Mr. Hardesty of Atcheson Taxidermy has been in the business of taxidermy for 48 years. He estimated that he has prepared between 30,000 and 50,000 trophies.  At the time of trial, Atcheson Taxidermy averaged about 400 clients per year, down from 600-700 clients per year before the recession.  Mr. Hardesty is a member of the National Taxidermy Association and has testified as an expert on several occasions with regard to the valuation of hunting trophies and with regard to the circumstances and method of an animal's death, in connection with prosecutions brought by the State of Montana.  He was accepted by the Court, without objection, as an expert witness in the field of taxidermy and trophy preparation.[17]

The Cargo was received by Mr. Hardesty on September 10, 2008.  At that time, Mr. Hardesty observed that one of the containers, which contained two of the Lion Trophies, had rust-colored and dark-colored substances on its top.  The other container was in "fairly good" condition, although neither container was sealed.

---

[16] What Buzz Cook's inspection of the Cargo revealed was not presented in evidence at trial.

[17] As noted, Mr. Hardesty testified by way of a *de bene esse* video deposition.

Mr. Hardesty opened both containers and inspected the Lion Trophies.  The parties agree that the Lion Trophy that was packed in a container separate from the other two Lion Trophies was the lion that Mr. Danner shot, and it was not damaged.  A photograph of Mr. Danner's trophy, on display in the "trophy room" in his home, taken after tanning and taxidermy, was submitted as part of Plaintiffs' Exhibit 6.  However, Mr. Hardesty observed "discoloration" on the two Lion Trophies that had been packed together in the other container.  Based on his experience, Mr. Hardesty believed that the two lion skins had gotten wet.

On or about September 15, 2008, Mr. Hardesty shipped the Lion Trophies by truck to Wildlife Gallery, via Conway Freight, with instructions to handle them with special care due to his concern that the trophies had been damaged by moisture.  According to Mr. Hardesty, he has used Wildlife Gallery for tanning for several years, and Wildlife Gallery performs "some of the best tanning in the country."

Mr. Peters, of Wildlife Gallery, testified, without objection, as an expert witness in the field of animal tanning and taxidermy.  Mr. Peters has been employed by Wildlife Gallery for nine years, and has been in the tanning business for over twenty years.  In that time, he has worked in virtually every capacity in the field of tannery and has personally participated in the tanning of over 50,000 trophies.  According to Mr. Peters, Wildlife Gallery is the largest wholesale, hair-on tannery in the country, tanning approximately 66,000 trophies per year.

In September 2008, Mr. Peters received the Lion Trophies and the other trophies of plaintiffs' hunt from Atcheson Taxidermy.  He recalled that Mr. Hardesty had requested "special care" of the Lion Trophies and had noted that the Cargo had been lost for approximately a year and appeared to have gotten wet.  Mr. Peters observed areas of red discoloration on two of the

lion skins that, in his view, were indicators of bacterial infection.  However, Mr. Peters testified that the extent of any damage could not be known until the trophies were rehydrated.

The Lion Trophies were placed in cold storage for three to five days before rehydration. The trophies were then rehydrated in a bactericidal bath, in which the skins soaked for six to eight hours.  The skins had been shipped leather-side out; after the rehydration, the skins were flipped right-side out, and significant "slippage" of the skins was discovered on the two Lion Trophies in issue.  According to Mr. Peters, "slippage" refers to a loosening and loss of hair on the animal skins.  He explained that it is caused by a bacterial infection that eats through the hair follicles, or bacterial infection of the hair "bulb," causing the hair to fall out.[18]

Mr. Peters informed Mr. Hardesty about the slippage.  Nevertheless, Mr. Hardesty instructed him to continue the tanning process.  After rehydration, the Lion Trophies were placed in a "pickle bath" for three days, to "pull proteins out of the skin."  The trophies were then "shaved"[19] and were returned to the pickle bath.  A synthetic tanning agent was then applied to turn the skins into leather.  Subsequently, the skins were dried, finished with oil for three days to give the skins pliability, and then run through sawdust drums to remove excess oil.  Finally, the skins were groomed and brushed.

The entire tanning process took twelve to fifteen days.  In addition to the two damaged Lion Trophies, all of the other trophies were tanned.  Several photographs of the skins were taken after tanning was completed, and were introduced into evidence as plaintiffs' Trial Exhibit

---

[18]  Mr. Hardesty testified that, in the process of creating hairless, buckskin leather, taxidermists intentionally induce slippage through bacterial infection in order to remove hair. Both experts testified that bacteria thrive on animal skins in the presence of moisture, which can be caused by the skins getting wet from an outside source or by the skins themselves "sweating," or drawing moisture out of the air.

[19]  In this context, "shaving" does not refer to hair removal.  Rather, it refers to paring down the leather side of the animal skin.

17.  The areas of "slippage" are apparent as large, hairless patches on the faces and paws of the two Lion Trophies.  Mr. Peters opined that, because of the prominent location of the damaged areas, the two affected trophies were "ruined."

Mr. Peters opined that it was not possible that the slippage had begun in South Africa, before transportation of the Lion Trophies by Cargolux.  According to Mr. Peters, the salting and skinning performed in South Africa appeared to have been an "excellent job."  In his view, the bacteria had most likely begun to affect the skins three to five months before they were received at Wildlife Gallery.  Mr. Peters based his opinion on several factors.

First, Mr. Peters noted that the slippage was confined to areas on the heads and paws of two of the Lion Trophies.  In his experience, the areas where the skin is thinnest, such as the head and paws, are the areas most vulnerable to bacterial infection; therefore, bacterial infections typically start in those locations, and then spread to other areas over time.  Based on his years of experience in tanning, Mr. Peters opined that the slippage was not extensive enough to have begun more than about five months before he inspected the skins.  In his view, if the exposure to bacteria and moisture had occurred in South Africa (*i.e.*, almost a year or more before he inspected the skins), the damage would have been "ten times worse": he estimated that 75% of the hair on the Lion Trophies would have been gone.  Second, Mr. Peters reasoned that, if the exposure to moisture and bacteria had begun earlier, the other skins in the same container would also have been affected.  Third, Mr. Peters noted that the color of the Lion Trophies' skin in the areas affected by slippage was indicative of a relatively recent exposure to moisture and bacteria.  Following tanning, the leather skin in the areas of slippage was white in color.  According to Mr. Peters, if the bacteria had attacked those areas more than approximately five months earlier, the white skin would have turned brown in the process of tanning.  Finally, Mr. Peters relied upon

the fact that the Lion Trophies had apparently been stored for several months in Menzies' warehouse, which the parties agree was not climate controlled.  He testified that, ideally, animal skin trophies should be stored in a cool, dry place.  According to Mr. Peters, there was a great potential for bacteria build-up in a hot, un-air-conditioned warehouse, which would promote "sweating" of the animal skins.

After the tanning process was complete, the Cargo was shipped back to Atcheson Taxidermy.  Mr. Hardesty completed the taxidermy of the undamaged Lion Trophy and the other trophies of the hunt.  However, he did not complete taxidermy of the damaged trophies.  In his view, one of the damaged Lion Trophies was a "total loss."  The extent of hair slippage on the face meant that the trophy would never "look right."  Mr. Hardesty believed that he could have salvaged the other damaged Lion Trophy by cannibalizing the feet from the trophy that was a total loss and stitching together a composite trophy.  However, he did not believe this would be likely to produce satisfactory results and he recommended against it to Mr. Danner.

Similar to Mr. Peters's testimony, Mr. Hardesty also opined that the damage to the Lion Trophies was extremely unlikely to have occurred in South Africa, although he conceded on cross-examination that "anything's possible."  Mr. Hardesty testified that, in his experience, "poor field care" of a trophy will be immediately apparent, in the form of visible mold, green flesh, and hair falling out before the tanning process.  No such damage was evident on the Lion Trophies.  Based on the nature of the damage to the trophies, Mr. Hardesty concluded that, after the Lion Trophies had been dipped and packed, the Lion Trophies had likely been subjected to a long period of moisture, and then dried slowly.  He believed that the trophies were likely completely saturated by moisture in the areas of damage.

F.  Damages

Mr. Danner claimed the hunting trip cost approximately $250,000.  Because Mr. Danner's Lion Trophy was not damaged, however, plaintiffs seek only the items of cost attributable to two hunters and two Lion Trophies, amounting to $96,559.85 in damages.  The Cargolux Defendants vigorously dispute whether plaintiffs' alleged damages are recoverable, but they have not seriously contested that plaintiffs incurred the costs alleged.

Set forth below are the damages summarized in Plaintiffs' Exhibit 10A, to which I have added notations regarding the testimony and the exhibits that supported each claim.

1.  *Lion Trophy Fees ($35,000 per lion)*          $ 70,000.00

Mr. Danner testified that a $35,000 trophy fee was payable to Tam upon shooting a lion, regardless of whether the lion was killed.  Plaintiffs also paid trophy fees in lower amounts for each of the other animals that were shot, and these trophy fees are itemized in Plaintiffs' Exhibit 8, at 1 (Tam's schedule of trophy fees).  All trophy fees were charged in U.S. dollars.[20]

2.  *Airfare (2 hunters, round-trip U.S.-South Africa)*     $   4,107.20

Plaintiffs' Exhibit 10, at 1-2, reflects that each plaintiff incurred a round-trip airfare of $2,053.60 for travel from Washington, D.C. to Johannesburg, South Africa; Johannesburg to Port Elizabeth, South Africa; and back.

3.  *"Hunt support through Air 2000 (2 hunters)"*       $     320.00

This item is supported by Plaintiffs' Exhibit 8, at 2, and Plaintiffs' Exhibit 10, at 2.  Apparently, Air 2000 performed a sort of hunters' concierge service, arranging for travel to and from the airport and assisting with clearance of the hunters' firearms for entry into South Africa.  Mr. Danner and Mr. Coletta both brought firearms with them and Air 2000 charged a fee of $160

---

[20]  As noted, plaintiffs have not sought to recover the trophy fees as to the undamaged Lion Trophy or the other trophies of the hunt.

for each.  Alex apparently did not bring a firearm from the United States and so incurred a lower fee of $130.  Plaintiffs seek to recover the two $160 charges.[21]   Again, the fees apparently were charged in U.S. dollars.

       *4.   "Guides and staff for 10 days (2 hunters)"*        *$  8,000.00*

Plaintiffs seek $8,000 as to this item, but it is not clear how this sum was calculated. According to Plaintiffs' Exhibit 8, at 3, which is a listing of Tam's "Daily Rates," Tam charged $400 per day for "1 client with professional hunter" and $275 per day for "2 clients with 1 professional hunter."   Handwritten notes on this page of the exhibit reflect that plaintiffs were charged for 10 days at the $400 rate (a subtotal of $4,000) as to Mr. Coletta, and 10 days at the $275 rate (a subtotal of $2,750) as to Mr. Danner and Alex (apparently the $275 daily fee was for both Mr. Danner and Alex together, and not for each, although it is not clear why a lower fee would be charged for two clients than for one).   In addition, the same exhibit page lists fees for "dipping, packing and shipping of trophies from the field to port of export" of $80 per "plains game trophy" and $200 for "big game."   Handwritten notations indicate that plaintiffs were charged $200 each for the three lions (a subtotal of $600) and $80 each for nine other animals (a subtotal of $720).   The handwritten notations further indicate that the total of these amounts was $8,070.  It is not clear whether the $8,000 sought by plaintiffs includes all of the foregoing items. If so, plaintiffs' damages calculation includes some double-counting because, as noted below, plaintiffs also seek separately to recover the $200 dipping and packing fee for each of the two damaged Lion Trophies.[22]

---

[21] It is unclear why the appropriate recoverable amount, if any, should not be the $160 charge for Mr. Coletta and the $130 charge for Alex.  However, in light of applicable limitations on the recoverability of damages, discussed *infra*, I need not resolve this small discrepancy.

[22] Recovery of the dipping and packing fees for the other items of game would not be appropriate, nor (under plaintiffs' damages theory) would recovery of the daily fees for the third

*5. Tips to guide, cook, maid, tracker (2 hunters)*     $ 6,600.00

No exhibit evidence was submitted in support of this item of damages.  Mr. Danner testified that he tipped Tam's skinning personnel $500 but did not otherwise testify as to the tips he paid.

*6. Dipping and packing (2 lions)*     $ 400.00

As discussed above, a $200 fee was incurred for dipping and packing of each lion.

*7. Atcheson Taxidermy*     $ 1,638.30

This amount is corroborated by Plaintiffs' Exhibit 13, which constitutes invoices of Atcheson Taxidermy, including invoices of other service providers who billed Atcheson and whose costs were passed on by Atcheson to plaintiffs.  The $1,638.30 that plaintiffs seek to recover includes $588 per damaged Lion Trophy for tanning only (a subtotal of $1,176); $240 for the services of Buzz Cook Taxidermy, the Seattle-based taxidermist that inspected the Cargo in Seattle upon its arrival from Vancouver; and $222.30 for the cost of shipping the Cargo from Cargolux in Seattle to Atcheson Taxidermy in Butte, Montana.  It does not include a charge of $6,150 (to which a 10% discount of $615 was applied), which is also reflected in Plaintiffs' Exhibit 13, for tanning, full taxidermy, and mounting of the undamaged Lion Trophy.

*8. Conway Freight*     $ 228.39

This amount represents the cost of shipment of the Cargo (including all trophies) from Atcheson Taxidermy to Wildlife Gallery.  See Plaintiffs' Exhibit 13 at 5.[23]

---

hunter.  However, because of applicable limitations to the amount of plaintiffs' recoverable damages, discussed *infra*, I need not resolve this ambiguity in the evidence as to damages.

[23] The Cargolux Defendants objected to this item of damages at trial, claiming that plaintiffs would have incurred these costs even if the Lion Trophies had not been damaged.  Due to other limitations on the recoverability of damages, discussed *infra*, this item of damages is not material to the amount of plaintiffs' recovery.

    *9.  Seattle Attorneys (Betts, Patterson & Mines)*        *$  3,988.45*

This item is supported by Plaintiffs' Exhibit 12, which consists of invoices of the Seattle law firm of Betts, Patterson & Mines.  Mr. Danner testified that he hired the law firm to "go after" Cargolux during the time that the Cargo was missing.[24]

    *10. Shipment by Cargolux*        *$  1,277.51*

As noted, this amount represents the dollar equivalent of Cargolux's shipping charges of ZAR 8529.50, as of the date that the Air Waybill was executed.

    **TOTAL:**        **$ 96,559.85**

Mr. Danner also testified to the personal importance of the hunt to him.  Mr. Danner is a lifelong hunter, and his son Alex is the only one of his children who has shown an interest in hunting.  He was proud of Alex's accomplishment in obtaining a Lion Trophy, and is disappointed that Alex and his son-in-law, Mr. Coletta, do not have their Lion Trophies to show for their achievement.  Moreover, plaintiffs scheduled the hunting trip before a shoulder surgery that Mr. Danner required.  He underwent that surgery in the Fall of 2007, after plaintiffs returned from South Africa.  Even if plaintiffs were to be awarded the cost of the trip, as they request, Mr. Danner testified that he will not be able to participate in a second lion hunt because, as a result of his surgery, he can no longer engage in a safari hunt.

Additional factual findings are included with my conclusions of law.

---

[24] The Cargolux Defendants contend that these attorneys' fees are not recoverable by plaintiffs because there is no applicable exception to the ordinary "American rule," by which each side is responsible for its own attorneys' fees, absent a fee-shifting contractual or statutory provision.  I am inclined to agree with the Cargolux Defendants.  But, in light of the limitations on recoverability of damages, discussed *infra*, I need not resolve this issue.

**Conclusions of Law**

A.  The Montreal Convention

Before addressing the parties' contentions, I pause to discuss the Montreal Convention and its applicability to this case.

The Montreal Convention is an international treaty regarding liability of air carriers, formally known as the Convention for the Unification of Certain Rules for International Carriage by Air. *See* S. Treaty Doc. 106-45 (2000). It was adopted by the International Civil Aviation Organization ("ICAO") of the United Nations at Montreal in 1999, and entered into force on November 4, 2003. The Montreal Convention was ratified by the United States on September 5, 2003, and by South Africa on November 22, 2006 (entering into force with respect to South Africa on January 21, 2007). *See* ICAO, List of Signatories to the Montreal Convention, *available at* http://www.icao.int/secretariat/legal/List%20of%20Parties/Mtl99_EN.pdf (last visited Jan. 4, 2013). The Montreal Convention applies, *inter alia*, to "international carriage of persons, baggage or cargo performed by aircraft for reward," where the place of departure and place of destination are both located in nations that are parties to the convention. Montreal Convention, Art. 1(1)-(2). As such, it applies to the carriage of the Cargo by Cargolux, because both the United States and South Africa were parties to the convention at all relevant times.

As noted, the Air Waybill refers to the Warsaw Convention, not the Montreal Convention. The Warsaw Convention (also known as the Convention for the Unification of Certain Rules Relating to International Transportation by Air, *see* 49 Stat. 3000, T. S. No. 876 (1934)), was the predecessor to the Montreal Convention. Article 55 of the Montreal Convention expressly preempts the Warsaw Convention. Thus, the Montreal Convention is "an entirely new treaty that unifies and replaces the system of liability that derives from the Warsaw Convention."

*Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 371 n.4 (2d Cir. 2004).   In their post-trial memoranda, the parties agree that, despite the reference to the Warsaw Convention in the Air Waybill, the Warsaw Convention has no application here.   *See* ECF 108 at 8-9; ECF 111 at 9 n.5. I concur with the parties' assessment, for the reasons that follow.

As a treaty ratified by the United States, the Montreal Convention is the "law of this land," under the Supremacy Clause, U.S. Const., Art. II, § 2.   *Zicherman v. Korean Air Lines Co., Ltd.*, 516 U.S. 217, 226 (1996) (construing Warsaw Convention).   The Montreal Convention provides: "Any clause contained in the contract of carriage and all special agreements entered into before the damage occurred by which the parties purport to infringe the rules laid down by this Convention, whether by deciding the law to be applied, or by altering the rules as to jurisdiction, shall be null and void."   Montreal Convention, Art. 49.   Moreover, it states: "In the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention . . . ."   *Id.*, Art. 29. Although the Montreal Convention allows a carrier to "stipulate that the contract of carriage shall be subject to higher limits of liability than those provided for in this Convention or to no limits of liability whatsoever," *id.*, Art. 25, the convention establishes a floor below which the parties may not contract: "Any provision tending to relieve the carrier of liability or to fix a lower limit that that which is laid down in this Convention shall be null and void . . . ."   *Id.*, Art. 26.

As discussed, the Air Waybill contains provisions limiting the carrier's liability "in carriage to which the Warsaw Convention does not apply."   The Warsaw Convention does not apply to the carriage at issue in this case because the Warsaw Convention has been superseded in both the United States and South Africa by the Montreal Convention.   Accordingly, by the Air

Waybill's own terms, the Air Waybill's limitations would apply to the carriage in this case. However, to the extent that the claims at issue are governed by the Montreal Convention, and the liability limits of the Montreal Convention exceed the limits imposed by the Air Waybill, the Montreal Convention's limits govern, despite the conflicting provisions of the Air Waybill, by virtue of the supremacy of the Montreal Convention.[25]

Under the Montreal Convention, a "carrier is liable for damage sustained in the event of the destruction or loss of, or damage to, cargo upon condition only that the event which caused the damage so sustained took place during the carriage by air." Montreal Convention, Art. 18(1). In essence, if the event that caused the damage took place during the "carriage by air," as defined in the Montreal Convention, the carrier is strictly liable for damage sustained, subject to certain enumerated affirmative defenses.[26] *See, e.g.*, *Bassam v. Am. Airlines*, 287 F. App'x 309, 312-13 (5th Cir. 2008); *Knowlton v. Am. Airlines, Inc.*, Civ. No. RDB-06-854, 2007 WL 273794, at *2 (D. Md. Jan. 31, 2007). Moreover, Article 19 of the Montreal Convention states that a "carrier is liable for damage occasioned by delay in the carriage by air of . . . cargo," subject to affirmative defenses that are not at issue here. However, the Montreal Convention imposes limits on the amount of the carrier's liability, as discussed, *infra*.

The parties disagree as to whether the "event which caused the damage" to plaintiffs' Cargo occurred "during the carriage by air," within the meaning of the Montreal Convention, and thus they disagree as to whether the liability limits of the Montreal Convention apply. Further, if the Montreal Convention does not apply, the parties also disagree as to whether provisions of the

---

[25] As noted, the parties also agreed that the Warsaw Convention has no application here, despite the Air Waybill's reference to it.

[26] The carrier may demonstrate that it is not liable because the damage stemmed from certain enumerated causes, such as inherent defect, act of war, or the negligence or wrongful act of the plaintiff; however, the carrier bears the burden of proof as to these affirmative defenses. *See* Montreal Convention, Art. 18(2) & Art. 20. The affirmative defenses are not at issue here.

Air Waybill that also purport to limit the Cargolux Defendants' liability are applicable or enforceable against plaintiffs.

<u>B.  Liability and Limitation of Recoverable Damages</u>

I am amply persuaded that the Cargolux Defendants are liable for the loss of plaintiffs' Cargo, but I reject plaintiffs' damages claim.  My rationale follows.

The Cargolux Defendants argue that plaintiffs had the burden to prove that the Cargo was delivered to Cargolux in good condition, and that plaintiffs have failed to meet their burden.   As the Cargolux Defendants see it, the Court would be required to indulge in speculation in order to conclude that the Cargo was not damaged in South Africa before it was received by Cargolux.

In support of their position, the Cargolux Defendants challenge the statement in the Air Waybill that the Cargo was "accepted in apparent good order and condition." They also dispute the expert testimony of Mr. Peters, to the effect that the exposure of the Cargo to moisture most likely occurred within three to five months before the Cargo was received at the Wildlife Gallery.

With respect to the statement in the Air Waybill that the Cargo was accepted in "apparent" good condition, the Cargolux Defendants cite copious case law to the effect that such a statement does not establish that cargo was undamaged when received by a carrier, in the absence of evidence that the cargo was actually open to inspection by the carrier.  *See* ECF 111 at 2-3.  Although the case law cited by the Cargolux Defendants appears sound, I need not analyze it in detail; even assuming that the statement regarding the "apparent" good condition of the Cargo is not dispositive of its condition at the time Cargolux accepted it, I am persuaded by Mr. Peters's expert testimony that the Cargo could not have been damaged as of that time.

Both at trial and in their post-trial briefing, the Cargolux Defendants argued that Mr. Peters's testimony as to when the exposure to moisture and bacteria likely began is improper expert testimony under Rule 702 of the Federal Rules of Evidence, and thus cannot bear any evidentiary weight. I reject that argument. Instead, I find Mr. Peters a thoroughly persuasive and knowledgeable witness, and I credit his testimony in its entirety.

Under Rule 702 of the Federal Rules of Evidence, an expert's testimony is admissible so long as (1) "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," (2) the witness is "qualified as an expert by knowledge, skill, experience, training, or education," (3) "the testimony is based upon sufficient facts or data," (4) "the testimony is the product of reliable principles and methods," and (5) "the witness has applied the principles and methods reliably to the facts of the case." *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) (holding that under Rule 702 "the trial judge must ensure that any and all [expert] testimony admitted is not only relevant, but reliable").

The Advisory Committee Notes to Rule 702 confirm that formal scientific or academic training and methodology is not a necessary predicate to testimony as an expert. Rather, experience alone, or in conjunction with "other knowledge, skill, training or education," can provide a sufficient foundation for expert testimony. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). However, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, Advisory Cmte. Notes;

*see Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 345 n.9 (D. Md. 2011). A court need not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen'l Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *accord Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 421 (4th Cir. 1993) ("[W]e are unprepared to agree that 'it is so if an expert says it is so.'") (citation omitted). Similarly, a court may exercise its "discretion to find that there is simply too great an analytical gap between the data and the opinion proffered." *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 454 n.4 (4th Cir. 2010).

Preliminarily, I observe that the foregoing principles are matters of evidentiary admissibility. The Cargolux Defendants did not seek a preliminary ruling as to the admissibility of Mr. Peters's opinion testimony by means of a *Daubert* or Rule 702 hearing. They did not object to the qualification of Mr. Peters as an expert, nor do my notes reflect that they objected to his testimony on this basis when it was offered. Rather, they raised their arguments against Mr. Peters's testimony in a motion for judgment at the close of plaintiffs' case, and reiterated their arguments in their post-trial memorandum, *see* ECF 111, after Mr. Peters's testimony had already been received in evidence. To the extent that the Cargolux Defendants' arguments pertain to the admissibility of Mr. Peters's testimony, rather than its sufficiency or weight, their arguments are waived by failure to interpose a timely objection. *See* Fed. R. Evid. 103(a)(1).

Even if the issue were preserved, I see no merit in the argument, whether as to admissibility, sufficiency, or weight of the evidence. To be sure, as to expert testimony, "'admissibility does not imply utility.'" *Weigel v. Target Stores*, 122 F.3d 461, 469 (7th Cir. 1997). As the fact finder, I would be free to discount Mr. Peters's testimony if I did not find it probative. The Cargolux Defendants attempted to challenge Mr. Peters's testimony through cross-examination. They were also free to offer competing testimony of their own expert, but

they chose not to do so.  Mr. Peters explained, to the Court's full satisfaction, the basis for his opinion that the damage to the Lion Trophies could not have occurred before shipment from South Africa.  His testimony was not *ipse dixit*; rather, he explained that his conclusion was based on the degree of damage, the location of the damage, and the color of the damaged areas, and his opinion was founded on his extensive experience in all facets of the tanning industry. The Cargolux Defendants offered no evidence to dispute Mr. Peters's conclusions, and I find his unrebutted testimony entirely credible.  Accordingly, I find as a fact that the damage to the Lion Trophies was caused by exposure to moisture and bacteria and that the exposure did not occur before Cargolux took receipt of the Cargo for shipment in South Africa.

The Cargolux Defendants next argue that, if the Cargo was delivered to Cargolux in undamaged condition, the Court must conclude that they delivered it to Even-Rock, still undamaged.  For this proposition, they rely on a provision of the Montreal Convention and an allegation in plaintiffs' Amended Complaint.  Article 31 of the Montreal Convention states: "Receipt by the person entitled to delivery of checked baggage or cargo without complaint is *prima facie* evidence that the same has been delivered in good condition and in accordance with the document of carriage . . . ."  Montreal Convention, Art. 31(1).  Seizing on this provision, the Cargolux Defendants argue that the signing of the warehouse receipt by Kim Keep constitutes *prima facie* evidence, which plaintiffs must rebut, that Even-Rock received the Cargo.  The Cargolux Defendants also observe that plaintiffs alleged in their Amended Complaint (ECF 6) (which is the operative pleading) that Even-Rock "signed for the release of the Two Crates from Cargolux's warehouse via CAS."  Amended Complaint ¶ 13.  According to the Cargolux Defendants, this allegation constitutes a judicial admission that is binding on plaintiffs and absolves the Cargolux Defendants of liability.

As I see it, neither Article 31 of the Montreal Convention nor Paragraph 13 of plaintiffs'
Amended Complaint can bear the weight the Cargolux Defendants place on it.  As to Article 31,
the first paragraph of that provision, quoted above, establishes a rebuttable presumption of
delivery of cargo in good condition upon "receipt by the person entitled to delivery of checked
baggage or cargo *without complaint*."  Montreal Convention, Art. 31(1) (emphasis added).  The
remaining paragraphs of Article 31 pertain to requirements of timing and form for the
submission of complaints regarding loss or damage of baggage or cargo, *see id.*, Art. 31(2)-(4),
and Article 31 as a whole is entitled "Timely Notice of Complaints."  As indicated, Mr. Danner
submitted a written complaint to the Cargolux Defendants regarding the loss of the Cargo, and
the Cargolux Defendants have not argued that his complaint was time-barred under Article 31.[27]
Therefore, as I see it, Mr. Keep's purported acceptance of the Cargo, without the notation of
damage at that time, does not give rise to the evidentiary presumption established by Article
31.[28]

Even if the presumption of delivery in good condition did arise, the presumption is
rebuttable.  I would find it rebutted in this case, because the Cargo was ultimately recovered
months later, in damaged condition, in a warehouse without air conditioning that was operated
by an agent of Cargolux, in a country in which Even-Rock does not operate.

---

[27] A complaint for damage to cargo must be delivered within 14 days after receipt of the
cargo, and a complaint for delay must be made "within twenty-one days from the date on which
the . . . cargo ha[s] been placed at [the] disposal" of the person entitled to receipt.  Montreal
Convention, Art. 31(2).  Mr. Danner's notice was transmitted well before the Cargo was
recovered from Vancouver and placed at plaintiffs' disposal in September 2008.  Again, the
Cargolux Defendants have not argued that plaintiffs' claim was untimely.

[28] The Court also observes that the Cargolux Defendants' reliance on Mr. Keep's
purported acceptance of the Cargo, without notation of damage, is in some tension with their
insistence that Cargolux's acceptance of the Cargo, without notation of damage, fails to establish
the condition of the Cargo when Cargolux received it.

With respect to plaintiffs' allegation in Paragraph 13 of their Amended Complaint that Even-Rock signed for release of the Cargo, the Cargolux Defendants take that allegation out of context. In the very next paragraph of the Amended Complaint, plaintiffs alleged that Even-Rock "never loaded or took possession of the Two Crates on November 30, 2007," Amended Complaint ¶ 14, and in the following paragraph, plaintiffs contended, "[u]pon information and belief" that the Cargo was not released by the Department of Agriculture until December 26, 2007. *Id.* ¶ 15. It is simply not credible for the Cargolux Defendants to claim that they relied on Paragraph 13 of the Amended Complaint or are prejudiced by plaintiff's argument at trial that Even-Rock did not, in fact, take receipt of the Cargo. Even if such an interpretation of Paragraph 13 were not belied by the following two paragraphs of the Amended Complaint (and it is), it has been clear since at least Judge Bennett's ruling on the Cargolux Defendants' motion to dismiss, *see* ECF 42, that there is an intense dispute as to whether, in fact, the Cargo was actually picked up by Even-Rock. In sum, neither Article 31 of the Montreal Convention nor Paragraph 13 of plaintiffs' Amended Complaint precludes a determination that the event that caused the damage to the Cargo took place during the period of "carriage by air" by Cargolux or at a time when the Cargo was otherwise in the charge of Cargolux or its agent.

As noted, the Montreal Convention imposes strict liability for damage to or loss of cargo, "upon condition only that the event which caused the damage so sustained took place during the carriage by air." Montreal Convention, Art. 18(1). The term "carriage by air" is elucidated in the Montreal Convention. It "comprises the period during which the cargo is in the charge of the carrier." *Id.*, Art. 18(3). However, this definition is qualified by Article 18(4) of the Convention, which states:

> The period of the carriage by air does not extend to any carriage by land, by sea or by inland waterway performed outside an airport. If, however, such

carriage takes place in the performance of a contract for carriage by air, for the purpose of loading, delivery or transhipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the carriage by air.  If a carrier, without the consent of the consignor, substitutes carriage by another mode of transport for the whole or part of a carriage intended by the agreement between the parties to be carriage by air, such carriage by another mode of transport is deemed to be within the period of carriage by air.

Although the Montreal Convention imposes strict liability for damage to cargo that occurs during "carriage by air," it also contains provisions that limit the amount of a carrier's liability.  In particular, Article 22(3) of the Montreal Convention provides:

In the carriage of cargo, the liability of the carrier in the case of destruction, loss, damage or delay is limited to a sum of [19] Special Drawing Rights per kilogramme, unless the consignor has made, at the time when the package was handed over to the carrier, a special declaration of interest in delivery at destination and has paid a supplementary sum if the case so requires. In that case the carrier will be liable to pay a sum not exceeding the declared sum, unless it proves that the sum is greater than the consignor's actual interest in delivery at destination.

The Special Drawing Right ("SDR") is a "defined basket of major currencies periodically reviewed by the International Monetary Fund to reflect the relative importance of the constitutent currencies."  74 Fed. Reg. 59017, 59017 n.2 (Nov. 16. 2009).  The International Monetary Fund publishes daily conversion rates between the U.S. dollar and the SDR at http://www.imf.org/ external/np/fin/data/rms_sdrv.aspx. Defendants' Exhibit 7 is a printout of this webpage as of September 27, 2012.  On that date, the value of the SDR was approximately $1.54.

As ratified, Article 22(3) of the Montreal Convention established a default liability limit of 17 SDRs per kilogram of cargo.  However, pursuant to provisions set forth in Article 24 for periodic review of the liability limit, the limit was subsequently increased to 19 SDRs per kilogram.  *See* 74 Fed. Reg. 59017 (Nov. 16, 2009).

Under Article 23(1) of the Montreal Convention, "[c]onversion of [SDR] sums into national currencies shall, in case of judicial proceedings, be made according to the value of such

- 30 -

currencies in terms of the [SDR] at the date of the judgement."  As of today's date, the SDR is

equivalent to $1.52489.  *See* International Monetary Fund, SDR Valuation, *available at* http://

www.imf.org/external/np/fin/data/rms_sdrv.aspx (last visited Jan. 4, 2013).  Thus, on the basis of

the current dollar value of the SDR, the amount of 19 SDRs per kilogram for a Cargo weighing

114 kilograms is equivalent to $3,302.91.[29]

Assuming that the Montreal Convention applies, the Cargolux Defendants' liability is

limited to a maximum of $3,302.91.  To avoid the Montreal Convention's liability limit,

plaintiffs argue that the event that caused the damage to the Cargo did not occur during the

"carriage by air," thus taking this case outside the ambit of the Montreal Convention.  But, to the

extent that the Montreal Convention does not apply, the contractual provisions of the Air

Waybill would govern, and they also limit the amount of the carrier's liability.  As noted, the Air

Waybill declares that "the carrier shall be liable for the goods during the period they are in its

charge or the charge of its agent," but provides that the "carrier's liability shall not exceed USD

20.00 or the equivalent per kilogram of goods lost, damaged or delayed, unless a higher value is

declared by the shipper and a supplementary charge paid."  Plaintiffs did not make a special

declaration of the Cargo's value, so as to increase the limit of liability under either the Montreal

Convention or the Air Waybill.  At the $20 per kilogram rate specified in the Air Waybill, the

---

[29] Following trial, in an Order dated October 4, 2012 (ECF 107), I stated that, absent objection by one of the parties, the Court proposed to take judicial notice of the value of the SDR as of the date of judgment in this case by referring to the website of the International Monetary Fund.  Neither side objected to this proposal.

Although plaintiffs dispute applicability of the Montreal Convention for the purpose of damages, neither side objected to the Court's proposal to use 114 kilograms as the basis for calculation of Montreal Convention liability, as it was the full weight of the Cargo listed on the Air Waybill.  Only the contents of one of the two containers that comprised the Cargo were damaged, but the individual weight of each container was not listed on the Air Waybill.  In any event, both containers were substantially delayed.

limit of the Cargolux Defendants' liability is a maximum of $2,280, about $1,100 dollars less than the limit under the Montreal Convention.

Therefore, plaintiffs also seek to avoid the contractual limitation of liability under the Air Waybill as well, arguing that the contractual provisions do not apply. They contend that the Air Waybill constitutes an unenforceable contract of adhesion, and that the transportation of the Cargo to Vancouver was not contemplated by the Air Waybill and so the Air Waybill cannot apply to such transportation. *See* ECF 108 at 9-10. These arguments are unavailing.

As I observed in my summary judgment ruling, a substantial body of case law recognizes a federal common law cause of action against an air carrier for loss of or damage to cargo. *See Danner*, 855 F. Supp. 2d at 465-67. The same body of case law also recognizes, as an integral component of a carrier's common law liability, the so-called "released valuation doctrine." This doctrine is well summarized in *Deiro v. American Airlines, Inc.*, 816 F.2d 1360, 1365 (9th Cir. 1987) (internal citations omitted):

> As a general rule, under the federal common law governing common carriers, carriers may partially limit their liability for injury, loss, or destruction of baggage on a "released valuation" basis. Under this doctrine, in exchange for a low carriage rate, the passenger-shipper is deemed to have released the carrier from liability beyond a stated amount. The carrier can lawfully limit recovery to an amount less than the actual loss sustained only if it grants its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge. Therefore, the shipper is bound only if he has reasonable notice of the rate structure and is given a fair opportunity to pay the higher rate in order to obtain greater protection.

*Accord Treiber & Straub, Inc. v. U.P.S., Inc.*, 474 F.3d 379, 385-86 (7th Cir. 2007); *Nippon Fire & Marine Ins. Co. v. Skyway Freight Sys., Inc.*, 235 F.3d 53, 59-60 (2d Cir. 2000); *Read-Rite Corp. v. Burlington Air Express, Ltd.*, 186 F.3d 1190, 1198 (9th Cir. 1999); *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 930 (5th Cir. 1997); *First Pa. Bank, N.A. v. Eastern Airlines, Inc.*, 731 F.2d 1113, 1115-19 (3d Cir. 1984).

Under the released valuation doctrine, "[l]imited liability provisions are *prima facie* valid if the face of the contract (or, in this case, air waybill) recites the liability limitation and 'the means to avoid it.'  The burden then shifts to the shipper to prove that it did not have a 'fair opportunity' to purchase greater liability coverage." *Read-Rite*, 186 F.3d at 1198 (internal citations omitted).  There is no indication from the evidence before me that Cargolux's Air Waybill did not comply with the requirements of the released valuation doctrine.  The front of the Air Waybill states, in prominent, capitalized letters: "THE SHIPPER'S ATTENTION IS DRAWN TO THE NOTICE CONCERNING CARRIER'S LIMITATION OF LIABILITY. Shipper may increase such limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required."  The conditions of carriage on the reverse of the Air Waybill fully spelled out the dollar-amount limitations of liability.  Thus, the burden shifts to the plaintiffs to prove that they did not have a fair opportunity to purchase greater coverage.  *See Read-Rite*, 186 F.3d at 1198.  Plaintiffs have advanced no such evidence.

To be sure, plaintiffs were not present when the Air Waybill was executed.  Rather, it was executed on their behalf by Rex.  It is clear that Rex was their agent.  And, it is hornbook law that "an agent may bind a principal to a contract pursuant to actual or apparent authority." *APG, Inc. v. MCI Telecommunications Corp.*, 436 F.3d 294, 301 (1st Cir. 2006).  Moreover, even if Rex did not fully review the Air Waybill or communicate its provisions to plaintiffs, it does not make the Air Waybill non-binding; as the Seventh Circuit explained in the context of the released valuation doctrine, "'[f]ailure of the plaintiff to read the matter plainly placed before it cannot overcome the presumption that the plaintiff assented to the terms of the carrier.'  This is basic contract law: one cannot accept a contract and then renege based on one's own failure to read it." *Treiber & Straub*, 474 F.3d at 385 (citation omitted).  *Cf. Sass v. Andrew*, 152 Md.

- 33 -

App. 406, 440, 832 A.2d 247, 266-67 (2003) (stating, under Maryland law, that "ordinarily, 'a person who executes a document is legally obligated to read it before executing it,'" and "'[o]ne is under a duty to learn the contents of a contract before signing it; if, in the absence of fraud, duress, undue influence, and the like he fails to do so, he is presumed to know the contents'") (internal citations and some quotation marks omitted).

Perhaps most salient in this regard is the fact that, at Mr. Danner's instruction, Rex purchased a separate policy of insurance for the Cargo (albeit in an amount that turned out to be inadequate). In *Read-Rite*, the Ninth Circuit cogently explained the significance of a shipper's purchase of separate insurance in the context of the released valuation doctrine:

> The function of the federal common law rule requiring notice of limited liability is to ensure that the shipper has an opportunity to make an informed choice between, on the one hand, shipping at a lower cost with limited liability, and, on the other, separately purchasing insurance or shipping at a higher cost without limited liability. Under the federal common law . . . , the function served by notice of limited liability is accomplished if the shipper in fact purchases separate insurance, whether or not such notice is actually given. The decision to insure separately "in and of itself demonstrates . . . a conscious decision not to opt out of the liability limitation." The separate purchase of insurance simply cannot be reconciled with a contention that the shipper has been disadvantaged by a lost opportunity to pay the carrier more money in return for greater coverage. As we explained in [an earlier case], "[w]hy would [the shipper] increase its costs by insuring the same cargo twice?"

*Read-Rite*, 186 F.3d at 1198-99 (internal citations and footnote omitted).

Accordingly, there is no basis to conclude that the limitation of liability contained in the Air Waybill is not valid and binding against plaintiffs.

Moreover, I also reject plaintiffs' argument that the liability limitations do not apply because the damage to the Cargo occurred outside of the anticipated scope of carriage under the Air Waybill. The plain terms of the Air Waybill state that it applies "during the period [the cargo is] in [the] charge [of the carrier] or the charge of its agent." There is no suggestion that

the liability limitations of the Air Waybill do not apply to damage occasioned by unanticipated misplacement or errors in connection with the shipment of cargo.  Indeed, a carrier and shipper never contract with the expectation that cargo will be lost, damaged, or destroyed; the entire purpose of such liability limitations is to provide for situations in which such unanticipated and unfortunate events arise.

In sum, both the Montreal Convention and the Air Waybill contemplate limitations on the liability of the carrier and its agents, but impose strict liability within those limits.  The strict liability provisions suggest that a finding of negligence on the part of the Cargolux Defendants is unnecessary; however, to the extent that negligence is a factor, I have little difficulty concluding that the negligence of Cargolux, CAS, or both, was a cognizable cause of the loss of the Cargo.

To be sure, Mr. Keep signed for the Cargo, and Ms. Alvarado of CAS believed that Mr. Keep was an employee of Even-Rock.  Moreover, it was her opinion that Freight Link could not have mistakenly picked up the Cargo from Cargolux's warehouse because they ordinarily arrived at the warehouse at a later time in the evening.  She also observed that CAS and Cargolux had no record of any complaints from another party missing cargo during the same time period, which might suggest that cargo was switched.

I do not doubt the veracity of any of the witnesses, and it is possible to draw logical inferences in favor of the Cargolux Defendants from the foregoing facts.  However, as the fact-finder, I find other facts, pointing toward opposite inferences, more convincing.  It is undisputed that Even-Rock does not operate in Canada.  I cannot accept that it is pure coincidence that the Cargo was ultimately recovered in Vancouver, Canada, in a warehouse operated by an agent of Cargolux, to which Cargolux ships cargo on virtually a daily basis.  It is also noteworthy that, if the Cargo was placed on the wrong truck, only a CAS employee could have done so; Ms.

Alvarado and Mr. Chinn testified that drivers who take receipt of cargo do not handle the cargo. Neither of the defense witnesses was present when the Cargo was purportedly picked up by Mr. Keep, and so they cannot testify to what actually occurred.  Finally, Cargolux and CAS both failed to place an alert regarding the missing Cargo into the E-Champ system, which could have enabled the missing Cargo to be located before it was damaged.  I am persuaded, by a preponderance of the evidence, that the Cargolux Defendants are at fault for the loss of the Cargo.

Accordingly, the only remaining question with respect to the limits of the Cargolux Defendants' liability is whether it is the Montreal Convention's liability limit that applies or, instead, the limit of the Air Waybill.  This question turns on whether the event that caused the loss of the Cargo occurred during the "carriage by air."  As noted, Article 18 of the Montreal Convention provides that the period of carriage by air includes the period during which the cargo is in the charge of the carrier, and establishes a rebuttable presumption that any damage that occurs during carriage by land outside of an airport in the performance of a contract for carriage by air is caused by an event that occurred during the carriage by air.  As I see it, that presumption has not been rebutted in this case.  Accordingly, I find that the Cargolux Defendants are liable to plaintiffs for the loss of the Cargo, but that the amount of their liability is limited, pursuant to the Montreal Convention, to a maximum of $3,302.91.

## C.  Measure of Damages

Although the Cargolux Defendants' liability is capped at $3,302.91, consideration of the amount of plaintiffs' actual damages is still necessary, because plaintiffs are only entitled to recover the amount of their actual damages, up to the maximum limit.  In other words, if the amount of plaintiffs' actual damages fell below the limit of liability, plaintiffs would only be able

to recover their actual damages.  *See* Montreal Convention, Art. 29 (providing that punitive, exemplary, or other non-compensatory damages are not recoverable against a carrier for loss of or damage to cargo).

The parties have vigorously disputed the appropriate measure of damages.  Plaintiffs characterize the damages they seek as replacement costs for the two damaged Lion Trophies, which in their view includes the cost of another safari to replace personally the two Lion Trophies.  The Cargolux Defendants counter that the damages plaintiffs demand, including virtually all costs associated with the hunting trip for two hunters, would more accurately be described as "event reenactment" damages.  According to the Cargolux Defendants, every court to have considered such a damages measure has rejected it.  *See* ECF 87 at 12-13 (citing cases).

As I explained at the summary judgment stage, *see Danner*, 855 F. Supp. 2d at 473-74, appropriate valuation of items of idiosyncratic value, such as the Lion Trophies, has long presented a difficult question for the legal system.  In this case, however, the applicable limitations of liability obviate the need for the Court to resolve the thorny issue of the true value of plaintiffs' damages.  It is enough to conclude, as I do, that regardless of the measure of damages, plaintiffs' actual damages exceed the limits of the Cargolux Defendants' liability.

Assuming that a replacement cost measure of damages is appropriate, even if none of the other items of damages plaintiffs seek are proper items of replacement cost, I am persuaded that the trophy fee for each animal, which is incurred upon shooting a lion, is properly included in an evaluation of the replacement cost of a lion trophy.  Plaintiffs paid $70,000 in trophy fees for the two damaged Lion Trophies ($35,000 for each), easily exceeding the liability limits under the Montreal Convention or the Air Waybill.

On the other hand, if market value is the more appropriate measure of damages than replacement cost, I am also convinced that the market value of the undamaged Lion Trophies would have exceeded the liability limits.  To be sure, plaintiffs did not present direct evidence of the Lion Trophies' market value.  However, given that their replacement cost is at least an order of magnitude higher than the liability limits, this tends to suggest that the market value would also exceed the limits of liability.  Likewise, the costs of tanning and taxidermy of the Lion Trophies (over $1,600 for full tanning and taxidermy of the undamaged trophy) are suggestive of a substantially higher market value.  It is also salient that plaintiffs obtained insurance of the Cargo worth in excess of $47,000, which was apparently paid by the insurer without complaint upon the loss of the Cargo.  Even if an insufficient amount of insurance was mistakenly purchased for the Cargo, as plaintiffs contend, the insurance valuation remains relevant evidence of market value.  *See, e.g.*, *United States v. Davis*, 799 F.2d 1490, 1493 (11th Cir. 1986) (stating that "evidence of valuation for insurance purposes may in itself constitute sufficient evidence from which the jury might reasonably infer a value").  Moreover, in an effort to demonstrate that the Lion Trophies had at least some market value, the Cargolux Defendants submitted a printout of a listing for sale of a female lion skin rug at an asking price of $2,500.  *See* ECF 98-1.  If each of the two Lion Trophies had a market value of only $2,500, their combined market value would also exceed the limits of the Cargolux Defendants' liability.[30]

In sum, although the evidence submitted was not sufficient to establish a precise market value for the Lion Trophies, it was sufficient to establish circumstantially, by the standard of

---

[30] Notably, the trophy in the Cargolux Defendants' exhibit is a female lion, unlike plaintiffs' full-maned male Lion Trophies, and apparently was shot in 1975, and thus may have depreciated considerably.  Moreover, although the trophy in the Cargolux Defendants' exhibit was improved by tanning and taxidermy, it is not fully mounted; rather, it was prepared as a rug.  These factors suggest that, if anything, the sum of $2,500 for each would underestimate the market value of plaintiffs' Lion Trophies.

preponderance of the evidence, that the market value of the Lion Trophies exceeded the Cargolux Defendants' limits of liability.  In the context of this case, no further analysis of value is necessary.

### D.  Collateral Source Rule

At the summary judgment stage, I determined that the Cargolux Defendants were not entitled to an offset of their liability by the sum of approximately $47,000 in insurance proceeds that plaintiffs received due to the loss of the Cargo.  In so holding, I relied on the federal common law collateral source rule.  *See Danner*, 855 F. Supp. 2d at 475-76.  The collateral source rule "is this: when the victim of a tort receives payment for his injuries from a collateral source, that is, a source independent of the tortfeasor, the payment should not be deducted from the damages owed by the tortfeasor."  *Ward v. Allied Van Lines, Inc.*, 231 F.3d 135, 13 (4th Cir. 2000).

In their post-trial memoranda, the Cargolux Defendants renewed their argument for an offset of damages, reasoning that their liability here is not "tort" liability, as such, and so the collateral source rule should not apply.  They note that in *Ward* the Fourth Circuit rejected application of the collateral source rule against a common carrier of cargo.

In that case, Allied Van Lines ("Allied"), a common carrier, was transporting the plaintiffs' household goods when Allied's van was struck by a train operated by Norfolk Southern Railway Company ("Norfolk Southern"), destroying the plaintiffs' belongings.  *See id.* at 137.  The plaintiffs sued Norfolk Southern for negligence and sued Allied under the federal Carmack Amendment, which imposes strict liability on interstate motor carriers for cargo damage, akin to the Montreal Convention.  *See id.*  Norfolk Southern settled with the plaintiffs for $40,000, and the claim against Allied was litigated to judgment in the amount of $207,000.

*See id.* at 138.  The Fourth Circuit held that Allied was entitled to a setoff from its liability in the amount of the $40,000 settlement with Norfolk Southern, notwithstanding the collateral source rule.  *See id.* at 138-41.  The Court reasoned that the strict liability regime of the Carmack Amendment renders carriers "essentially insurers of the goods they transport" and, as such, the "carriers should have the benefit of the rights of subrogation and reimbursement that apply to insurers at common law."  *Id.* at 140.

However, *Ward* does not indicate that the collateral source rule should not apply in this case.  As the *Ward* Court recognized, "Norfolk Southern was not a collateral source; it was a tortfeasor."  *Id.* at 139.  As noted, the collateral source rule concerns payments from sources that are independent of the tortfeasor; ordinarily, payments "from alleged joint tortfeasors do not qualify as collateral sources."  *Vercon Const., Inc. v. Highland Mortg. Co.*, Civ. No. 3:03-1270-JFA, 2005 WL 6158875, at *2 n.2 (D.S.C. July 21, 2005).  On that basis, the *Ward* Court expressly distinguished another Carmack Amendment case, *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103 (1st Cir. 1978), in which the collateral source rule was applied.

In *Anton*, the plaintiff whose cargo was destroyed in transit was an Air Force colonel, and he had received what was in essence a payment of insurance proceeds from the Air Force, covering part of the value of his destroyed property.  *See Ward*, 231 F.3d at 139 (discussing *Anton*).  The *Anton* Court held "that the collateral source rule prevented the carrier from reducing its liability by deducting what was, in effect, an insurance payment to the victim."  *Id.* (discussing *Anton*).  The *Ward* Court reasoned that *Anton* was inapplicable to the case before it "because the railroad's $40,000 payment to [the plaintiffs] was not akin to an insurance benefit."  *Id.*  Here, as in *Anton*, the payment at issue is an insurance benefit, and so the collateral source rule is fully applicable.  *See also Custom Rubber Corp. v. ATS Specialized, Inc.*, 633 F. Supp. 2d

- 40 -

495 (N.D. Ohio 2009) (holding that plaintiff was bound by limitation of liability in carrier's bill of lading, but that collateral source rule barred setoff of carrier's liability on the basis of plaintiff's receipt of insurance proceeds).

In sum, the collateral source rule applies, and the Cargolux Defendants are not entitled to an offset of their liability. This conclusion is in full accord with the policy concerns underlying the collateral source rule. In this case, plaintiffs purchased insurance for the Cargo through a contract with their insurer, by which the insurer agreed to pay plaintiffs a fixed amount if the Cargo was lost. Plaintiffs paid valuable consideration for this contract with their insurer, in the form of the premium they paid for the insurance policy. The Cargolux Defendants were not a party to the insurance contract and paid no portion of the premium. There is no reason that they should be the gratuitous beneficiaries of an insurance benefit purchased with plaintiffs' premiums, thereby receiving a windfall reduction in the amount of their liability.

### Conclusion

For the foregoing reasons, plaintiffs are entitled to judgment in their favor in the amount of $3,302.91. An appropriate Order follows.


Date:   January 4, 2013                          _____/s/_____

                                                 Ellen Lipton Hollander
                                                 United States District Judge